# EXHIBIT 2

NORTH CAROLINA

WAKE COUNTY

FILED

2023 JAN 30 P 3: 35

WAKE CO. C.S.C.

BY_____

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

23 CVS _____

SVB FINANCIAL GROUP and SILICON
VALLEY BANK,

        Plaintiffs,

        v.

FEDERAL INSURANCE COMPANY and
BERKLEY REGIONAL INSURANCE
COMPANY,

        Defendants.

**COMPLAINT FOR BREACH OF
CONTRACT AND DECLARATORY RELIEF**

**DEMAND FOR JURY TRIAL**

## COMPLAINT

Plaintiffs SVB Financial Group and Silicon Valley Bank ("SVB" and, collectively with SVB Financial Group, "Plaintiffs") hereby allege, by and for their complaint against Defendants Federal Insurance Company ("Chubb") and Berkley Regional Insurance Company ("Berkley," and collectively with Chubb, "Insurers"), as follows:

## INTRODUCTION

1. This insurance coverage dispute arises from a fraudulent scheme perpetrated by Elliot Smerling ("Smerling") involving forged documents. In reliance on forged documents provided by Smerling, SVB issued a $150 million line of credit to Smerling's private equity fund, JES Global Capital III, L.P. (the "JES Fund").

2. Smerling held himself out to be the founder of the JES Fund and its general partner, JES Global Capital GP III, LLC (the "JES General Partner"). In December 2020, Smerling, a Florida resident, contacted SVB to discuss opening the line of credit. This inquiry was passed along to an employee in SVB's Raleigh office (the "Raleigh Employee").

3. In the weeks that followed, SVB, led by the Raleigh Employee, conducted diligence regarding Smerling's request for a line of credit. Smerling and the JES General Partner represented

to SVB that the JES Fund was a legitimate private equity fund that had $500 million in capital commitments from prominent limited partners (the "Limited Partners"), including the endowment for the University of Miami, and that the JES Fund already had invested nearly $100 million in three portfolio companies. Smerling provided original documents, including signed subscription agreements (the "Subscription Agreements") that were purportedly executed by each of the Limited Partners in the JES Fund. Unbeknownst to SVB at that time, the signatures were forged.

4. SVB entered into a Loan and Security Agreement (the "Loan Agreement") with the JES Fund and JES General Partner, effective February 3, 2021, for the $150 million line of credit. Smerling and the JES Fund immediately made a request, which was sent to the Raleigh Employee, to draw down approximately $95 million from the line of credit. SVB wired the $95 million sum to an account that Smerling and the JES Fund and the JES General Partner (collectively, the "JES Entities") advised was associated with the JES Fund.

5. Subsequently, while conducting post-closing diligence, SVB requested additional information from the JES Entities. However, the JES Entities refused to provide the requested information.

6. Thereafter, SVB discovered that Smerling had provided forged documents.

7. On February 26, 2021, SVB sent the JES Entities a notice declaring an Event of Default under the Loan Agreement based on their provision of forged documents and falsified information, and demanding immediate repayment of the amounts drawn down under the Loan Agreement.

8. Also on February 26, 2021, Smerling was arrested in Florida by agents of the Federal Bureau of Investigation ("FBI") and charged with federal crimes in connection with the SVB loan, in a criminal complaint filed by the United States Attorney for the Southern District of New York. Smerling later pled guilty to certain charges. During the plea hearing, in his plea allocution, Smerling admitted that:

I'm guilty of committing bank fraud and securities fraud. . . . **I forged signatures of purported investors** and created fake documents in support of those [loan] applications. I did this to induce the banks to loan me those funds.

Transcript of Feb. 8, 2022 Proceedings at 14:18-23, *U.S. v. Smerling*, U.S. District Court for the Southern District of New York, Case No. 21-CR-317. Smerling has been sentenced to a prison term of 97 months.

9.     While SVB has recouped a portion of the loan amount, Plaintiffs' losses currently stand at approximately $73 million, as well as additional interest, charges, fees and other obligations owing under the Loan Agreement, and additional damages.

10.     Plaintiffs are insureds under Financial Institution Bond insurance policies issued by Chubb and Berkley that cover losses resulting from "Forgery or Alteration" and "Extended Forgery." Financial Institution Bonds are often referred to as crime insurance policies. Plaintiffs' losses from Smerling's forgery scheme are covered under the policies.

11.     Plaintiffs promptly provided notice of Smerling's scheme and Plaintiffs' losses to Chubb and Berkley. However, despite the fact that the Chubb and Berkley policies cover losses resulting from forgeries—and even though it is undisputed that Smerling "forged signatures of purported investors" in order to induce SVB "to loan [him] those funds"—Chubb and Berkley have denied coverage, breaching the terms of the policies. Accordingly, Plaintiffs have commenced this action seeking damages, as well as interest and additional relief described below.

## THE PARTIES

12.     SVB Financial Group is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in California.

13.     SVB is a wholly-owned subsidiary of SVB Financial Group. SVB is a corporation incorporated under the laws of the State of California, with its principal place of business in California. SVB was established in 1983 and has offices in 17 states, including North Carolina. SVB has maintained an office in the Raleigh area for 14 years. SVB opened an office in Morrisville in 2009, and then moved the office to Raleigh in 2019. SVB has leased office space

in Charlotte and is preparing to open that office in the summer of 2023.

14. On information and belief, Federal Insurance Company ("Chubb") is an insurance company incorporated in the State of Indiana, with its principal place of business in New Jersey. Federal Insurance Company is registered and licensed to do business in North Carolina, and in fact does business in this state, including through an office it maintains in Charlotte. It is commonly referred to as "Chubb," as it is part of the Chubb group of insurance companies.

15. On information and belief, Berkley Regional Insurance Company ("Berkley") is an insurance company incorporated in the State of Iowa, with its principal place of business in Iowa. Berkley is registered and licensed to do business in North Carolina, and in fact does business in this state, including through an office it maintains in Charlotte.

16. Both Plaintiffs are insureds under policies of insurance issued by Chubb and Berkley that cover Plaintiffs' losses arising from forged documents, as described below.

## JURISDICTION AND VENUE

17. The Insurers are each subject to the personal jurisdiction of this Court in accordance with due process and N.C. Gen. Stat. §§ 1-75.4 and 58-16-30.

18. Venue is proper in this Court pursuant to N.C. Gen. Stat. § 1-80. Plaintiffs have been regularly engaged in business in Wake County since 2009 through an office of SVB. Further, the SVB relationship manager for the JES Loan, who had numerous communications with Smerling, the JES Entities and their representatives, and received the request for the $95 million drawdown, works in SVB's Raleigh office. For these reasons and others, venue is proper in this Court.

## THE CHUBB PRIMARY POLICY

19. Chubb issued to SVB Financial Group and its subsidiaries, including SVB, a Financial Institution Bond insurance policy (the "Chubb Policy") with a bond number of 82403947 and with a bond period of August 1, 2020 to August 1, 2021. The Chubb Policy has a "single loss" limit of $15 million and aggregate limits of $30 million, after satisfying a deductible. In most instances, the deductible is $1 million.

20.     Plaintiffs are insured under the Chubb Policy. Plaintiffs paid substantial premiums for the Chubb Policy and have fully performed and complied with all of the applicable terms and conditions of the Chubb Policy. The Chubb Policy is attached hereto as **Exhibit 1,** and the Chubb Policy's terms and conditions are incorporated herein by reference.[1]

21.     The Chubb Policy covers losses resulting from "Extended Forgery" occurring anywhere in the U.S. or in the world, including in North Carolina. Under the insuring agreement for Extended Forgery, Chubb is obligated to indemnify Plaintiffs for, among other things:

> Loss resulting directly from [Plaintiffs] having, in good faith, for its own account or the account of others . . . extended credit or assumed liability, in reliance on any original . . . (6) corporate, partnership or personal **Guarantee** [or] (7) **Security Agreement** . . . which (i) bears a **Forgery;** or (ii) is fraudulently materially altered . . . .

Exhibit ("Exh.") 1 at P0028 (End. 4, Amended Extended Forgery Endorsement).

22.     The Chubb Policy defines "**Forgery**" as "the signing of the name of another natural person with the intent to deceive but does not mean a signature which consists in whole or in part of one's own name, with or without authority, in any capacity for any purpose." Exh. 1 at P0013 (Definition n).

23.     The Chubb Policy defines "**Guarantee**" as "a written undertaking obligating the signer to pay the debt of another to [Plaintiffs] or its assignee . . . , if the debt is not paid in accordance with its terms." Exh. 1 at P0013 (Definition o).

24.     "**Security Agreement**" means any "agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." Exh. 1 at P0014 (Definition x).

25.     The word "original" is not defined in the Chubb Policy. Under the plain language of the Chubb Policy and applicable law, the word "original" encompasses electronic documents, among other things.

---

[1] For ease of reference, Plaintiffs have consecutively numbered the pages of the Chubb and Berkley Policies, and affixed those numbers (which run from P001 to P0067) to the Policies.

## THE BERKLEY EXCESS POLICY

26.     Berkley issued to SVB Financial Group an Excess Follow Form Insurance Policy (the "Berkley Policy"), with a bond number of BFCB-45001721-26 and with a bond period of August 1, 2020 to August 1, 2021. The Berkley Policy has an additional "single loss" limit of $15 million and additional aggregate limits of $30 million, without any deductible. The Berkley Policy "follows form" to, or incorporates, the terms and conditions of the Chubb Policy.

27.     Plaintiffs are insured under the Berkley Policy. Plaintiffs paid substantial premiums for the Berkley Policy and have fully performed and complied with all of the applicable terms and conditions of the Berkley Policy. The Berkley Policy is attached hereto as **Exhibit 2**, and the Berkley Policy's terms and conditions are incorporated herein by reference.

28.     Berkley is obligated to pay all loss that either:

> (a) would have been paid by [Chubb under the Chubb Policy,] but for the fact that such loss exceeds the Limit of Liability [of the Chubb Policy]; and (b) for which [Chubb] has made monetary payment, and the Insured has collected, the full monetary amount of the expressed limit of [Chubb's] expressed Single Loss Limit of Liability, except when [Chubb] is unable to pay due to [Chubb's] own insolvency or where [Chubb] in good faith, settles a claim made by the Insured as a result of a covered loss for less than the expressed single loss limit of liability . . . .

Exh. 2 at P0058 (Terms and Conditions) & P0061 (Rider 2).

## THE FORGERIES AND PLAINTIFFS' RESULTING LOSS

29.     On December 1, 2020, Smerling, unsolicited, contacted SVB to discuss establishing a line of credit, and this inquiry was passed along to the Raleigh Employee. Later that day, the Raleigh Employee asked Smerling for information and provided a non-disclosure agreement for signature.

30.     Smerling represented that he, through the JES General Partner, oversaw and managed the JES Fund. Smerling advised SVB that the JES Fund was a $500 million fund, with $50 million in capital that had already been received from its Limited Partners, and $450 million in additional capital committed by the Limited Partners. Smerling also told SVB that the JES Fund had an existing line of credit with another bank, Sumitomo Mitsui Bank Corporation, on which

there was approximately $100 million drawn down, and that the JES Fund wished to close that line of credit and open a similar line of credit with SVB.

31. In the weeks that followed, SVB, led by the Raleigh Employee, conducted diligence regarding Smerling's request for a line of credit for the JES Fund. Smerling provided to SVB original documents, including Subscription Agreements that were purportedly executed on behalf of each of the Limited Partners in the JES Fund, which SVB continues to have in its possession. The Subscription Agreements incorporate by reference the terms of the Limited Partnership Agreement ("LP Agreement") for the JES Fund; they bind each Limited Partner to the terms of the LP Agreement; and they make each Limited Partner a party to the LP Agreement. The purported "subscribers," or Limited Partners, included, among others: the University of Miami Endowment; Huizenga Holdings, Inc.; Sun Trust Robinson Humphrey, Inc.; BBVA Securities, Inc.; Bank of NY Mellon – Investment Management; CLP Holdings Ltd.; Meridian Capital Asia; New York University – Endowment; and Steven M. Cohen Inc.

32. SVB relied in good faith upon these documents in issuing the line of credit to the JES Fund. SVB entered into a Loan and Security Agreement (the "Loan Agreement") with the JES Fund and JES General Partner effective February 3, 2021, for a line of credit of $150 million.

33. Following execution of the Loan Agreement, on February 3, 2021, the JES Fund provided instructions, which were sent to the Raleigh Employee, requesting an advance of approximately $95 million from SVB. SVB wired approximately $95 million to an account at Sumitomo Mitsui Bank Corporation that Smerling and the JES Entities told SVB was associated with the JES Fund.

34. While conducting post-closing diligence, SVB requested additional information from the JES Entities, as permitted under the Loan Agreement. However, the JES Entities refused to provide the requested information.

35. Thereafter, SVB discovered that Smerling had provided forged documents.

36. On February 26, 2021, SVB sent Smerling a notice declaring an Event of Default under the Loan Agreement based on the provision of forged and falsified information and

demanding immediate repayment from the JES Fund of the amounts drawn down under the Loan Agreement.

37.     Also on February 26, 2021, Smerling was arrested by FBI agents in Florida and charged with violations of federal law. Smerling later pled guilty to certain charges. During the plea hearing, in his plea allocution, Smerling admitted that:

> I'm guilty of committing bank fraud and securities fraud. . . **I forged signatures of purported investors** and created fake documents in support of those [loan] applications. I did this to induce the banks to loan me those funds.

Transcript of Feb. 8, 2022 Proceedings at 14:18-23, *U.S. v. Smerling*, U.S. District Court for the Southern District of New York, Case No. 21-CR-317. Smerling was sentenced to a prison term of 97 months and is presently incarcerated. In addition, SVB filed suit against Smerling and the JES General Partner alleging fraudulent inducement, among other claims, in a case filed in the U.S. District Court for the Southern District of New York.

38.     While SVB has been able to recoup a portion of the loan amount from Smerling, the JES Fund, and/or the JES General Partner, Plaintiffs' losses arising from this forgery scheme are approximately $73 million, plus additional interest, charges, fees and other obligations owing under the Loan Agreement (the "Loss"), and additional damages. The Loss resulted directly from SVB's good faith reliance on originals of qualifying documents under the Policies' "Extended Forgery" coverage. Plaintiffs' Loss exceeds the limits of the Insurers' policies and satisfies any applicable deductible.

## THE SMERLING CLAIM IS COVERED UNDER THE POLICIES

39.     Plaintiffs' Loss is covered under the Chubb Policy and Berkley Policy (collectively, the "Policies"). In issuing the line of credit, SVB relied in good faith upon originals of documents bearing forgeries that trigger the Policies' "Extended Forgery" coverage.

40.     The Subscription Agreements and the LP Agreement constitute "Guarantees" within the meaning of the Policies. The Subscription Agreements incorporate by reference all of the terms of the LP Agreement. These agreements obligate the Limited Partners to pay the debts

of the JES Fund. For example, the LP Agreement states that the Limited Partners must pay the JES Fund's obligations for purposes of payment of the JES Fund's loan obligations. Further, the LP Agreement states that in the event of a default under a line of credit or loan, such as the SVB loan, the Limited Partners are required to pay a call by the lender. Under the LP Agreement, the Limited Partners agreed that their payment obligations are absolute and unconditional. For these reasons and others, each of the Subscription Agreements and the LP Agreement—whether alone or in combination with other documents—constitutes a "Guarantee" under the Policies.

41. Accordingly, Plaintiffs' Loss is covered under the Policies.

42. In addition, the LP Agreement and the Subscription Agreements constitute "Security Agreements" within the meaning of the Policies. As discussed above, the LP Agreement secures payment or performance of an obligation because, *inter alia,* it requires the Limited Partners to make payments for the line of credit with SVB. Further, the LP Agreement creates an interest in personal property because the JES Fund obtains an interest in the capital committed by the Limited Partners, including the right to require those capital contributions at such times and in such amounts as required by the JES General Partner. In addition, the Loan Agreement itself creates an interest in the collateral for the SVB loan.

43. For these reasons and others, each of the Subscription Agreements and the LP Agreement—whether alone or in combination with other documents—constitutes a "Security Agreement" under the Policies.

44. Accordingly, Plaintiffs' Loss is covered under the Policies.

**THE INSURERS' REFUSAL TO INDEMNIFY PLAINTIFFS**

45. In March 2021, Plaintiffs promptly provided notice to Chubb and Berkley of Smerling's scheme and Plaintiffs' resulting Loss. On or about April 9, 2021, Chubb responded that the Chubb Policy's "Forgery or Alteration" coverage or its "Extended Forgery" coverage "could be potentially applicable to the loss."

46. Chubb requested a proof of loss and agreed to extensions of time for its submission. Plaintiffs timely provided a detailed proof of loss to both Chubb and Berkley in October 2021.

47.     However, Chubb denied coverage, claiming that the LP Agreement and the Subscription Agreements do not constitute "Guarantees" or "Security Agreements" within the meaning of the Chubb Policy, and contending that there was "no qualifying document" under the Extended Forgery coverage. Berkley also denied coverage based on Chubb's rationale.

## CAUSES OF ACTION
## COUNT I
### (Breach of Contract)

48.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if fully set forth herein.

49.     The Chubb Policy and Berkley Policy constitute valid and enforceable contracts between the Insurers and Plaintiffs, under which the Insurers are obligated to indemnify Plaintiffs for losses resulting from forgeries.

50.     Plaintiffs have complied fully with all the terms and conditions of the Policies. They have fulfilled each of the applicable obligations thereunder.

51.     The Smerling claim and Plaintiffs' resulting Loss meets all of the requirements of the "Extended Forgery" coverage provided by the Policies. Accordingly, the Insurers are obligated to indemnify and reimburse Plaintiffs for their Loss, up to the limits of each of the Policies.

52.     However, the Insurers have denied coverage and refused to indemnify and reimburse Plaintiffs for their Loss. In so doing, Insurers have materially breached their contractual duties under the Policies. As a direct and proximate result of the Insurers' breaches of contract, Plaintiffs have been injured and suffered damages and are entitled to recover those damages from the Insurers, including compensatory, consequential, and incidental damages.

53.     Accordingly, Plaintiffs request entry of judgment for breach of contract, awarding the payment of damages in amounts to be proven at trial (which are in excess of $25,000), as well as attorneys' fees and pre- and post-judgment interest to the extent permitted by law.

## COUNT II
### (Declaratory Judgment under N.C. Gen. Stat. § 1-253 *et seq.*)

54.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs

10

as if fully set forth herein.

55.     Under the Policies, Chubb and Berkley agreed to insure losses for "Extended Forgery."

56.     The Smerling claim and Plaintiffs' resulting Loss meets all requirements of the "Extended Forgery" coverage provided by the Policies. Accordingly, the Insurers are obligated to indemnify and reimburse Plaintiffs for their Loss.

57.     However, the Insurers dispute their legal obligations under the Policies and refuse to indemnify or reimburse Plaintiffs for the Loss.

58.     As such, an actual and justiciable controversy exists between Plaintiffs and Insurers with regard to the Insurers' duties under the Policies as they relate to the Loss. The controversy is of sufficient immediacy to justify the issuance of a declaratory judgment, which will terminate some or all of the existing controversy between the parties.

59.     Pursuant to N.C. Gen. Stat. § 1-253 *et seq.*, Plaintiffs are entitled to a declaration as to the respective obligations of the Insurers to indemnify and reimburse Plaintiffs for the Loss. Plaintiffs therefore seek judicial declarations that the Insurers owe a duty to indemnify and reimburse Plaintiffs for the Loss, as well as declarations resolving any other disputes between the parties regarding their respective rights, obligations, and duties under the Policies.

## PRAYERS FOR RELIEF

Wherefore, Plaintiffs SVB Financial Group and Silicon Valley Bank respectfully request that this Court enter judgment in its favor against the Insurers and grant the following relief:

a.  To award all damages allowed by law, including all of Plaintiffs' Loss, as well as compensatory, consequential, and incidental damages flowing from the Insurers' breaches of contract, which are more than $25,000.00;

b.  To award all other benefits of the Policies according to proof;

c.  To award Plaintiffs statutory interest of 8% on all Loss covered by the Policies, in accordance with N.C. Gen. Stat. § 24-1;

d.  To declare that the Insurers owe a duty to indemnify and reimburse Plaintiffs for the Loss, and for further declarations regarding the nature and scope of Insurers' obligations under the Policies;

e.  To award Plaintiffs pre-judgment and post-judgment interest, and other costs of the litigation;

f.  To award attorneys' fees and costs; and

g.  To award such other and further relief as the Court deems just, equitable, and proper.

## JURY TRIAL DEMAND

Plaintiffs SVB Financial Group and Silicon Valley Bank hereby demand a jury trial on all issues so triable.

This the 30th day of January, 2023.

KILPATRICK TOWNSEND & STOCKTON LLP

By: _____ *for*

Susan H. Boyles
N.C. State Bar # 20877
1001 West Fourth Street
Winston-Salem, NC 27101-2400
(336) 607-7417
sboyles@kilpatricktownsend.com

FARELLA BRAUN + MARTEL LLP
Raymond Sheen (Motion for *pro hac vice* admission to be filed)
Morgan Churma (Motion for *pro hac vice* admission to be filed)
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4972
Rsheen@fbm.com
mchurma@fbm.com

*Attorneys for Plaintiffs SVB FINANCIAL GROUP and SILICON VALLEY BANK*

# EXHIBIT 1

**Chubb Group of Insurance Companies**

202B Hall's Mill Road
Whitehouse Station, NJ 08889

# DECLARATIONS
# FINANCIAL INSTITUTION
# BOND FORM A

NAME OF ASSURED (including its **Subsidiaries**):

SVB FINANCIAL GROUP

3003 TASMAN DRIVE
SANTA CLARA, CA 95054

Bond Number: 82403947

**FEDERAL INSURANCE COMPANY**
Incorporated under the laws of Indiana a stock
insurance company herein called the COMPANY

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

---

**ITEM 1.** BOND PERIOD: from 12:01 a.m. on August 1, 2020
to 12:01 a.m. on August 1, 2021

**ITEM 2** AGGREGATE LIMIT OF LIABILITY: $30,000,000

**ITEM 3.** SINGLE LOSS LIMITS OF LIABILITY - DEDUCTIBLE AMOUNTS:

The amounts set forth below shall be part of and not in addition to the AGGREGATE LIMIT OF LIABILITY. If **"Not Covered"** is inserted opposite any specified INSURING CLAUSE, such INSURING CLAUSE and any other reference to such INSURING CLAUSE in this Bond shall be deemed to be deleted.

| INSURING CLAUSE | SINGLE LOSS LIMIT OF LIABILITY | DEDUCTIBLE AMOUNT |
|---|---|---|
| 1. Dishonesty | | |
| A. Employee | $ 15,000,000 | $ 500,000 |
| B. Trade or Loan | $ 15,000,000 | $ 500,000 |
| C. Audit Expense | $ 500,000 | $ 50,000 |
| 2. On Premises | $ 15,000,000 | $ 500,000 |
| 3. In Transit | $ 15,000,000 | $ 500,000 |
| 4. Forgery or Alteration | $ 15,000,000 | $ 500,000 |
| 5. Extended Forgery | $ 15,000,000 | $ 500,000 |
| 6. Automated Device | $ 15,000,000 | $ 500,000 |
| 7. Counterfeit Money | $ 15,000,000 | $ 500,000 |
| 8. Computer System | $ 15,000,000 | $ 500,000 |
| 9. Defective Signature | $ 15,000,000 | $ 500,000 |
| 10. Voice Initiated Funds Transfer Instruction | $ 15,000,000 | $ 500,000 |
| 11. Telefacsimile Instruction | $ 15,000,000 | $ 500,000 |
| 12. Cash Letter | $ 15,000,000 | $ 500,000 |

**ITEM 4.** THE LIABILITY OF THE COMPANY IS ALSO SUBJECT TO THE TERMS OF THE FOLLOWING ENDORSEMENTS EXECUTED SIMULTANEOUSLY HEREWITH:

1-19

**IN WITNESS WHEREOF, THE COMPANY** caused this Bond to be signed by its authorized officers, but it shall not be valid unless also signed by an authorized representative of the Company.

Secretary

President

Countersigned by _____ August 19, 2020 _____

Authorized Representative

---

The COMPANY, in consideration of payment of the required premium, and in reliance on the APPLICATION and all other statements made and information furnished to the COMPANY by the ASSURED, and subject to the DECLARATIONS made a part of this Bond and to all other terms and conditions of this Bond, agrees to pay the ASSURED for:

## Insuring Clauses

*Dishonesty*

**1. A. Employee**

Loss resulting directly from dishonest acts, other than stated in 1.B. below, of any **Employee**, committed alone or in collusion with others except with a director or trustee of the ASSURED who is not an **Employee**, which result in improper personal financial gain to either such **Employee** or other natural person acting in collusion with such **Employee**, or which acts were committed with the intent to cause the ASSURED to sustain such loss.

**B. Trade Or Loan**

Loss resulting directly from dishonest acts of any **Employee**, committed alone or in collusion with others except with a director or trustee of the ASSURED who is not an **Employee**, which arises totally or partially from:

(1) any **Trade**, or

(2) any **Loan**,

provided, however, the ASSURED shall first establish that the loss was directly caused by dishonest acts of any **Employee** which result in improper personal financial gain to such **Employee** and which acts were committed with the intent to cause the ASSURED to sustain such loss.

Notwithstanding the foregoing, when a loss is covered under this INSURING CLAUSE and the **Employee** was acting in collusion with others and intended to receive improper personal financial gain, but said **Employee** failed to derive such improper personal financial gain, such loss will nevertheless be covered under this INSURING CLAUSE as if the **Employee** had obtained such improper personal financial gain provided that the ASSURED establishes that the **Employee** intended to receive such improper personal financial gain.

**C. Audit Expense**

Expense incurred by the ASSURED for that part of the cost of audits or examinations required by State or Federal supervisory authorities to be conducted either by such authorities or by independent accountants by reason of the discovery of loss sustained by the ASSURED through dishonest acts of any **Employee** as covered under 1.A. or 1.B. above.

For the purpose of this INSURING CLAUSE, improper personal financial gain shall not include salary, salary increases, commissions, fees, bonuses, promotions, awards, profit sharing, incentive plans, pensions or other emoluments received by an **Employee**.

Case 5:23-cv-00095-BO-RN   Document 21-3   Filed 02/27/23   Page 16 of 82
P0002

## Insuring Clauses
*(continued)*

**On Premises**

2. A. Loss of **Property** resulting directly from:

    (1) robbery, burglary, misplacement, mysterious unexplainable disappearance, damage or destruction, or

    (2) false pretenses, or common law or statutory larceny, committed by a natural person while on the premises of the ASSURED,

    while the **Property** is lodged or deposited at premises located anywhere.

    B. Loss of **Property** while in the possession of any customer of the ASSURED or of any representative of such customer resulting directly from:

    (1) robbery, while such customer or representative is actually transacting business with the ASSURED at an outside window and attended by an **Employee** at any of the ASSURED'S premises, or

    (2) robbery, during banking hours, while such customer or representative is in any building or on any driveway or parking lot maintained by the ASSURED as a convenience for such customers or representatives using motor vehicles, if such customer or representative is present in such building or on such facility for the purpose of transacting banking business with the ASSURED at any of the ASSURED'S premises,

    provided such loss, at the option of the ASSURED, is included in the ASSURED'S proof of loss, and excluding, in any event, loss caused by such customer or such representative.

**In Transit**

3. Loss of **Property** resulting directly from common law or statutory larceny, misplacement, mysterious unexplainable disappearance, damage or destruction, while the **Property** is in transit anywhere:

    a. in an armored motor vehicle, including loading and unloading thereof,

    b. in the custody of a natural person acting as a messenger of the ASSURED, or

    c. in the custody of a **Transportation Company** and being transported in a conveyance other than an armored motor vehicle provided, however, that covered **Property** transported in such manner is limited to the following:

    (1) written records,

    (2) **Certificated Securities** issued in registered form, which are not endorsed or are restrictively endorsed, or

    (3) **Negotiable Instruments** not payable to bearer, which are not endorsed or are restrictively endorsed, except for checks, regardless of negotiability, which were in transit to a data processing center and have proven to be destroyed.

## Insuring Clauses

*In Transit*
*(continued)*

Coverage under this INSURING CLAUSE begins immediately on the receipt of such **Property** by the natural person or **Transportation Company** and ends immediately on delivery to the premises of the addressee or to any representative of the addressee located anywhere.

---

*Forgery Or Alteration*   4.   Loss resulting directly from:

    a.   **Forgery** on, or fraudulent material alteration of, any **Negotiable Instrument** (other than an **Evidence of Debt**), **Acceptance, Withdrawal Order** or receipt for the withdrawal of **Property, Certificate of Deposit** or **Letter of Credit,** or

    b.   transferring, paying or delivering any funds or other **Property,** or establishing any credit or giving any value in reliance on any written instructions to the ASSURED authorizing or acknowledging the transfer, payment, delivery or receipt of funds or other **Property,** which instructions fraudulently purport to bear the handwritten signature of any customer of the ASSURED, financial institution, or **Employee,** but which instructions either bear a **Forgery** or have been fraudulently materially altered without the knowledge and consent of such customer, financial institution or **Employee.**

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.

---

*Extended Forgery*   5.   Loss resulting directly from the ASSURED having, in good faith, for its own account or the account of others:

    a.   acquired, sold or delivered, or given value, extended credit or assumed liability, in reliance on any original

        (1)   **Certificated Security,**

        (2)   deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,

        (3)   **Certificate of Origin or Title,**

        (4)   **Document of Title,**

        (5)   **Evidence of Debt,**

        (6)   corporate, partnership or personal **Guarantee,**

        (7)   **Security Agreement,** or

        (8)   **Instruction** which

            i.   bears a **Forgery,** or

            ii.   is fraudulently materially altered, or

            iii.   is lost or stolen, or

## Insuring Clauses

**Extended Forgery**
*(continued)*

b.   guaranteed in writing or witnessed any signature on any transfer, assignment, bill of sale, power of attorney, **Guarantee,** or endorsement upon or in connection with any item listed in a.(1) through a.(8) above, or

c.   acquired, sold or delivered, or given value, extended credit or assumed liability in reliance on any item listed in a.(1) through a.(4) above which is a **Counterfeit Original.**

Actual physical possession, and continued actual physical possession if taken as collateral, of the items listed in a.(1) through a.(8) above by the ASSURED or a correspondent Federal or State chartered deposit institution of the ASSURED is a condition precedent to the ASSURED having relied on such items. Release or return of such collateral is an acknowledgment by the ASSURED that it no longer relies on such collateral.

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.

---

**Automated Device**

6.   Loss of **Money** or **Negotiable Instruments** resulting directly from burglary of any **Automated Device.**

---

**Counterfeit Money**

7.   Loss resulting directly from the receipt by the ASSURED in good faith of any counterfeit **Money.**

---

**Computer System**

8.   Loss resulting directly from fraudulent:

a.   entries of data into, or

b.   changes of data elements or programs within,

a **Computer System,** provided the fraudulent entry or change causes:

(1)   funds or other property to be transferred, paid or delivered,

(2)   an account of the ASSURED or of its customer to be added, deleted, debited or credited, or

(3)   an unauthorized account or a fictitious account to be debited or credited.

---

**Defective Signature**

9.   Loss resulting directly from the ASSURED having in good faith, in connection with any **Loan,** accepted, received or acted on the validity of any:

a.   real property mortgage,

b.   real property deed of trust or like instrument pertaining to realty, or

c.   assignment of such mortgage, deed of trust or like instrument

which proves to have been defective by reason of:

(1)   the signature of any person on such document having been obtained through trick, artifice, fraud or false pretenses, or

---

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 19 of 82

P0005

## Insuring Clauses

*Defective Signature
(continued)*

    (2)    the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud or false pretenses.

---

*Voice Initiated Funds
Transfer Instruction*

10.    Loss resulting directly from the ASSURED having transferred any funds on the faith of any **Voice Initiated Funds Transfer Instruction** made by a person purporting to be:

    a.    a **Customer**, or

    b.    an authorized representative of the **Customer**, or

    c.    an **Employee** who was authorized by the ASSURED to instruct other **Employees** to transfer funds,

provided, however, such instructions were received by an **Employee** specifically designated to receive and act upon such instructions, and such acts were committed by said person for the purpose of making an improper personal financial gain for such person or any other person.

The following conditions are precedent to coverage under this INSURING CLAUSE:

    a.    The ASSURED will record all **Voice Initiated Funds Transfer Instructions**. The ASSURED, however, shall not be deprived of coverage under this INSURING CLAUSE if at the time of filing proof of loss, as set forth in SECTION 7. of this Bond, the ASSURED is unable to produce such electronic recordings solely because of failure of the electronic recording equipment to audibly record such instructions.

    b.    The ASSURED shall verify all **Voice Initiated Funds Transfer Instructions** in excess of the DEDUCTIBLE AMOUNT stated in ITEM 3.10. of the DECLARATIONS by a direct electronically recorded call back to the **Customer** when such instructions:

        (1)    involve a request to transfer funds to other than the **Customer's** account,

        (2)    are non-repetitive, or

        (3)    are not in accordance with the parameters contained in the written voice initiated funds transfer agreement between the ASSURED and the **Customer**.

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 20 of 82
P0006

| | | |
|---|---|---|
| *Telefacsimile Instruction* | 11. | Loss resulting directly from the ASSURED having transferred, paid or delivered any funds or other **Property** or established any credit, debited any account or given any value on the faith of any fraudulent instructions sent by a **Customer**, financial institution or another office of the ASSURED by **Telefacsimile** directly to the ASSURED authorizing or acknowledging the transfer, payment or delivery of funds or **Property** or the establishment of a credit or the debiting of an account or the giving of value by the ASSURED where such **Telefacsimile** instructions: |

    a.    bear a valid test key exchanged between the ASSURED and a **Customer** or another financial institution with authority to use such test key for **Telefacsimile** instructions in the ordinary course of business, but which test key has been wrongfully obtained by a person who was not authorized to initiate, make, validate or authenticate a test key arrangement, and

    b.    fraudulently purport to have been sent by such **Customer** or financial institution when such **Telefacsimile** instructions were transmitted without the knowledge or consent of such **Customer** or financial institution by a person other than such **Customer** or financial institution and which bear a **Forgery** of a signature,

provided that the **Telefacsimile** instruction was verified by a direct call back to an employee of the financial institution, or a person thought by the ASSURED to be the **Customer**, or an employee of another financial institution.

| | | |
|---|---|---|
| *Cash Letter* | 12. | Loss of checks or drafts contained in a **Cash Letter** which have been accepted by the ASSURED for deposit, payment, or collection resulting directly from robbery, common law or statutory larceny, misplacement, mysterious unexplainable disappearance, or damage to or destruction of, the **Cash Letter** while in transit from any office of the ASSURED to any other premise in the United States of America or Canada. |

Coverage under this INSURING CLAUSE begins immediately after the **Cash Letter** leaves the premises of the ASSURED and ends immediately on delivery to the premises of the addressee or to any representative of the addressee located in the United States of America or Canada.

Loss shall be limited to **Extra Expense** incurred by the ASSURED in identifying the depositors of such lost checks or drafts and in assisting such depositors in obtaining duplicates thereof.

The following conditions are precedent to coverage under this INSURING CLAUSE:

The ASSURED shall have made:

    a.    a record of the name of the issuer, drawer or maker of each such check or draft and a record of the name of the person presenting each such check or draft with all other descriptive data necessary for the purpose of reconstruction, or

    b.    a film record of each check or draft in its entirety, and

## Insuring Clauses

*Cash Letter*
*(continued)*

c.   all reasonable efforts to exercise its rights to the fullest extent under the terms of any deposit agreement with any customer to charge back items to a customer.

The ASSURED, however, shall not be deprived of coverage under this INSURING CLAUSE if such film records are unavailable due to the failure of the film record equipment to record such check or draft, or due to the unintended destruction of the film record after it has been made, and such failure or destruction was unknown at the time the check or draft was placed in the **Cash Letter**.

## General Agreements

*Joint Assured*

A.   Only the first named ASSURED shall be deemed to be the sole agent of the others for all purposes under this Bond, including but not limited to the giving or receiving of any notice or proof required to be given and for the purpose of effecting or accepting any amendments to or termination of this Bond. Each and every other ASSURED shall be conclusively deemed to have consented and agreed that none of them shall have any direct beneficiary interest in or any right of action under this Bond and neither this Bond nor any right of action shall be assignable.

Knowledge possessed or discovery made by any ASSURED shall constitute knowledge possessed or discovery made by all of the ASSUREDS for the purposes of this Bond.

All losses and other payments, if any, payable by the COMPANY shall be payable to the first named ASSURED without regard to such ASSURED'S obligations to others, and the COMPANY shall not be responsible for the application by the first named ASSURED of any payment made by the COMPANY. If the COMPANY agrees to and makes payment to any ASSURED other than the one first named, such payment shall be treated as though made to the first named ASSURED. The COMPANY shall not be liable for loss sustained by one ASSURED to the advantage of any other ASSURED.

At the written request of the first named ASSURED, any payment in satisfaction of loss covered by this Bond involving **Money** or other **Property** in which the Federal National Mortgage Association, the Federal Home Loan Mortgage Company, or the Government National Mortgage Association has an interest, shall be paid by an instrument issued to the named ASSURED and such association or company as joint loss payees subject to the following conditions and limitations:

(1)   This Bond is for the sole use and benefit of the named ASSURED as expressed herein. The organizations named above shall not be considered ASSUREDS under this Bond, nor shall they otherwise have any rights or benefits under this Bond.

(2)   Notwithstanding any payment made at the written request of the first named ASSURED, the amount paid for any **Single Loss** shall not exceed the applicable SINGLE LOSS LIMIT OF LIABILITY or the unused portion of the AGGREGATE LIMIT OF LIABILITY under this Bond, whichever is less.

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 22 of 82
F00008

## General Agreements

<table>
<tr><td><em>Joint Assured</em><br><em>(continued)</em></td><td></td><td>(3)</td><td>If the COMPANY makes any such payment, such payment shall be treated as though made to the first named ASSURED.</td></tr>
</table>

---

<em>Representations Made By Assured</em>    B.    The ASSURED represents that all information it has furnished in the APPLICATION for this Bond or otherwise is complete, true and correct. Such APPLICATION and other information constitute part of this Bond.

The ASSURED must promptly notify the COMPANY of any change in any fact or circumstance which materially affects the risk assumed by the COMPANY under this Bond.

Any intentional misrepresentation, omission, concealment or incorrect statement of a material fact, in the APPLICATION or otherwise, shall be grounds for recision of this Bond.

---

<em>Additional Offices Or Employees - Consolidation, Merger Or Purchase Or Acquisition Of Assets Or Liabilities - Notice To Company</em>    C.    If the ASSURED, while this Bond is in force, merges or consolidates with, or purchases or acquires assets or liabilities of another institution, the ASSURED shall not have the coverage afforded under this Bond for loss which has:

(1)    occurred or will occur on premises,

(2)    been caused or will be caused by any **Employee**, or

(3)    arisen or will arise out of the assets or liabilities,

of such institution, unless the ASSURED:

a.    gives the COMPANY written notice of the proposed consolidation, merger or purchase or acquisition of assets or liabilities prior to the proposed effective date of such action, and

b.    obtains the written consent of the COMPANY to extend some or all of the coverage provided by this Bond to such additional exposure, and

c.    on obtaining such consent, pays to the COMPANY an additional premium.

Notwithstanding anything stated above to the contrary, the COMPANY hereby agrees to provide coverage which shall be effective on the date of acquisition under this Bond for those acquired institutions in which the ASSURED owns greater than fifty percent (50%) of the voting stock or voting rights either directly or through one or more of its subsidiaries for the remainder of the BOND PERIOD, with no additional premium, provided the acquired institution meets all of the following conditions:

i.    the assets shall not exceed ten percent (10%) of the ASSURED'S assets,

ii.    there shall be neither any paid nor pending Bond claim for the three (3) year period prior to the date of acquisition, and

iii.    the ASSURED is not aware of any disciplinary action or proceeding by State or Federal officials involving the acquired institution as of the date of acquisition.

---

Case 5:23-cv-00095-BO-RN Document 1-3 Filed 02/27/23 Page 23 of 82
P0009

## General Agreements

**Additional Offices Or Employees - Consolidation, Merger Or Purchase Or Acquisition Of Assets Or Liabilities - Notice To Company**
*(continued)*

The COMPANY further agrees that as respects any acquisition that involves a State or Federal regulatory assisted acquisition or assumption of assets and/or liabilities, coverage shall be provided under this Bond for the remainder of the BOND PERIOD as long as conditions i. and ii. above are met. As respects such acquisition or assumption of assets and/or liabilities, coverage applies only to a **Single Loss** fully sustained by the ASSURED on or after the date of such acquisition or assumption. All of the circumstances, conditions or acts causing or contributing to a **Single Loss** must occur on or after the date of such acquisition or assumption for coverage to apply regardless of the time such loss is discovered by the ASSURED.

---

**Change Of Control - Notice To Company**

D. The ASSURED shall notify the COMPANY at the earliest practical moment, not to exceed sixty (60) days, after the ASSURED learns of a change of control.

There shall be no coverage under this Bond for any loss involving a stockholder or affiliated group of stockholders that acquires control if such loss occurs after the date such party acquired control and if notice of such change in control is not received by the COMPANY within the sixty (60) day time period.

As used in this General Agreement, control means the power to determine the management or policy of a controlling holding company or of the ASSURED by virtue of partnership interest or voting stock ownership. A change in control, for the purpose of the required notice, means a change in ownership of voting stock or voting rights which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten percent (10%) or more of such stock or voting rights.

---

**Notice To Company Of Legal Proceedings Against Assured - Election To Defend**

E. The ASSURED shall notify the COMPANY at the earliest practical moment, not to exceed sixty (60) days after the ASSURED receives notice, of any legal proceeding brought to determine the ASSURED'S liability for any loss, claim or damage which, if established, would constitute a collectible loss under this Bond. Concurrent with such notice, and as requested thereafter, the ASSURED shall furnish copies of all pleadings and pertinent papers to the COMPANY.

The COMPANY may, at its sole option, elect to conduct the defense of all or part of such legal proceeding. The defense by the COMPANY shall be in the name of the ASSURED through attorneys selected by the COMPANY. The ASSURED shall provide all reasonable information and assistance as required by the COMPANY for such defense.

If the COMPANY elects to defend all or part of any legal proceeding, the court costs and attorneys' fees incurred by the COMPANY and any settlement or judgment on that part defended by the COMPANY shall be a loss under the applicable INSURING CLAUSE of this Bond. In addition, if the amount demanded in the legal proceeding is greater than the amount recoverable under this Bond, or if a DEDUCTIBLE AMOUNT is applicable, or both, the COMPANY'S liability for court costs and attorneys' fees incurred in defending all or part of such legal proceeding is limited to the proportion of such court costs and attorneys' fees incurred that the amount recoverable under this Bond bears to the total of the amount demanded in such legal proceeding.

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 24 of 82
F0010

## General Agreements

*Notice To Company Of Legal Proceedings Against Assured - Election To Defend*
*(continued)*

If the COMPANY declines to defend the ASSURED, no settlement without the prior written consent of the COMPANY or judgment against the ASSURED shall determine the existence, extent or amount of coverage under this Bond, and the COMPANY shall not be liable for any costs, fees and expenses incurred by the ASSURED.

*Nominees*

F.    Loss sustained by any nominee organized by the ASSURED for the purpose of handling certain of the ASSURED'S business transactions and composed exclusively of its **Employees** shall, for all purposes under this Bond and whether any partner of the nominee is concerned or implicated in such loss, be deemed to be loss sustained by the ASSURED.

## Conditions And Limitations

*Definitions*

1.    As used in this Bond:

a.    **Acceptance** means a draft which the drawee has, by signature written on it, engaged to honor as presented.

b.    **Automated Device** means a machine maintained by the ASSURED to disburse **Money**, accept deposits, cash checks or drafts, or make credit card loans.

c.    **Cash Letter** means any letter or package dispatched by the ASSURED itemizing by separate amounts all checks or drafts enclosed within it which have been accepted by the ASSURED for deposit, payment, collection or encashment.

d.    **Certificate of Deposit** means an acknowledgment in writing by a financial institution of receipt of **Money** with an engagement to repay it.

e.    **Certificate of Origin or Title** means a document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

f.    **Certificated Security** means a share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer, which is:

(1)    represented by an instrument issued in bearer or registered form, and

(2)    of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment, and

(3)    either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

g.    **Computer System** means a computer and all input, output, processing, storage, off-line media libraries, and communication facilities which are connected to the computer and which are under the control and supervision of the operating system(s) or application(s) software used by the ASSURED.

## Conditions And Limitations

*Definitions*
*(continued)*

h.  **Counterfeit Original** means an imitation of an actual valid original which is intended to deceive and be taken as the original.

i.  **Customer** means any corporation, partnership, proprietor, trust or natural person having an account with the ASSURED and having a written agreement with the ASSURED for **Voice Initiated Funds Transfer Instructions** or **Telefacsimile** Instructions.

j.  **Document of Title** means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for delivery of goods, and any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers, and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

k.  **Employee** means:

(1)  an officer of the ASSURED,

(2)  a natural person while in the regular service of the ASSURED at any of the ASSURED'S premises and compensated directly by the ASSURED through its payroll system and subject to the United States Internal Revenue Service Form W-2 or equivalent income reporting plans of other countries, and whom the ASSURED has the right to control and direct both as to the result to be accomplished and details and means by which such result is accomplished in the performance of such service,

(3)  a guest student pursuing studies or duties in any of the ASSURED'S premises,

(4)  an attorney retained by the ASSURED and an employee of such attorney while either is performing legal services for the ASSURED,

(5)  a natural person provided by an employment contractor to perform employee duties for the ASSURED under the ASSURED'S supervision at any of the ASSURED'S premises,

(6)  an employee of an institution merged or consolidated with the ASSURED prior to the effective date of this Bond,

(7)  a director or trustee of the ASSURED, but only while performing acts within the scope of the customary and usual duties of any officer or other employee of the ASSURED or while acting as a member of any committee duly elected or appointed to examine or audit or have custody of or access to **Property** of the ASSURED, or

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 26 of 82

P00012

*Definitions*
*(continued)*

(8)    each natural pèrson, partnership or corporation duly authorized by the ASSURED to perform data processing of the ASSURED'S checks and accounting records related to such checks, but only while such natural person, partnership or corporation is performing services and not creating, preparing, modifying or maintaining the ASSURED'S computer software or programs.

Each employer of persons as set forth in k.(4), k.(5) and k.(8) preceding and the partners, officers and other employees of such employers shall collectively be deemed to be one person for the purpose of SECTION 1.y. below, and in the event of payment under this Bond, the COMPANY shall be subrogated to the ASSURED'S rights of recovery, as stated in SECTION 11. against any such employer.

**Employee** does not mean any agent, broker, factor, commission merchant, independent contractor not specified in k.(4), k.(5) or k.(8) preceding, intermediary, finder or other representative of the same general character who is not on the ASSURED'S payroll system or who is not subject to the ASSURED'S reporting to the United States Internal Revenue Service on a Form W-2 or equivalent income reporting plans of other countries.

l.    **Evidence of Debt** means an instrument, including a **Negotiable Instrument**, executed by a customer of the ASSURED and held by the ASSURED, which in the regular course of business is treated as evidencing the customer's debt to the ASSURED.

m.    **Extra Expense** means wages paid to temporary employees or overtime wages paid to regular **Employees** engaged in identifying the depositors of lost checks or drafts and assisting depositors in obtaining duplicates thereof.

n.    **Forgery** means the signing of the name of another natural person with the intent to deceive but does not mean a signature which consists in whole or in part of one's own name, with or without authority, in any capacity for any purpose.

o.    **Guarantee** means a written undertaking obligating the signer to pay the debt of another to the ASSURED or its assignee or to a financial institution from which the ASSURED has purchased participation in the debt, if the debt is not paid in accordance with its terms.

p.    **Initial Transaction Statement** means the first written statement signed by or on behalf of the issuer of an **Uncertificated Security** sent to the registered owner or registered pledgee containing:

(1)    a description of the issue of which the **Uncertificated Security** is a part, and

(2)    the number of shares or units transferred to the registered owner, pledged by the registered owner to the registered pledgee, or released from pledge by the registered pledgee, and

(3)    the name, address and taxpayer identification number, if any, of the registered owner and registered pledgee, and

(4)    the date the transfer pledge or release was registered.

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 27 of 82
P0013

## Conditions And Limitations

*Definitions*
*(continued)*

q.  **Instruction** means a written order to the issuer of an **Uncertificated Security** requesting that the transfer, pledge or release from pledge of the specified **Uncertificated Security** be registered.

r.  **Letter of Credit** means an engagement in writing by a bank or other person made at the request of a customer that the bank or other person will honor drafts or other demands for payment in compliance with the conditions specified in the engagement.

s.  **Loan** means all extensions of credit by the ASSURED and all transactions creating a creditor or lessor relationship in favor of the ASSURED, including all purchase and repurchase agreements, and all transactions by which the ASSURED assumes an existing creditor or lessor relationship.

t.  **Money** means a medium of exchange in current use authorized or adopted by a domestic or foreign government as part of its currency.

u.  **Negotiable Instrument** means any writing:

    (1)  signed by the maker or drawer, and

    (2)  containing an unconditional promise or order to pay a sum certain in **Money** and no other promise, order, obligation or power given by the maker or drawer, and

    (3)  is payable on demand or at a definite time, and

    (4)  is payable to order or bearer.

v.  **Property** means any **Money; Certificated Security; Initial Transaction Statement; Negotiable Instrument; Certificate of Deposit; Document of Title; Acceptance; Evidence of Debt; Security Agreement; Withdrawal Order; Certificate of Origin or Title; Letter of Credit**; insurance policy; abstract of title, deed and mortgage on real estate; revenue and other stamps; tokens; unsold state lottery tickets; gems; jewelry; precious metals in any form; tangible items of personal property which are not specifically enumerated; and books of account and other records recorded in writing, but not data processing records or media.

w.  **Securities** means either **Certificated Securities** or **Uncertificated Securities**.

x.  **Security Agreement** means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

y.  **Single Loss** means all covered loss, including court costs and attorneys' fees incurred by the COMPANY under General Agreement E., resulting from:

    (1)  any one act of burglary, robbery or attempt at either, in which no **Employee** is implicated, or

    (2)  any one act or series of related acts on the part of any natural person resulting in damage, destruction, or misplacement of **Property**, or

*Definitions
(continued)*

(3)    all acts other than those specified in y.(1) and y.(2), caused by any natural person or in which such person is implicated, or

(4)    any one event not specified in y.(1), y.(2) or y.(3).

z.    **Subsidiary** means any organization that, at the inception date of this Bond, is named in the APPLICATION or is created during the BOND PERIOD and of which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled by the ASSURED either directly or through one or more of its subsidiaries.

aa.    **Telefacsimile** means a system of transmitting written documents by electronic signals over telephone lines to equipment maintained by the ASSURED for the purpose of reproducing a copy of said document. **Telefacsimile** does not mean electronic communication sent by Telex or similar means of communication, or through an electronic communication system or through an automated clearing house.

bb.    **Trade** means any purchase, exchange, or sale transaction, with or without knowledge of the ASSURED, whether or not represented by any indebtedness or balance shown to be due the ASSURED on any customer account, actual or fictitious.

cc.    **Transportation Company** means any organization which provides its own or its leased vehicles for transportation or which provides freight forwarding or air express services.

dd.    **Uncertificated Security** means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer, which is:

(1)    not represented by an instrument and the transfer of which is registered on books maintained for that purpose by or on behalf of the issuer, and

(2)    of a type commonly dealt in on securities exchanges or markets, and

(3)    either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

ee.    **Voice Initiated Funds Transfer Instruction** means those instructions authorizing the transfer of funds in a **Customer's** account to a financial institution for credit to accounts designated by the **Customer**:

(1)    made over the telephone, and

(2)    directed to those **Employees** specifically authorized by the ASSURED to receive such instructions by telephone at the ASSURED'S offices, and

(3)    by the **Customer** or a natural person authorized and appointed by the **Customer** to request by telephone the transfer of such funds, and

(4)    which were electronically recorded.

## Conditions And Limitations

*Definitions*
*(continued)*

ff.  **Withdrawal Order** means a non-negotiable instrument, other than an **Instruction**, signed by a customer of the ASSURED authorizing the ASSURED to debit the customer's account in the amount of funds stated therein.

For the purposes of these definitions, the singular includes the plural and the plural includes the singular, unless otherwise indicated.

---

*General Exclusions -*
*Applicable To All Insuring*
*Clauses*

2.  **This bond does not directly or indirectly cover:**

a.  loss not reported to the COMPANY in writing within sixty (60) days after termination of this Bond as an entirety;

b.  loss due to riot or civil commotion outside the United States of America and Canada, or any loss due to military, naval or usurped power, war or insurrection. This SECTION 2.b., however, shall not apply to loss which occurs in transit in the circumstances recited in INSURING CLAUSE 3., provided that when such transit was initiated there was no knowledge on the part of any person acting for the ASSURED of such riot, civil commotion, military, naval or usurped power, war or insurrection;

c.  loss resulting from the effects of nuclear fission or fusion or radioactivity;

d.  loss of potential income including, but not limited to, interest and dividends not realized by the ASSURED or by any customer of the ASSURED;

e.  damages of any type for which the ASSURED is legally liable, except compensatory damages, but not multiples thereof, arising from a loss covered under this Bond;

f.  any costs, fees and expenses incurred by the ASSURED:

(1)  in establishing the existence of or amount of loss covered under this Bond, except to the extent covered under INSURING CLAUSE 1.C., or

(2)  as a party to any legal proceeding, even if such legal proceeding results in a loss covered by this Bond;

g.  loss resulting from indirect or consequential loss of any nature;

h.  loss resulting from dishonest acts of any member of the Board of Directors or Board of Trustees of the ASSURED who is not an **Employee**, acting alone or in collusion with others;

i.  loss, or that part of any loss, resulting solely from any violation by the ASSURED or by any **Employee**:

(1)  of any law regulating:

a.  the issuance, purchase or sale of securities,

b.  securities transactions on security or commodity exchanges or the over the counter market,

c.  investment companies,

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 30 of 82

P0016

## Conditions And Limitations

    d.    investment advisors, or

    (2)    of any rule or regulation made pursuant to any such law; or

j.    loss of confidential information, material or data.

---

*Specific Exclusions - Applicable To All Insuring Clauses Except Insuring Clause 1.*

3.    **This bond does not directly or indirectly cover:**

a.    loss of property contained in customers' safe deposit boxes;

b.    loss caused by an **Employee** provided, however, this SECTION 3.b. shall not apply to loss covered under INSURING CLAUSE 2. or 3. which results directly from misplacement, mysterious unexplainable disappearance, or damage to or destruction of **Property**;

c.    loss resulting from the use of credit, debit, charge, access, convenience, identification, cash management or other cards whether such cards were issued, or purport to have been issued, by the ASSURED or by anyone other than the ASSURED;

d.    loss involving an **Automated Device** provided, however, this SECTION 3.d. shall not apply to INSURING CLAUSE 6.;

e.    loss through the surrender of property away from premises of the ASSURED as a result of a threat:

    (1)    to do bodily harm to any natural person, except loss of **Property** in transit in the custody of any natural person acting as messenger of the ASSURED, provided that when such transit was initiated there was no knowledge by the ASSURED of any such threat, or

    (2)    to do damage to the premises or **Property** of the ASSURED;

f.    loss involving items of deposit which are not finally paid for any reason including, but not limited to, forgery or any other fraud;

g.    loss resulting from payments made or withdrawals from any account involving erroneous credits to such account, unless such payments or withdrawals are physically received by such depositor or representative of such depositor who is within the office of the ASSURED at the time of such payment or withdrawal, or except when covered under INSURING CLAUSE 1.;

h.    loss of any tangible item of personal property which is not specifically enumerated as **Property** and for which the ASSURED is legally liable, if such **Property** is specifically insured by the other insurance of any kind and in any amount obtained by the ASSURED, and in any event loss of such **Property** occurring more than sixty (60) days after the ASSURED shall have become aware that it is liable for the safekeeping of such **Property**;

i.    loss involving any **Uncertificated Security** provided, however, this SECTION 3.i. shall not apply to INSURING CLAUSE 8.;

j.    loss of property while in the mail provided, however, this SECTION 3.j. shall not apply to INSURING CLAUSE 12.;

*Specific Exclusions -*
*Applicable To All Insuring*
*Clauses Except Insuring*
*Clause 1.*
*(continued)*

k. damages resulting from any civil, criminal or other legal proceeding in which the ASSURED is adjudicated to have engaged in racketeering activity. For the purposes of this SECTION 3.k., "racketeering activity" is defined in 18 United States Code 1961 et seq., as amended;

l. loss resulting from the failure for any reason of a financial or depository institution, its receiver or other liquidator to pay or deliver funds or **Property** to the ASSURED provided, however, this SECTION 3.l. shall not apply to **Securities** covered under INSURING CLAUSE 2.A.(1);

m. loss caused by any agent, broker, factor, commission merchant, independent contractor, intermediary, finder or other representative of the same general character of the ASSURED;

n. loss caused by an **Employee**, agent, broker, factor, commission merchant, independent contractor, intermediary, finder or other representative of the same general character, of any third party, while conducting business with the ASSURED on behalf of such third party.

o. loss of **Property** while in the custody of a **Transportation Company** provided, however, this SECTION 3.o. shall not apply to INSURING CLAUSE 3.;

p. loss resulting directly or indirectly from **Telefacsimile** Instructions provided, however, this SECTION 3.p. shall not apply to INSURING CLAUSE 11.;

q. loss resulting from entries or changes made by a natural person with authorized access to a **Computer System** who acts in good faith on instructions, unless such instructions are given to that person by a software contractor or its partner, officer, or employee authorized by the ASSURED to design, develop, prepare, supply, service, write or implement programs for the ASSURED'S **Computer System**; or

r. loss resulting directly or indirectly from the input of data into a **Computer System** terminal device, either on the premises of a customer of the ASSURED or under the control of such a customer, by a customer or other person who had authorized access to the customer's authentication mechanism.

---

*Specific Exclusions -*
*Applicable To All Insuring*
*Clauses Except Insuring*
*Clauses 1., 4. And 5.*

**4. This bond does not directly or indirectly cover:**

a. loss resulting from the complete or partial non-payment of or default on any **Loan** whether such **Loan** was procured in good faith or through trick, artifice, fraud or false pretenses provided, however, this SECTION 4.a. shall not apply to INSURING CLAUSE 8. or 9.;

b. loss resulting from forgery or any alteration;

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 32 of 82
F0018

## Conditions And Limitations

*Specific Exclusions - Applicable To All Insuring Clauses Except Insuring Clauses 1., 4. And 5. (continued)*

c.   loss involving a counterfeit provided, however, this SECTION 4.c. shall not apply to INSURING CLAUSE 7.; or

d.   loss resulting from any **Trade** provided, however, this SECTION 4.d. shall not apply to INSURING CLAUSE 8.

## Limit Of Liability

*Aggregate Limit Of Liability*

5.   The COMPANY'S total cumulative liability for all **Single Loss** of all ASSUREDS discovered during the BOND PERIOD shall not exceed the AGGREGATE LIMIT OF LIABILITY as stated in ITEM 2. of the DECLARATIONS. Each payment made under the terms of this Bond shall reduce the unpaid portion of the AGGREGATE LIMIT OF LIABILITY until it is exhausted.

On exhausting the AGGREGATE LIMIT OF LIABILITY by such payments:

a.   the COMPANY shall have no further liability for loss or losses regardless of when discovered and whether or not previously reported to the COMPANY, and

b.   the COMPANY shall have no obligation under GENERAL AGREEMENT E. to continue the defense of the ASSURED, and on notice by the COMPANY to the ASSURED that the AGGREGATE LIMIT OF LIABILITY has been exhausted, the ASSURED shall assume all responsibility for its defense at its own cost.

The unpaid portion of the AGGREGATE LIMIT OF LIABILITY shall not be increased or reinstated by any recovery made and applied in accordance with SECTION 11. In the event that a loss of **Property** is settled by indemnity in lieu of payment, then such loss shall not reduce the unpaid portion of the AGGREGATE LIMIT OF LIABILITY.

*Single Loss Limit Of Liability*

The COMPANY'S liability for each **Single Loss** shall not exceed the applicable SINGLE LOSS LIMIT OF LIABILITY as stated in ITEM 3. of the DECLARATIONS or the unpaid portion of the AGGREGATE LIMIT OF LIABILITY, whichever is less. If a **Single Loss** is covered under more than one INSURING CLAUSE, the maximum payable shall not exceed the largest applicable SINGLE LOSS LIMIT OF LIABILITY.

## Discovery

6.   This Bond applies only to loss first discovered by an officer of the ASSURED during the BOND PERIOD. Discovery occurs at the earlier of an officer of the ASSURED being aware of:

a.   facts which may subsequently result in a loss of a type covered by this Bond, or

b.   an actual or potential claim in which it is alleged that the ASSURED is liable to a third party,

regardless of when the act or acts causing or contributing to such loss occurred, even though the amount of loss does not exceed the applicable DEDUCTIBLE AMOUNT, or the exact amount or details of loss may not then be known.

## Conditions And Limitations
*(continued)*

| | | | |
|---|---|---|---|
| *Notice To Company -*<br>*Proof - Legal Proceedings*<br>*Against Company* | 7. | a. | The ASSURED shall give the COMPANY notice at the earliest practicable moment, not to exceed sixty (60) days after discovery of a loss, in an amount that is in excess of 50% of the applicable DEDUCTIBLE AMOUNT, as stated in ITEM 3. of the DECLARATIONS. |
| | | b. | The ASSURED shall furnish to the COMPANY proof of loss, duly sworn to, with full particulars, within six (6) months after such discovery. |
| | | c. | **Certificated Securities** listed in a proof of loss shall be identified by certificate or bond numbers, if issued with them. |
| | | d. | Legal proceedings for the recovery of any loss under this Bond shall not be brought prior to the expiration of sixty (60) days after the proof of loss is filed with the COMPANY or after the expiration of twenty-four (24) months from the discovery of such loss. |
| | | e. | This Bond affords coverage only in favor of the ASSURED. No claim, suit, action or legal proceeding shall be brought under this Bond by anyone other than the ASSURED. |
| | | f. | Proof of loss involving **Voice Initiated Funds Transfer Instructions** shall include electronic recordings of such instructions. |
| | | g. | Proof of loss involving a **Cash Letter** shall include a record or film record of such checks or drafts contained in the **Cash Letter**. |

| | | |
|---|---|---|
| *Deductible Amount* | 8. | The COMPANY shall be liable under this Bond only for the amount by which any **Single Loss** is greater than the applicable DEDUCTIBLE AMOUNT as stated in ITEM 3. of the DECLARATIONS, and is equal to or less than the applicable SINGLE LOSS LIMIT OF LIABILITY. |

*Valuation*

| | | |
|---|---|---|
| *Books Of Account Or*<br>*Other Records* | 9. | The value of any loss of **Property** consisting of books of account or other records used by the ASSURED in the conduct of its business shall be the amount paid by the ASSURED for blank books, blank pages, or other materials which replace the lost books of account or other records, plus the cost of labor paid by the ASSURED for the actual transcription or copying of data to reproduce such books of account or other records. |
| *Loan* | | The value of any loss or that portion of any loss resulting from a **Loan** shall be the amount actually disbursed by the ASSURED to a borrower under such **Loan** reduced by all amounts including, but not limited to, interest and fees received by the ASSURED under all **Loans** to such borrower, whether or not part of any claim under this Bond. |
| *Money* | | Any loss of **Money**, or loss payable in **Money**, shall be paid in the **Money** of the United States of America or the dollar equivalent of it, determined by the free market rate of exchange in effect at the time of discovery of such loss. |

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 34 of 82
P00020

*Other Property*

The value of any loss of **Property**, other than as stated above, shall be the actual cash value or the cost of repairing or replacing such **Property** with property of like quality and value, whichever is less.

*Securities*

The value of any loss of **Securities** shall be the average market value of such **Securities** on the business day immediately preceding discovery of such loss provided, however, that the value of any **Securities** replaced by the ASSURED, with the consent of the COMPANY and prior to the settlement of any claim for them, shall be the actual market value at the time of replacement. In the case of a loss of interim certificates, warrants, rights or other **Securities**, the production of which is necessary to the exercise of subscription, conversion, redemption or deposit privileges, the value of them shall be the market value of such privileges immediately preceding their expiration if said loss is not discovered until after their expiration. If no market price is quoted for such **Securities** or for such privileges, the value shall be fixed by agreement of the parties.

*Set-Off*

Any loss covered under INSURING CLAUSE 1. shall be reduced by a set-off consisting of the amount owed to the **Employee** causing the loss, whether or not assigned to another.

*Trade*

The value of any loss or that portion of any loss resulting from a **Trade** shall be reduced by the amount of commission and other amounts received by the ASSURED as a result of such **Trade**.

*Securities Settlement*  10.

In the event of a loss of **Securities** covered under this Bond, the COMPANY may, at its sole discretion, purchase replacement **Securities**, tender the value of the **Securities in Money,** or issue its indemnity to effect replacement **Securities**.

The indemnity required from the ASSURED under the terms of this SECTION against all loss, cost or expense arising from the replacement of **Securities** by the COMPANY'S indemnity shall be:

a.  for **Securities** having a value less than or equal to the applicable DEDUCTIBLE AMOUNT - one hundred (100%) percent;

b.  for **Securities** having a value in excess of the applicable DEDUCTIBLE AMOUNT but within the SINGLE LOSS LIMIT OF LIABILITY - the percentage that the DEDUCTIBLE AMOUNT bears to the value of the **Securities;**

c.  for **Securities** having a value greater than the applicable SINGLE LOSS LIMIT OF LIABILITY - the percentage that the DEDUCTIBLE AMOUNT and portion in excess of the SINGLE LOSS LIMIT OF LIABILITY bears to the value of the **Securities**.

The value referred to in SECTIONS 10.a., b., and c. is the value in accordance with SECTION 9., VALUATION, regardless of the value of such **Securities** at the time the loss under the COMPANY'S indemnity is sustained.

The COMPANY is not required to issue its indemnity for any portion of a loss of **Securities** which is not covered by this Bond; however, the COMPANY may do so as a courtesy to the ASSURED and at its sole discretion.

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 35 of 82
P0021

## Conditions And Limitations

**Securities Settlement**
*(continued)*

The ASSURED shall pay the proportion of the COMPANY'S premium charge for the COMPANY'S indemnity as set forth in SECTIONS 10.a., b., and c. No portion of the SINGLE LOSS LIMIT OF LIABILITY shall be used as payment of premium for any indemnity purchased by the ASSURED to obtain replacement **Securities**.

---

**Subrogation -**
**Assignment - Recovery**

11. In the event of a payment under this Bond, the COMPANY shall be subrogated to all of the ASSURED'S rights of recovery against any person or entity to the extent of such payment. On request, the ASSURED shall deliver to the COMPANY an assignment of the ASSURED'S rights, title and interest and causes of action against any person or entity to the extent of such payment.

Recoveries, whether effected by the COMPANY or by the ASSURED, shall be applied net of the expense of such recovery in the following order:

a. first, to the satisfaction of the ASSURED'S covered loss which would otherwise have been paid but for the fact that it is in excess of either the SINGLE LOSS LIMIT OF LIABILITY or AGGREGATE LIMIT OF LIABILITY,

b. second, to the COMPANY in satisfaction of amounts paid in settlement of the ASSURED'S claim,

c. third, to the ASSURED in satisfaction of the applicable DEDUCTIBLE AMOUNT, and

d. fourth, to the ASSURED in satisfaction of any loss suffered by the ASSURED which was not covered under this Bond.

Recovery from reinsurance or indemnity of the COMPANY shall not be deemed a recovery under this SECTION.

---

**Cooperation Of Assured**

12. At the COMPANY'S request and at reasonable times and places designated by the COMPANY, the ASSURED shall:

a. submit to examination by the COMPANY and subscribe to the same under oath, and

b. produce for the COMPANY'S examination all pertinent records, and

c. cooperate with the COMPANY in all matters pertaining to the loss.

The ASSURED shall execute all papers and render assistance to secure to the COMPANY the rights and causes of action provided for under this Bond. The ASSURED shall do nothing after loss to prejudice such rights or causes of action.

---

*Termination*

13. This Bond terminates as an entirety on the earliest occurrence of any of the following:

   a. immediately on the receipt by the COMPANY of a written notice from the ASSURED of its decision to terminate this Bond, or

   b. immediately on the appointment of a trustee, receiver or liquidator to act on behalf of the ASSURED, or the taking over of the ASSURED by State or Federal officials, or

   c. immediately on the dissolution of the ASSURED, or

   d. immediately on the taking over of the ASSURED by another entity, or

   e. immediately on exhausting the AGGREGATE LIMIT OF LIABILITY, or

   f. immediately on expiration of the BOND PERIOD.

   This Bond terminates as to any **Employee**:

   (1) immediately on the ASSURED, or any of its directors, trustees or officers not acting in collusion with such **Employee**, learning of any dishonest act committed by such **Employee** at any time, whether in the employment of the ASSURED or otherwise, whether or not such act is of the type covered under this Bond, and whether against the ASSURED or any other person or entity, or

   (2) fifteen (15) days after the receipt by the ASSURED of a written notice from the COMPANY of its decision to terminate this Bond as to any **Employee**.

   Termination as to any **Employee** shall not apply if the dishonest act occurred prior to employment with the ASSURED and involved less than $10,000.

   Such termination, however, is without prejudice to the loss of any **Property** then in transit in the custody of such **Employee**.

   Should this Bond be cancelled, reduced, non-renewed or restrictively modified by the COMPANY, the COMPANY will endeavor to give sixty (60) days advance notice to the Federal National Mortgage Association, the Federal Home Loan Mortgage Company, or the Government National Mortgage Association, but failure to do so shall not impair or delay the effectiveness of any such cancellation, reduction, non-renewal or restrictive modification, nor shall the COMPANY be held liable in any way.

   Should this Bond be cancelled or reduced at the request of the ASSURED, the COMPANY will endeavor to notify the Federal National Mortgage Association, the Federal Home Loan Mortgage Company, or the Government National Mortgage Association of such cancellation or reduction within ten (10) business days after receipt of such request, but failure to do so shall not impair or delay the effectiveness of such cancellation or reduction, nor shall the COMPANY be held liable in any way.

## Conditions And Limitations
*(continued)*

*Other Insurance*    14.   Coverage under this Bond shall apply only as excess over any other valid and collectible insurance, indemnity or suretyship obtained by or on behalf of:

    a.   the ASSURED, or

    b.   one other than the ASSURED on **Property** subject to SECTION 3.h., or

    c.   a **Transportation Company**, or

    d.   another entity on whose premises the loss occurred or which employed the person causing the loss or engaged the messenger conveying the **Property** involved.

*Employee Benefit Plans*    15.   All of the ASSURED'S employee benefit plans that qualify under Section 412 of the employee Retirement Income Security Act of 1974 (ERISA), are provided bonding protection under INSURING CLAUSE 1., DISHONESTY, as required under ERISA.

*Conformity*    16.   If any limitation within this Bond is prohibited by any law controlling this Bond's construction, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

*Change Or Modification*    17.   This Bond or any instrument amending or affecting this Bond may not be changed or modified orally. No change in or modification of this Bond shall be effective except when made by written endorsement to this Bond signed by an authorized representative of the COMPANY.

Case 5:23-cv-00095-BO-RN   Document 41-3   Filed 02/27/23   Page 38 of 82
P00241

FEDERAL INSURANCE COMPANY

Endorsement No.: 1

Bond Number: 82403947

NAME OF ASSURED: SVB FINANCIAL GROUP

---

## REVISE ITEM 2 & 3 ENDORSEMENT

It is agreed that this Bond is amended by deleting ITEMS 2. and 3. in their entirety on the DECLARATIONS and substituting the following:

"**ITEM 2.** AGGREGATE LIMIT OF LIABILITY: $30,000,000

**ITEM 3.** SINGLE LOSS LIMITS OF LIABILITY – DEDUCTIBLE AMOUNTS:

The amounts set forth below shall be part of and not in addition to the AGGREGATE LIMIT OF LIABILITY. If **"Not Covered"** is inserted opposite any specified INSURING CLAUSE, such INSURING CLAUSE and any other reference to such INSURING CLAUSE in this Bond shall be deemed to be deleted.

| INSURING CLAUSE | SINGLE LOSS LIMIT OF LIABILITY | DEDUCTIBLE AMOUNT |
|---|---|---|
| 1. Dishonesty | | |
|    A. Employee | $15,000,000 | $1,000,000 |
|    B. Trade or Loan | $15,000,000 | $1,000,000 |
|    C. Audit Expense | $500,000 | $50,000 |
| 2. On Premises | $15,000,000 | $1,000,000 |
| 3. In Transit | $15,000,000 | $1,000,000 |
| 4. Forgery or Alteration | $15,000,000 | $1,000,000 |
| 5. Extended Forgery | $15,000,000 | $1,000,000 |
| 6. Automated Devise | $15,000,000 | $1,000,000 |
| 7. Counterfeit Money | $15,000,000 | $1,000,000 |
| 8. Extended Computer System | $15,000,000 | $1,000,000 |
| 9. Defective Signature | $15,000,000 | $1,000,000 |
| 10. Extortion | Not Covered | N/A |
| 11. Stop Payment Order | $15,000,000 | $1,000,000 |
| 12. Cash Letter | $500,000 | $0 |
| 13. Check Kiting | $15,000,000 | $1,000,000 |
| 14. Social Engineering (EE/Vendor) | $500,000 | $1,000,000 |

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date: August 19, 2020

By _____
Authorized Representative

A-2 Bond
Form 17-02-2329 (Ed. 10-00)

Page 1

Effective date of
this endorsement/rider: August 1, 2020

FEDERAL INSURANCE COMPANY

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 82403947

Issued to:  SVB FINANCIAL GROUP

## PRO RATA CANCELLATION ENDORSEMENT

In consideration of the premium charged, it is agreed that, notwithstanding anything to the contrary in the policy or any endorsements thereto, in the event that this policy is cancelled, any premium refund due to the insured shall be computed on a pro rata basis.

The cancellation will be effective even if a refund has not been made or offered.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Effective date of
this endorsement/rider: August 1, 2020

FEDERAL INSURANCE COMPANY

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 82403947

Issued to:  SVB FINANCIAL GROUP

---

## COMPLIANCE WITH APPLICABLE TRADE SANCTION LAWS

It is agreed that this insurance does not apply to the extent that trade or economic sanctions or other similar laws or regulations prohibit the coverage provided by this insurance.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

FEDERAL INSURANCE COMPANY

Endorsement No.: 4

Bond Number:     82403947

NAME OF ASSURED:  SVB FINANCIAL GROUP

---

## AMENDED EXTENDED FORGERY ENDORSEMENT

It is agreed that this Bond is amended by deleting INSURING CLAUSE 5., Extended Forgery, in its entirety and substituting the following:

5.    Extended Forgery

Loss resulting directly from the ASSURED having, in good faith, for its own account or the account of others:

a.    acquired, sold or delivered, or given value, extended credit or assumed liability, in reliance on any original

   (1)    **Certificated Security,**

   (2)    deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,

   (3)    **Certificate of Origin or Title,**

   (4)    **Document of Title,**

   (5)    **Evidence of Debt,**

   (6)    corporate, partnership or personal **Guarantee,**

   (7)    **Security Agreement,** or

   (8)    **Instruction**

   which

      i.      bears a **Forgery,** or

      ii.     is fraudulently materially altered, or

      iii.    is lost or stolen, or

b.    guaranteed in writing or witnessed any signature on any transfer, assignment, bill of sale, power of attorney, **Guarantee,** or endorsement upon or in connection with any item listed in a.(1) through a.(8) above, or

c.    acquired, sold or delivered, or given value, extended credit or assumed liability in reliance on any item listed in a.(1) through a.(4) above which is a **Counterfeit Original.**

A-2 Bond
Form 17-02-5496 (Ed. 7-03)                                                            Page 1

Actual physical possession, and continued actual physical possession if taken as collateral, of the items listed in a.(1) through a.(8) above by the ASSURED or a correspondent Federal or State chartered deposit institution of the ASSURED is a condition precedent to the ASSURED having relied on such items. Release or return of such collateral is an acknowledgment by the ASSURED that it no longer relies on such collateral.

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  August 19, 2020                              By _____
                                                              Authorized Representative

A-2 Bond
Form 17-02-5496 (Ed. 7-03)                                                    Page 2

FEDERAL INSURANCE COMPANY

Endorsement No.  5

Bond Number:       82403947

NAME OF ASSURED:  SVB FINANCIAL GROUP

---

## JOINT LOSS PAYEE AND NOTIFICATION ENDORSEMENT

It is agreed that this Bond is amended by adding at the end of General Agreement A., Joint Assured, the following:

Notwithstanding the foregoing, at the written request of the first named ASSURED, any payment in satisfaction of loss covered by this Bond involving **Money** or other **Property** in which

Fannie Mae

has an interest shall be paid by an instrument issued to the named ASSURED and

Fannie Mae

as joint loss payees subject to the following conditions and limitations:

(1)  The Bond is for the sole use and benefit of the named ASSURED as expressed herein.  The organization named above shall not be considered as an ASSURED under the Bond, nor shall it otherwise have any rights or benefits under said Bond.

(2)  Notwithstanding any payment made at the written request of the first named ASSURED, the amount paid for any **Single Loss** shall not exceed the applicable SINGLE LOSS LIMIT OF LIABILITY or the unused portion of the AGGREGATE LIMIT OF LIABILITY under this Bond, whichever is less.

(3)  If the COMPANY makes any such payment, such payment shall be treated as though made to the first named ASSURED.

Should this Bond be cancelled, non-renewed or restrictively modified by the COMPANY, the COMPANY will endeavor to give advance notice to the organization named above, but failure to provide such notice shall not impair, delay or negate the effect of such cancellation, non-renewal or restrictive modification, nor shall it impose any obligation or liability of any kind on the COMPANY, its agents or representatives.

Should this Bond be cancelled, non-renewed or restrictively modified at the request of the ASSURED, the COMPANY shall endeavor to notify the organization named above within ten (10) business days after receipt of such request, but failure to do so shall not impair, delay or negate the effect of such cancellation, non-renewal or restrictive modification, nor shall it impose any obligation or liability of any kind on the COMPANY, its agents or representatives.

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  August 19, 2020                 By  _____
                                                          Authorized Representative

A-2 Bond
Form 17-02-1041 (Rev. 3-03)

**FEDERAL INSURANCE COMPANY**

Endorsement No.  6

Bond Number:    82403947

NAME OF ASSURED: SVB FINANCIAL GROUP

---

## JOINT LOSS PAYEE AND NOTIFICATION ENDORSEMENT

It is agreed that this Bond is amended by adding at the end of General Agreement A., Joint Assured, the following:

Notwithstanding the foregoing, at the written request of the first named ASSURED, any payment in satisfaction of loss covered by this Bond involving **Money** or other **Property** in which

Freddie Mac

has an interest shall be paid by an instrument issued to the named ASSURED and

Freddie Mac

as joint loss payees subject to the following conditions and limitations:

(1)   The Bond is for the sole use and benefit of the named ASSURED as expressed herein.  The organization named above shall not be considered as an ASSURED under the Bond, nor shall it otherwise have any rights or benefits under said Bond.

(2)   Notwithstanding any payment made at the written request of the first named ASSURED, the amount paid for any **Single Loss** shall not exceed the applicable SINGLE LOSS LIMIT OF LIABILITY or the unused portion of the AGGREGATE LIMIT OF LIABILITY under this Bond, whichever is less.

(3)   If the COMPANY makes any such payment, such payment shall be treated as though made to the first named ASSURED.

Should this Bond be cancelled, non-renewed or restrictively modified by the COMPANY, the COMPANY will endeavor to give advance notice to the organization named above, but failure to provide such notice shall not impair, delay or negate the effect of such cancellation, non-renewal or restrictive modification, nor shall it impose any obligation or liability of any kind on the COMPANY, its agents or representatives.

Should this Bond be cancelled, non-renewed or restrictively modified at the request of the ASSURED, the COMPANY shall endeavor to notify the organization named above within ten (10) business days after receipt of such request, but failure to do so shall not impair, delay or negate the effect of such cancellation, non-renewal or restrictive modification, nor shall it impose any obligation or liability of any kind on the COMPANY, its agents or representatives.

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  August 19, 2020                                 By _____
                                                              Authorized Representative

A-2 Bond
Form 17-02-1041 (Rev. 3-03)

**FEDERAL INSURANCE COMPANY**

Endorsement No. 7

Bond Number: 82403947

NAME OF ASSURED: SVB FINANCIAL GROUP

---

**JOINT LOSS PAYEE AND NOTIFICATION ENDORSEMENT**

It is agreed that this Bond is amended by adding at the end of General Agreement A., Joint Assured, the following:

Notwithstanding the foregoing, at the written request of the first named ASSURED, any payment in satisfaction of loss covered by this Bond involving **Money** or other **Property** in which Ginnie Mae

has an interest shall be paid by an instrument issued to the named ASSURED and Ginnie Mae

as joint loss payees subject to the following conditions and limitations:

(1) The Bond is for the sole use and benefit of the named ASSURED as expressed herein. The organization named above shall not be considered as an ASSURED under the Bond, nor shall it otherwise have any rights or benefits under said Bond.

(2) Notwithstanding any payment made at the written request of the first named ASSURED, the amount paid for any **Single Loss** shall not exceed the applicable SINGLE LOSS LIMIT OF LIABILITY or the unused portion of the AGGREGATE LIMIT OF LIABILITY under this Bond, whichever is less.

(3) If the COMPANY makes any such payment, such payment shall be treated as though made to the first named ASSURED.

Should this Bond be cancelled, non-renewed or restrictively modified by the COMPANY, the COMPANY will endeavor to give advance notice to the organization named above, but failure to provide such notice shall not impair, delay or negate the effect of such cancellation, non-renewal or restrictive modification, nor shall it impose any obligation or liability of any kind on the COMPANY, its agents or representatives.

Should this Bond be cancelled, non-renewed or restrictively modified at the request of the ASSURED, the COMPANY shall endeavor to notify the organization named above within ten (10) business days after receipt of such request, but failure to do so shall not impair, delay or negate the effect of such cancellation, non-renewal or restrictive modification, nor shall it impose any obligation or liability of any kind on the COMPANY, its agents or representatives.

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date: August 19, 2020     By _____
                                   Authorized Representative

A-2 Bond
Form 17-02-1041 (Rev. 3-03)

P0032

Effective date of
this endorsement/rider: August 1, 2020

FEDERAL INSURANCE COMPANY

Endorsement/Rider No. 8

To be attached to and
form a part of Bond No. 82403947

Issued to: SVB FINANCIAL GROUP

---

## GINNIE MAE ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1) Except with respect to paragraphs (7) and (8) of this endorsement, this endorsement takes effect if, but only if, the Government National Mortgage Association (hereinafter "Ginnie Mae") terminates the ASSURED's right to service mortgages that are owned by Ginnie Mae. Paragraphs (7) and (8) shall be effective when this endorsement becomes effective.

(2) In the event of such a termination, and where the ASSURED has failed to file a claim under this bond for a loss sustained prior to the termination set forth in paragraph (1) above, including failure to file notice of loss or proof of loss, as the case may be, Ginnie Mae shall have the right to file a claim directly under this bond no later than 10 business days after expiration of the time period that this bond required the ASSURED to take such action. The notice of loss or proof of loss submitted by Ginnie Mae must be accompanied by:

   a. Proof of Ginnie Mae's interest in the funds or other **Property** related to the loss, and

   b. Proof that Ginnie Mae notified the ASSURED in writing that if the ASSURED failed to comply with the notice/proof requirements set forth by the NOTICE/PROOF LEGAL PROCEEDINGS condition of this bond, Ginnie Mae would take action to comply with the requirements of such condition. Ginnie Mae notice shall be mailed to the ASSURED's last address known to Ginnie Mae or the ASSURED's address on this bond. Proof of mailing shall be sufficient proof of notice.

(3) In the event Ginnie Mae provides such notice of loss and the ASSURED does not notify the COMPANY within 10 days of receipt of the notice referred to in paragraph (2)b. above that the ASSURED intends itself to pursue a claim for the loss, Ginnie Mae shall have full authority to provide the proof of loss, negotiate, settle, file suit or take any other action that this bond requires or permits the ASSURED to do, without any further action or approval by the ASSURED. The ASSURED shall cease to have the right to file the proof of loss, negotiate, settle, file suite or take any other action with respect to the loss. In the event the ASSURED has provided the notice of loss in compliance with the NOTICE/PROOF LEGAL PROCEEDINGS condition of this bond and Ginnie Mae provides the proof of loss and the ASSURED does not notify the COMPANY within 10 days of receipt of the notice referred to in paragraph (2)b. above that ASSURED intends itself to pursue a claim for the loss, Ginnie Mae shall have full authority to negotiate, settle, file suit or take any action that this bond requires or permits the ASSURED to do, without any further action or approval by the ASSURED. The ASSURED shall cease to have the right to negotiate, settle, file suit or take any other action with respect to the loss. Any suit shall be filed in the name of the ASSURED for the benefit of Ginnie Mae.

(4) In the event Ginnie Mae provides such notice of loss or proof of loss and the ASSURED notifies the COMPANY within 10 days of receipt of the notice referred to in paragraph (2)b. above that the ASSURED intends itself to pursue a claim for the loss, unless otherwise ordered by a court of competent jurisdiction, and subject to Ginnie Mae's rights under paragraph (3), the ASSURED shall have full authority to negotiate, settle, file suit or take any other action in relation to the loss, but Ginnie Mae shall be a loss payee of any payment

for a covered loss along with the ASSURED as their interests may appear, and any payment shall be made as described in paragraph (5).

(5) Any payment of the ASSURED's loss after such notice of loss or proof of loss provided by Ginnie Mae, or after Ginnie Mae notifies the COMPANY and the ASSURED in writing that it claims an interest in any payment due under this bond, shall at the COMPANY's option, be made by check or draft either (a) jointly payable to the ASSURED and Ginnie Mae, as their interests may appear, or (b) payable solely to Ginnie Mae, and, in either case, mailed to Ginnie Mae.

(6) Nothing in this endorsement shall make Ginnie Mae an ASSURED under this bond, nor obligate the COMPANY to pay any loss not suffered by the ASSURED, nor obligate the COMPANY to pay any loss or any amount which it would not owe had the ASSURED alone submitted the claim.

(7) Should this bond be canceled, reduced, non-renewed or restrictively modified by the COMPANY, the COMPANY will endeavor to give 30 days written advance notice to Ginnie Mae, but failure to do so shall not impair or delay the effectiveness of such cancellation or reduction, nor shall the ASSURED be liable for any damages allegedly caused by its failure to give such notice.

(8) Should this bond be canceled or reduced at the request of the ASSURED, the COMPANY will endeavor to notify Ginnie Mae in writing of such cancellation or reduction within 10 business days after receipt of such request, but failure to do so shall not impair or delay the effectiveness of such cancellation or reduction, nor shall COMPANY be liable for any damages allegedly caused by its failure to give such notice.

(9) The ASSURED and the COMPANY agree that Ginnie Mae may obtain a copy of this bond upon written request to the ASSURED. In addition, upon the request of Ginnie Mae, the COMPANY will confirm whether this bond is in effect and will endeavor to provide information regarding the Limits of Liability, Insuring Clauses and riders of this bond.

(10) All notices to be submitted to Ginnie Mae shall be sent to the following address:

(11) Except as provided above, this bond remains in full force and effect according to its terms, and the limits of liability, deductibles, and all of its other terms and conditions continue to apply.

(12) The ASSURED agrees that the inclusion of this endorsement on the bond is absolute proof of consent by the ASSURED to allow the COMPANY to comply with the terms of this endorsement even when action by the COMPANY in compliance with this endorsement may detrimentally affect the ASSURED's rights with regard to other claims and/or may not be in the best interest of the ASSURED.

(13) Accordingly, any reference in the attached bond to the "Government National Mortgage Association" is deleted.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Accepted by first named ASSURED:

Title _____

Date _____

Signed _____

**FEDERAL INSURANCE COMPANY**

Endorsement No.: 9

Bond Number: 82403947

NAME OF ASSURED: SVB FINANCIAL GROUP

**AMENDING DEFINITION OF EMPLOYEE-FORMER EMPLOYEES ENDORSEMENT**

It is agreed that this Bond is amended by adding to the definition of **Employee** in Section 1., Definitions, the following:

(9) a natural person who resigns, retires or is terminated from the service of the ASSURED during the BOND PERIOD provided that this applies:

    a. for a period of sixty (60) days subsequent to such resignation, retirement or termination but not beyond the date of expiration or termination of the Bond; and

    b. if such resignation, retirement or termination has not arisen from or in connection with the discovery by the ASSURED of any actual or alleged dishonest, fraudulent or criminal act(s) of such person.

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date: August 19, 2020

By _____
                       Authorized Representative

General Use
Form 17-02-2335 (Ed. 10-00)

**FEDERAL INSURANCE COMPANY**

Endorsement No: 10

Bond Number:    82403947

NAME OF ASSURED: SVB FINANCIAL GROUP

---

### PREMIUM ENDORSEMENT

It is agreed that:

1.    The premium for this Bond for the period  August 1, 2020 to August 1, 2021 is:


Premium:   One hundred and five thousand dollars ($105,000.00)

2.    It is further agreed that this premium is subject to change during this period if amendments are made to this Bond at the request of the ASSURED.


This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.


ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.


Date:  August 19, 2020                              By  _____

                                                              Authorized Representative

A-2 Bond
Form 17-02-0735 (Rev. 1-97)

**FEDERAL INSURANCE COMPANY**

Endorsement No.: 11

Bond Number: 82403947

NAME OF ASSURED: SVB FINANCIAL GROUP

---

**STOP PAYMENT ORDER OR REFUSAL TO PAY NEGOTIABLE INSTRUMENT ENDORSEMENT**

It is agreed that this Bond is amended as follows:

1.  By adding the following to ITEM 3. SINGLE LOSS LIMITS OF LIABILITY – DEDUCTIBLE AMOUNTS of the DECLARATIONS for this Bond:

| INSURING CLAUSE | SINGLE LOSS LIMIT OF LIABILITY | DEDUCTIBLE AMOUNT |
|---|---|---|
| 11. Stop Payment Order or Refusal to Pay Negotiable Instrument | $15,000,000 | $500,000 |

2.  By adding the following INSURING CLAUSE:

    11. Stop Payment Order or Refusal to Pay Negotiable Instrument

    Loss resulting directly from the ASSURED being legally liable to pay compensatory damages for:

    a.  complying or failing to comply with notice from any depositor of the ASSURED or any authorized representative of such depositor, to stop payment on any **Negotiable Instrument** made or drawn upon or against the ASSURED by such depositor, or

    b.  refusing to pay any **Negotiable Instrument** made or drawn upon or against the ASSURED by any depositor of the ASSURED or by any authorized representative of such depositor.

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 52 of 82

F0038

3.  By adding the following Specific Exclusion:

    Section 4.A. Specific Exclusions – Applicable to INSURING CLAUSE 11

    **This Bond does not directly or indirectly cover:**

    a.  liability assumed by the ASSURED by agreement under any contract, unless such liability would have attached to the ASSURED even in the absence of such agreement,

    b.  loss arising out of:

        (1)  libel, slander, wrongful entry, eviction, defamation, false arrest, false imprisonment, malicious prosecution, assault or battery,

        (2)  sickness, disease, physical bodily harm, mental or emotional distress or anguish, or death of any person, or

        (3)  discrimination.

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  August 19, 2020

By _____
          Authorized Representative

FEDERAL INSURANCE COMPANY

Endorsement No.: 12

Bond Number: 82403947

NAME OF ASSURED: SVB FINANCIAL GROUP

---

## AMENDED DEDUCTIBLE AMOUNT – SPECIFIC ENTITY ENDORSEMENT

It is agreed that solely with respect to loss involving SVB Securities, the ITEM 3., Deductible Amount, for such loss shall be $ 1,000,000.

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date: August 19, 2020       By _____
                                                     Authorized Representative

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 54 of 82
P0040

FEDERAL INSURANCE COMPANY

Endorsement No.:     13

Bond Number:          82403947

NAME OF ASSURED: SVB FINANCIAL GROUP

---

## AUDIT, CLAIMS AND REWARD EXPENSE ENDORSEMENT

It is agreed that this Bond is amended as follows:

1.      By deleting in its entirety INSURING CLAUSE 1.C. and substituting the following:

     C.      Audit, Claims and Reward Expense

       (1)     Reasonable expense incurred by the ASSURED for audits or examinations required by State or Federal supervisory authorities to be conducted either by such authorities or by independent accountants as the result of loss sustained by the ASSURED in excess of the applicable DEDUCTIBLE AMOUNT.  This INSURING CLAUSE applies solely to losses covered under INSURING CLAUSE 1.

       (2)     Reasonable expense incurred by the ASSURED, solely for independent firms or individuals retained to determine the amount of loss, where:

         a.      the loss is covered under the Bond, and

         b.      the loss is in excess of the applicable DEDUCTIBLE AMOUNT.

       (3)     Reasonable reward monies, not to exceed Ten Thousand Dollars ($10,000) per event, paid by the ASSURED for information leading to the capture or apprehension of any persons who, while this Bond is in effect, shall have robbed any of the ASSURED'S messengers, or robbed or burglarized any of the ASSURED'S premises, or shall have made an attempt thereat.

2.      Under General Exclusions-Applicable To All Insuring Clauses, Section 2.f.(1) does not apply to loss covered under this INSURING CLAUSE.

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2019.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date:  August 19, 2020                          By _____
                                                              Authorized Representative

A-2 Bond
Form 17-02-2339 (Ed. 10-00)

FEDERAL INSURANCE COMPANY

Endorsement No.: 14

Bond Number: 82403947

NAME OF ASSURED: SVB FINANCIAL GROUP

---

## CHECK KITING ENDORSEMENT

It is agreed that this Bond is amended as follows:

1.    By adding the following INSURING CLAUSE:

"13.   Check Kiting

Loss resulting directly from the ASSURED having credited the account of a customer on the faith of any **Item of Deposit** which proves to be uncollectible, provided that such customer intended to:

a.    cause the ASSURED to sustain such loss, and

b.    obtain improper financial gain,

provided that the crediting of such account permitted fraudulent withdrawal from that account.

This INSURING CLAUSE does not apply to loss involving any **Item of Deposit** which is not finally paid for any reason, including, but not limited to, forgery or any other fraud, if the ASSURED:

c.    has been alerted to a potential loss on an account by any automated detection program, and

d.    within seventy-two (72) hours of receiving such alert fails:

(1)    to block further withdrawal or payment transactions on any affected account,

(2)    subject to UCC requirements, to return an **Item of Deposit** presented for payment and drawn on an uncollectible account, or

(3)    to place an uncollectible **Item of Deposit** on hold to the maximum extent

permitted by applicable banking regulation.

It shall be a condition precedent to coverage under this INSURING CLAUSE that the ASSURED uses a report specifically designed to detect check kiting fraud, which is prepared, reviewed and acknowledged daily by no less than two of the ASSURED'S officers."

2. By adding to Section 1., Definitions, the following:

"gg. **Items of Deposit** means one or more checks drawn upon a financial institution other than the ASSURED."

3. By deleting Exclusion f. in its entirety from Section 3., Specific Exclusions, and substituting the following:

"f. loss involving **Items of Deposit** which are not finally paid for any reason including, but not limited to, forgery or any other fraud, provided, however, this Section 3.f. shall not apply to this INSURING CLAUSE."

This Endorsement applies to loss discovered after 12:01 a.m. on August 1, 2020.

ALL OTHER TERMS AND CONDITIONS OF THIS BOND REMAIN UNCHANGED.

Date: August 19, 2020          By _____
                                        Authorized Representative

Effective date of
this endorsement/rider: August 1, 2020

FEDERAL INSURANCE COMPANY

Endorsement/Rider No. 15

To be attached to and
form a part of Policy No. 82403947

Issued to: SVB FINANCIAL GROUP

---

EXTENDED COMPUTER SYSTEMS WITH CYBER FRAUD ENDORSEMENT
(FOR USE ON THE A-2 BOND FORM)

In consideration of the premium charged, it is agreed that this Bond is amended as follows:

(1) Item 2.,Single Loss Limits of Liability – Deductible Amounts, of the Declarations of this Bond is amended to include the following:

| INSURING CLAUSE | | SINGLE LOSS LIMIT OF LIABILITY | | DEDUCTIBLE AMOUNT |
|---|---|---|---|---|
| 8. Extended Computer Systems | | $ 15,000,000 | | $ 500,000 |
| 10. Extortion | | $ Not Covered | | $ N/A |

(2) By deleting INSURING CLAUSE 8. Computer System and replacing it with the following:

8. Extended Computer Systems

A. Computer Systems

Loss resulting directly from the ASSURED having transferred, paid or delivered any funds or property, established any credit, debited any account or given value as the direct result of the fraudulent preparation, or the fraudulent modification of **Electronic Instruction** or the fraudulent input of **Electronic Data** directly into:

(1) the ASSURED'S **Computer System**,

(2) a **Service Bureau's Computer System**,

(3) an **Electronic Funds Transfer System**, or

(4) a **Customer Communication System**.

B. Electronic Data, Electronic Media, Electronic Instruction

Loss resulting directly from:

14-02-21158 (10/2015)          Page 1

(1) fraudulent: (i) modification, (ii) alteration, (iii) damage, (iv) deletion, or (v) destruction of **Electronic Data, Electronic Media** or **Electronic Instruction** owned by the ASSURED, or for which the ASSURED is legally liable, while stored within or being run within any **Computer System** covered under 8.A. above; or

(2) robbery, burglary, larceny or theft of **Electronic Data, Electronic Media** or **Electronic Instruction.**

C.   Electronic Communication

Loss resulting directly from the ASSURED having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any electronic communication directed to the ASSURED, which was transmitted or appears to have been transmitted through:

(1) an **Electronic Communication System**,

(2) an automated clearing house or custodian, or

(3) a telex, TWX, **Telefacsimile** or similar means of communication.

into the ASSURED'S **Computer System** or **Communication Terminal**, and which was purportedly sent by an automated clearing house, custodian, or financial institution, but which communication was fraudulently sent, or was fraudulently modified, without the knowledge of such automated clearing house, custodian, or financial institution.

D.   Cyber Fraud

Loss resulting directly from the ASSURED having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of a **Command** purportedly issued by a **Customer**, or by a natural person authorized by the **Customer** to make a **Command** on the **Customer's** behalf, but which **Command** was fraudulently issued, or was fraudulently modified, without the **Customer's** knowledge.

E.   Assured's Service Bureau Operations

Loss resulting directly from a customer of the ASSURED having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value as the direct result of the fraudulent input, the fraudulent modification or the fraudulent destruction of **Electronic Data** stored within, or being run within, the ASSURED'S **Computer System**, or during electronic transmission from the ASSURED'S **Computer System** into the customer's **Computer System**, while the ASSURED is acting as a **Service Bureau** for said customer, which fraudulent acts were committed by a person who intended to cause the ASSURED or the ASSURED'S customer to sustain a loss or to obtain financial gain for such person or any other person, and for which loss the ASSURED is held to be legally liable.

F.   Electronic Transmission

Loss resulting directly from a customer of the ASSURED, any automated clearing house, custodian or financial institution having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any electronic communication directed to such customer, automated clearing house, custodian or financial institution and which was transmitted, or appears to have been transmitted, through:

(1) an **Electronic Communication System**,

(2) an automated clearing house or custodian, or

(3) a telex, TWX, **Telefacsimile** or similar means of communication.

into the customer's, automated clearing house's, custodian's or financial institution's **Computer System** or **Communication Terminal**, and which was purportedly sent by the

ASSURED, but which communication was fraudulently sent, or was fraudulently modified, without the ASSURED'S knowledge.

(3) By deleting INSURING CLAUSE 10, Voice Initiated Funds Transfer, and replacing it with the following:

    10.    Extortion

Loss resulting directly from the ASSURED having surrendered any funds or property to a person other than an employee of the ASSURED where said person has gained or alleges to have gained unauthorized access to the ASSURED'S **Computer System** and threatens to:

    (1)    cause the ASSURED to transfer, pay or deliver any funds or property using the ASSURED'S **Computer System**,

    (2)    sell or disclose confidential security codes to another person or party, to enable the recipient of such confidential security codes to cause the ASSURED to transfer, pay or deliver any funds or property using the ASSURED'S **Computer System,** or

    (3)    damage or destroy the ASSURED'S **Electronic Data** or the ASSURED'S **Electronic Instruction** while stored within the ASSURED'S **Computer System**;

provided, however, that before surrendering any funds or property the ASSURED makes every reasonable effort to conduct an investigation which provides a reasonable basis for concluding said threat is technologically credible, and the ASSURED reports said threat to the Federal Bureau of Investigation or other law enforcement agency having jurisdiction over such matters and reasonably complies with the recommendations, instructions or suggestions of such law enforcement agency.

(4) By deleting Insuring Clause 11., Telefacsimile Instruction.

(5) Section 1, Definitions, of the Conditions and Limitations Section is amended as follows:

    A.    The term **Customer** is deleted and replaced with the following:

**Customer** means (i) any natural person, or (ii) any corporation, partnership, proprietor, trust, or other entity, that has, or had, a written agreement with the ASSURED to transfer such natural person's or such entity's funds through the issuance or transmission of a **Command**.

    B.    The term **Computer System** is deleted and replaced with the following:

**Computer System** means a device or group of devices that by manipulation of electronic, magnetic optical or electromechanical impulses pursuant to a computer program can perform operations on **Electronic Data**.

    C.    The term **Telefacsimile** is deleted and replaced with the following:

**Telefacsimile** means a system of transmitting a facsimile of a tangible document by electronic signals over telephone lines to a piece of equipment maintained by the ASSURED for the specific purpose of receiving such signals and printing such facsimile on a tangible medium.

    D.    The term **Voice Initiated Funds Transfer Instruction** is deleted and replaced with the following:

**Voice Initiated Funds Transfer Instruction** means those oral instructions which authorize the transfer to another financial institution of funds in a **Customer's** account and which are

Case 5:23-cv-00095-BO-RN    Document 1-3    Filed 02/27/23    Page 60 of 82

<div style="margin-left: 2em;">

(1)    made over a telecommunications device, and

(2)    directed to those **Employees** specifically authorized by the ASSURED to receive such instructions by telephone at the ASSURED'S offices.

</div>

(6)    The following terms are added to Section 1. Definitions, of the Conditions and Limitations Section:

A.    **Command** means any:

    (1) electronic record or message created, generated, sent, communicated, received or stored by electronic means that is capable of retention by the recipient at the time of receipt, including an e-mail, and that was transmitted through an **Electronic Communication System;**

    (2) telex, TWX or **Telefacsimile**; or

    (3) **Voice Initiated Funds Transfer Instruction**.

B.    Communication Terminal means a teletype, teleprinter or video display terminal, or similar device capable of sending or receiving information electronically. Communication Terminal does not mean a telephone.

C.    Customer Communication System means those communications systems which provide Customers of the ASSURED with direct access to the ASSURED's Computer Systems.

D.    Electronic Communication System means any and all services provided by or through the facilities of any electronic communication system, including Fedwire, Clearing House Interbank Payment System (CHIPS), Society for Worldwide Interbank Financial Telecommunication (SWIFT) and similar automated interbank communication systems, automated teller and point of sale networks, and includes any shared networks, Internet access facilities, or other similar facilities, in which the ASSURED participates, allowing the input, output, examination, or transfer of Electronic Data or communications from one computer to the ASSURED'S Computer System.

E.    Electronic Data means facts or information converted to a form usable in Computer Systems and which is stored on Electronic Media for use by computer programs.

F.    Electronic Funds Transfer System means automated teller machines, point of sale terminals, and other similar operating systems and includes any shared networks, Internet access facilities, or other similar facilities for such systems, in which the ASSURED participates.

G.    Electronic Instruction means computer programs converted to a form usable in a Computer System to act upon Electronic Data.

H.    Electronic Media means the magnetic tape, magnetic disk, optical disk, or any other bulk media on which data is recorded."

I.    Service Bureau means a natural person, partnership or corporation authorized by written agreement to perform data processing services using computer systems.

(7)    Solely with respect to the coverage afforded by this endorsement, the following shall apply:

This Bond does not directly or indirectly cover:

a.    loss resulting directly or indirectly from forged, altered or fraudulent negotiable instruments, securities, documents or written instruments used as source documentation in the preparation of **Electronic Data**;

b. loss of negotiable instruments, securities, documents or written instruments except as converted to **Electronic Data** and then only in that converted form;

c. loss resulting from mechanical failure, faulty construction, error in design, latent defect, wear or tear, gradual deterioration, electrical disturbance, **Electronic Media** failure or breakdown or any malfunction or error in programming or error or omission in processing;

d. loss resulting directly or indirectly from instructions sent from a customer of the ASSURED to the ASSURED when such instructions are originated by the customer or a natural person to whom the customer has given the authority to make such instructions.

e. liability assumed by the ASSURED by agreement under any contract, unless such liability would have attached to the ASSURED even in the absence of such agreement; or

f. loss resulting directly or indirectly from:

1. written instruction unless covered under this INSURING CLAUSE 8.D.; or

2. instruction by voice over the telephone, unless covered under this INSURING CLAUSE 8.D.

(8) Solely with respect to the coverage afforded by this endorsement, Exclusions m., n., p., q., and r. in Section 3, Specific Exclusions – Applicable to All Insuring Clauses Except Insuring Clause 1, are deleted.

(9) By adding to Section 9., Valuation, the following:

Electronic Data, Electronic Media, Or Electronic Instruction

In case of loss of, or damage to, **Electronic Data, Electronic Media** or **Electronic Instruction** used by the ASSURED in its business, the COMPANY shall be liable under this Bond only if such items are actually reproduced form other **Electronic Data, Electronic Media** or **Electronic Instruction** of the same kind or quality and then for not more than the cost of the blank media and/or the cost of labor for the actual transcription or copying of data which shall have been furnished by the ASSURED in order to reproduce such **Electronic Data, Electronic Media** or **Electronic Instruction** subject to the applicable SINGLE LOSS LIMIT OF LIABILITY.

However, if such **Electronic Data** cannot be reproduced and said **Electronic Data** represents **Securities** or financial instruments having a value, then the loss will be valued as indicated in the Securities and Other Property paragraphs of this Section:

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 62 of 82

Effective date of
this endorsement/rider: August 1, 2020

FEDERAL INSURANCE COMPANY

Endorsement/Rider No. 16

To be attached to and
form a part of Bond No. 82403947

Issued to: SVB FINANCIAL GROUP

DEBIT CARD COVERAGE ENDORSEMENT

In consideration of the premium charged, it is agreed that this Bond is amended as follows:

(1) By adding the following INSURING CLAUSE to ITEM 3. of the DECLARATIONS:

| INSURING CLAUSE | SINGLE LOSS LIMIT OF LIABILITY | DEDUCTIBLE AMOUNT |
|---|---|---|
| DEBIT CARD | $25,000 per card | $5,000 per card |
|  | $500,000 per occurrence | $100,000 per occurrence |

(2) By adding the following INSURING CLAUSE:

DEBIT CARD

Loss resulting directly from a **Debit Transaction** due to the fraudulent use of a lost, stolen or altered **Debit Card** or **Counterfeit Debit Card** to access a deposit account with the ASSURED.

The following conditions are precedent to coverage under this DEBIT CARD INSURING CLAUSE:

A. there is a signed application by the cardholder for the **Debit Card** on file with the ASSURED;

B. the automated mechanical device or electronic payment device verifies the available funds in the cardholder's deposit account as part of the **Debit Transaction**; and

C. the **Debit Transaction** does not exceed the cardholder's deposit account balance.

(3) For the purposes of the coverage afforded by this endorsement, the following terms shall have the following meanings:

P0049

**Counterfeit Debit Card** means a **Debit Card** that is printed, embossed, or encoded with a customer's account number without the ASSURED'S authorization.

**Debit Card** means a card issued by or on behalf of the ASSURED which is used in any automated mechanical device or any electronic payment device in conjunction with a personal identification number (PIN), to obtain cash or to access the cardholder's deposit account to pay for goods or services by immediately debiting the cardholder's deposit account with the ASSURED.

**Debit Transaction** means the debiting of a cardholder's deposit account with the ASSURED through an automated mechanical device or electronic payment device which verifies the available funds in the cardholder's account.

**Computer Virus** means an unauthorized corrupting or harmful piece of code. **Computer Virus** includes but is not limited to "Trojan horses", "worms", and "time or logic bombs".

**Unauthorized Access** means the gaining of access to a computer, computer system or computer network by an unauthorized person or persons or an authorized person in an unauthorized manner.

**Unauthorized Use** means the use of a computer, or computer network by an unauthorized person or persons or an authorized person in an unauthorized manner.

**Activation System** means an electronic or manual fraud prevention system that verifies the authorized cardholder's identity prior to activating **Debit Cards**.

(4)   Paragraphs c. and d. of Section 3., Specific Exclusions – Applicable To All Insuring Clauses Except Insuring Clause 1, of the Conditions and Limitations are deleted and replaced with the following:

c.   loss resulting from the use of credit, debit, charge, access, convenience, identification, cash management or other cards whether such cards were issued, or purport to have been issued, by the ASSURED or by anyone other than the ASSURED, provided, however, this SECTION 3.c. shall not apply to the DEBIT CARD INSURING CLAUSE.

d.   loss involving an **Automated Device**, provided, however, this SECTION 3.d. shall not apply to INSURING CLAUSE 6. and the DEBIT CARD INSURING CLAUSE.

(5)   By adding the following Section to the Conditions and Limitations:

Specific Exclusions – Applicable To Insuring Clause DEBIT CARD INSURING CLAUSE

**This Bond does not directly or indirectly cover:**

A.   loss which the ASSURED could have charged back to, or obtained reimbursement from:

(1)   the cardholder,

Case 5:23-cv-00095-BO-RN   Document 1-3   Filed 02/27/23   Page 64 of 82

         (2)      any entity agreeing to honor **Debit Cards** of the ASSURED, or

         (3)      any other financial institution, plastic card association or clearing house representing the ASSURED,

regardless of any contractual language to the contrary;

B.    loss resulting directly or indirectly from the extension of credit against, or payment of, any **Negotiable Instrument**;

C.    loss resulting directly or indirectly from a processing system malfunction or transaction error;

D.    loss as a result of a threat to do bodily harm to any person, or to do damage to the premises or property of the ASSURED or Merchant;

E.    loss involving telephone sales, internet sales and/or mail order operations;

F.    loss resulting directly or indirectly from a **Computer Virus**, **Unauthorized Access** or **Unauthorized Use** of a computer or computer system of a third party data processor, whether the processor is liable or not;

G.    loss resulting directly or indirectly from the use of a **Debit Card** that was issued and mailed to a cardholder but not activated through an **Activation System**, except when a **Debit Card** was fraudulently issued by an unauthorized person or persons; or

H.    loss resulting from the use of any **Debit Card** outside the United States of America, the District of Columbia, Virgin Islands, Puerto Rico and Canada.

(6)    Solely for the purposes of the coverage afforded by this endorsement, Section 5., Limit of Liability, of the Conditions and Limitations is amended to include the following:

The COMPANY'S maximum aggregate liability for all loss under the DEBIT CARD INSURING CLAUSE discovered during the BOND PERIOD shall not exceed the AGGREGATE LIMIT OF LIABILITY shown in item 2. of the Declarations. Each payment made under the terms of this Endorsement shall reduce the unpaid portion of the AGGREGATE LIMIT OF LIABILITY until it is exhausted. Upon exhaustion of the AGGREGATE LIMIT OF LIABILITY, the COMPANY shall have no further obligation under the DEBIT CARD INSURING CLAUSE.

(7)    Solely with respect to the coverage afforded by this endorsement, Item 1 of the declarations is deleted and replaced with the following:

ITEM 1. BOND PERIOD:      from   12:01 A.M. on 08/01/2019

                                    to     12:01 A.M. on 08/01/2020

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Bond shall remain unchanged.

_____
Authorized Representative

Effective date of
this endorsement/rider: August 1, 2020

FEDERAL INSURANCE COMPANY

Endorsement/Rider No. 17

To be attached to and
form a part of Bond No. 82403947

Issued to: SVB FINANCIAL GROUP

---

AMEND LOAN VALUATION ENDORSEMENT
(FRAUDULENT LOAN INTEREST)

In consideration of the premium charged, it is agreed that Loan in Section 9., Valuation, in the Conditions and Limitations is deleted and replaced with the following:

*Loan*  The value of any loss or that portion of any loss resulting from a **Loan** shall be the amount actually disbursed by the ASSURED to a borrower under such **Loan** reduced by all interest and fees received by the ASSURED in connection with such **Loan**.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Bond shall remain unchanged.

_____
Authorized Representative

14-02-21229 (07/2014)

Effective date of
this endorsement/rider: August 1, 2020

FEDERAL INSURANCE COMPANY

Endorsement/Rider No. 18

To be attached to and
form a part of Bond No. 82403947

Issued to: SVB FINANCIAL GROUP

SOCIAL ENGINEERING FRAUD (EMPLOYEE/VENDOR) ENDORSEMENT
(For Use with Form A-2)

In consideration of the premium charged, it is agreed that this Bond is amended as follows:

(1)    By adding the following INSURING CLAUSE:

Social Engineering Fraud

Loss resulting directly from the ASSURED having, transferred, paid or delivered **Money** or **Securities** as the direct result of a **Social Engineering Fraud Instruction**.

(2)    Solely with respect to the coverage afforded by this endorsement, the following terms shall have the following meanings:

**Social Engineering Fraud Instruction** means any instruction which intentionally misleads an **Employee**, through misrepresentation of a material fact which is relied upon by an **Employee**, believing it to be genuine, for the purpose of directing or transferring the ASSURED's **Money** or **Securities** that were communicated by a natural person purporting to be:

a.   a director, officer, partner, member or sole proprietor of the ASSURED or other **Employee** who is authorized by the ASSURED to instruct another **Employee** to transfer funds, or an individual acting in collusion with such person purporting to be a director, officer, partner, member or sole proprietor or other **Employee** who is authorized by the ASSURED to instruct another **Employee** to transfer funds; or

b.   an employee of a **Vendor** who is authorized by the ASSURED to instruct an **Employee** to transfer funds or change bank account information of a **Vendor**; provided, however, **Social Engineering Fraud Instruction** shall not include any such instruction transmitted by an employee of a **Vendor** who was acting in collusion with any third party in submitting such instruction,

but which instructions were not actually made by such director, officer, partner, member or sole proprietor, **Employee,** or employee of a **Vendor**.

**Vendor** means any entity or natural person that has provided goods or services to the ASSURED under a legitimate pre-existing arrangement or written agreement.  However, **Vendor** does not include any customer, automated clearing house, custodian, financial institution, administrator, counter party or any similar entity.

14-02-21957 (03/2016)            Page 1

(3)    Solely with respect to the coverage afforded by this endorsement:

   A.    This bond does not directly or indirectly cover loss occurring prior to 08/01/2018.

   B.    Exclusion b. of Section 3., Specific Exclusions-Applicable To All Insuring Clauses Except Insuring Clause 1., is deleted and replaced with the following:

      b.    loss caused by an **Employee** provided, however, this SECTION 3.b. shall not apply to loss: (i) covered under INSURING CLAUSE 2. or 3. which results directly from misplacement, mysterious unexplainable disappearance, or damage or destruction of **Property**, or (ii) covered under Social Engineering Fraud INSURING CLAUSE;

   C.    This bond does not directly or indirectly cover loss due to any investment in **Securities**, or ownership in any corporation, partnership, real property, commodity or similar instrument, whether or not such investment is genuine.

(4)    The AGGREGATE LIMIT OF LIABILITY solely with respect to the Social Engineering Fraud INSURING CLAUSE shall be $ 500,000.  Such amount shall be part of and not in addition to the AGGREGATE LIMIT OF LIABILITY as stated in ITEM 2 of the Declarations of this Bond.

(5)    Item 3., Single Loss Limits of Liability – Deductible Amounts, of the Declarations of this Bond is amended to include the following:

| INSURING CLAUSE | SINGLE LOSS LIMIT OF LIABILITY | DEDUCTIBLE AMOUNT |
|---|---|---|
| Social Engineering Fraud | $ 500,000 | $ 500,000 |

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Bond shall remain unchanged.

_____
Authorized Representative

# IMPORTANT NOTICE TO POLICYHOLDERS

All of the members of the Chubb Group of Insurance companies doing business in the United States (hereinafter "Chubb") distribute their products through licensed insurance brokers and agents ("producers"). Detailed information regarding the types of compensation paid by Chubb to producers on US insurance transactions is available under the Producer Compensation link located at the bottom of the page at www.chubb.com, or by calling 1-866-588-9478. Additional information may be available from your producer.

Thank you for choosing Chubb.

10-02-1295 (ed. 6/2007)

**IMPORTANT POLICYHOLDER INFORMATION**

Inquiries concerning your policy should be directed to your insurance agent. The name, address and telephone number of your agent, if one is involved, is shown on the policy and/or in the material accompanying the policy.

If you require additional information you may contact the California Insurance Department at either the following address or phone number:

California Insurance Department
300 South Spring Street
Los Angeles, CA 90012
1-800-927-HELP

Form 14-02-1495 (Ed. 1/94)

# EXHIBIT 2



**Underwritten By**
*BERKLEY REGIONAL INSURANCE COMPANY*

**PRODUCER**
Kristina Lobo
Lockton Companies, LLC dba Lockton
Insurance Brokers, LLC (Pacific Series)
Three Embarcadero Center, Suite 600
San Francisco, CA 94111
(415) 568-4017

*Administrative Office:*
*475 Steamboat Road*
*Greenwich, CT 06830*

*Issuing Office:*
*29 South Main Street, Suite 308*
*West Hartford, CT 06107*

## COMMERCIAL BANKS/SAVINGS BANKS (FORM 24) EXCESS FOLLOW FORM CERTIFICATE

| | | | |
|---|---|---|---|
| BOND NUMBER | BFCB-45001721-26 | **PRIOR BOND NUMBER** | BFCB-45001721-25 |
| NAMED INSURED | SVB Financial Group | | |

**MAILING ADDRESS**   3003 Tasman Dr
Santa Clara, CA 95054

**BOND PERIOD**   8/01/2020 to 8/01/2021
(12:01 A.M. at your Mailing Address shown above)

**TERMS AND CONDITIONS:**

In consideration of the premium charged and in reliance upon the statements and information furnished to the COMPANY by the Insured and subject to the terms and conditions of the UNDERLYING COVERAGE scheduled below, the COMPANY agrees to pay the Insured, as excess and not contributing insurance, for loss which:

    a)    would have been paid by the underlying Carrier(s) in the UNDERLYING COVERAGE scheduled below but for the fact that such loss exceeds the Limit of Liability of the underlying Carrier(s), and

    b)    for which the underlying Carrier(s) has made monetary payment and the Insured has collected the full monetary amount of the underlying Carrier's expressed Limit of Liability.

This bond does not provide coverage in excess of any sub-limited coverage in the underlying bond(s) which is below the underlying Carrier's expressed Single Loss Limit of Liability in the UNDERLYING COVERAGE scheduled below.

| | |
|---|---|
| **LEAD CARRIER FOR LAYER:** | Berkley Regional Insurance Company |
| **SINGLE LOSS LIMIT OF LIABILITY:** | $15,000,000 excess of $15,000,000 plus deductible |
| **AGGREGATE LIMIT:** | $30,000,000 |

| **UNDERLYING COVERAGE:** | |
|---|---|
| Carrier: | Federal Insurance Company |
| Single Loss Limit of Liability: | $15,000,000 |
| Single Loss Deductible: | $1,000,000 |
| Aggregate Limit: | $30,000,000 |
| Bond Number: | |
| Bond Period: | 08/01/2020 to 08/01/2021 |

BCR FIB XS 01 15

| Forms and Riders Forming Part of this Policy When Issued: | |
|---|---|
| Form Number and Edition Date | Description of Form or Rider: |
| BCR WDC 01 01 15 | Berkley Crime We Deliver Cover Page |
| BCR COV 01 08 18 | Berkley Crime Cover Letter |
| BCR FIB XS 01 15 | Financial Institution Excess Follow Form Certificate |
| BCR FIB 01 01 15 | Premium Rider |
| BCR FIB 98 01 15 | Exhaustion of Underlying Limits Rider |
| BCR FIB 99 01 15 | Manuscript Rider |
| BCR FIB 99 01 15 | Manuscript Rider |
| BCR FIB 99 01 15 | Manuscript Rider |
| BCR FIB 86 12 17 | Office of Foreign Assets Control Rider - Endorsement |
| BCR WDB 01 01 15 | Berkley Crime We Deliver Back Page |

| Cancellation of Prior Insurance Issued by Us: |
|---|
| By acceptance of this Bond you give us notice canceling prior policy Numbers: BFCB-45001721-25 the cancellation to be effective at the time this Bond becomes effective. |

IN WITNESS WHEREOF, Berkley Regional Insurance Company designated herein has executed and attested these presents.

Ira S. Lederman
Director, Senior Vice President and Secretary

W. Robert Berkley, Jr.
Director and President

BOND NUMBER: BFCB-45001721-26
INSURED: SVB Financial Group
EFFECTIVE DATE: 08/01/2020
DATE OF ISSUANCE: 08/12/2020

**BCR FIB 01 01 15**
RIDER #: 1
EXPIRATION DATE: 08/01/2021

**THIS RIDER CHANGES THE BOND.  PLEASE READ IT CAREFULLY.**

# <u>PREMIUM RIDER</u>

For the period from 12:01 A.M. on 08/01/2020 to 12:01 A.M. on 08/01/2021 the premium for the attached bond is $41,233.

All other terms, conditions, limitations and exclusions remain unchanged.

BOND NUMBER: BFCB-45001721-26
INSURED: SVB Financial Group
EFFECTIVE DATE: 08/01/2020
DATE OF ISSUANCE: 08/12/2020

**BCR FIB 98 01 15**
RIDER #: 2
EXPIRATION DATE: 08/01/2021

**THIS RIDER CHANGES THE BOND. PLEASE READ IT CAREFULLY.**

# EXHAUSTION OF UNDERLYING LIMITS RIDER

TERMS AND CONDITIONS, Item (b) of the FINANCIAL INSTITUTION EXCESS FOLLOW FORM CERTIFICATE is deleted and replaced with the following:

(b) for which the Underlying Carrier(s) has made monetary payment, and the Insured has collected, the full monetary amount of the expressed limit of the Underlying Carrier's expressed Single Loss Limit of Liability, except when the Underlying Carrier is unable to pay due to the Underlying Carrier's own insolvency or where the Underlying Carrier in good faith, settles a claim made by the Insured as a result of a covered loss for less than the expressed single loss limit of liability of the Underlying Carrier that is applicable to the covered loss.

In either the case of insolvency or for which a good faith settlement is made by the Underlying Carrier(s) as respects a covered loss sustained by the Insured, the Insured's loss that is in excess of what should be paid by the Underlying Carrier in insolvency or that which is in excess of a good faith settlement that is made by the Underlying Carrier(s), shall be treated as self-insured and the Insured may make claim for the excess amount as per the Single Loss Limit of Liability described on the attached FINANCIAL INSTITUTION EXCESS FOLLOW FORM CERTIFICATE.

All other terms, conditions, limitations and exclusions remain unchanged.

BOND NUMBER: BFCB-45001721-26
INSURED: SVB Financial Group
EFFECTIVE DATE: 08/01/2020
DATE OF ISSUANCE: 08/12/2020

BCR FIB 99 01 15
RIDER #: 3
EXPIRATION DATE: 08/01/2021

**THIS RIDER CHANGES THE BOND. PLEASE READ IT CAREFULLY.**

# <u>MANUSCRIPT RIDER: 1</u>

Pursuant to Chubb's Extended Computer Systems with Cyber Fraud Endorsement (14-02-21158) (05/2014), Section (2) D. Cyber Fraud:

Our limit of liability will be $10,000,000 ($20,000,000 Aggregate) excess of Chubb's $15,000,000 ($30,000,000 Aggregate) plus $500,000 deductible.

We will also institute a call back requirement as follows:

(1) The fraudulent instruction purports, and reasonably appears, to have originated from:

(a) such Customer,
(b) an Employee acting on instructions of such Customer; or
(c) another financial institution acting on behalf of such Customer with authority to make such instructions; and

(2) The sender of the fraudulent instruction verified the instruction with the password, PIN, or other security code of such Customer; and

(3) The sender was not, in fact, such Customer, was not authorized to act on behalf of such Customer, and was not an Employee of the Insured; and

(4) The instruction was received by an Employee of the Insured specifically authorized by the Insured to receive and act upon such instructions; and

(5) For any transfer exceeding the amount set forth in item 7 of this Rider, the Insured verified the instruction via a call back to a predetermined telephone number set forth in the Insured's Written agreement with such Customer or other verification procedure approved in writing by the Underwriter; and

(6) The Insured preserved a contemporaneous record of the call back, if any, and of the instruction which verifies use of the authorized password, PIN or other security code of the Customer.

7. The amount of any single transfer for which verification via a call back will be required is: $500,000

All other terms, conditions, limitations and exclusions remain unchanged.

BOND NUMBER: BFCB-45001721-26
INSURED: SVB Financial Group
EFFECTIVE DATE: 08/01/2020
DATE OF ISSUANCE: 08/12/2020

BCR FIB 99 01 15
RIDER #: 4
EXPIRATION DATE: 08/01/2021

**THIS RIDER CHANGES THE BOND.  PLEASE READ IT CAREFULLY.**

# <u>MANUSCRIPT RIDER: 2</u>

It is agreed:

We will not follow Section (3) 10. Extortion of Chubb's Extended Computer Systems with Cyber Fraud Endorsement (14-02-21158) (05/2014).

All other terms, conditions, limitations and exclusions remain unchanged.

BOND NUMBER: BFCB-45001721-26
INSURED: SVB Financial Group
EFFECTIVE DATE: 08/01/2020
DATE OF ISSUANCE: 08/12/2020

BCR FIB 99 01 15
RIDER #: 5
EXPIRATION DATE: 08/01/2021

**THIS RIDER CHANGES THE BOND. PLEASE READ IT CAREFULLY.**

# <u>MANUSCRIPT RIDER: 1</u>

Pursuant to Chubb's Extended Computer Systems with Cyber Fraud Endorsement (14-02-21158) (05/2014), Section

(2) D. Cyber Fraud:

Our limit of liability will be $10,000,000 ($20,000,000 Aggregate) excess of Chubb's $15,000,000 ($20,000,000 Aggregate) plus $500,000 deductible.

We will also institute a call back requirement as follows:

(1) The fraudulent instruction purports, and reasonably appears, to have originated from:

(a) such Customer,

(b) an Employee acting on instructions of such Customer; or

(c) another financial institution acting on behalf of such Customer with authority to make such instructions; and

(2) The sender of the fraudulent instruction verified the instruction with the password, PIN, or other

security code of such Customer; and

(3) The sender was not, in fact, such Customer, was not authorized to act on behalf of such

Customer, and was not an Employee of the Insured; and

(4) The instruction was received by an Employee of the Insured specifically authorized by the Insured

to receive and act upon such instructions; and

(5) For any transfer exceeding the amount set forth in item 7 of this Rider, the Insured verified the

instruction via a call back to a predetermined telephone number set forth in the Insured's Written

agreement with such Customer or other verification procedure approved in writing by the Underwriter;

and

(6) The Insured preserved a contemporaneous record of the call back, if any, and of the instruction

which verifies use of the authorized password, PIN or other security code of the Customer.

7. The amount of any single transfer for which verification via a call back will be required is: $500,000

All other terms, conditions, limitations and exclusions remain unchanged.


All other terms, conditions, limitations and exclusions remain unchanged.

P0065

**RIDER/ENDORSEMENT**

To be attached to and form part of Financial Institution Bond, No. or Computer Crime Policy for Financial Institutions, No. BFCB-45001721-26 in favor of SVB Financial Group

It is agreed that:

1. In accordance with the U.S. Treasury Department's Office of Foreign Assets Control(OFAC) regulations, if it is determined that the Insured hereunder has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payment nor premium refunds may be made without authorization from OFAC.

2. The Office of Foreign Assets Control administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous: foreign agents; front organizations; terrorists; terrorist organizations; and narcotics traffickers; as Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – www.treas.gov/ofac.

This rider/endorsement shall become effective as of 12:01 a.m. on 08/01/2020.

Accepted:

.

**OFFICE OF FOREIGN ASSETS CONTROL RIDER/ENDORSEMENT**
FOR USE WITH FINANCIAL INSTITUTION BONDS, STANDARD FORMS NOS, 14, 15, 24
AND 25 AND COMPUTER CRIME POLICY FOR FINANCIAL INSTITUTIONS.
ADOPTED NOVEMBER, 2017

BCR FIB 86 12 17





**Berkley Crime**
29 South Main Street, 3rd FL | West Hartford, CT 06107 | 844.44.CRIME
Berkleycrime.com