# IN THE UNITED STATES DISRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | | |
|---|---|---|
| SVB FINANCIAL GROUP and FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR SILICON VALLEY BANK, | ) ) ) ) | **Case No. 5:23-cv-00095-BO** |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **FEDERAL INSURANCE COMPANY AND BERKLEY REGIONAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT** |
| FEDERAL INSURANCE COMPANY and BERKLEY REGIONAL INSURANCE COMPANY, | ) ) ) | |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................................I

TABLE OF AUTHORITIES .........................................................................................................II

I.      OVERVIEW ....................................................................................................... 1

II.     SUMMARY OF ARGUMENT ......................................................................... 2

III.    ELEMENTS OF COVERAGE........................................................................ 5

IV.    SUMMARY OF CLAIM ................................................................................. 8

   **A.**   SVB'S LOAN TO JES FUND.................................................................... 9

   **B.**   SVB RECEIVED A SCANNED COPY OF THE LIMITED PARTNERSHIP AGREEMENT AND SUBSCRIPTION AGREEMENTS. ................................. 10

V.     GOVERNING LEGAL STANDARD ....................................................... 13

VI.    ARGUMENT................................................................................................ 15

   **A.**   SVB'S ADMITTED FAILURE TO OBTAIN THE "ORIGINAL" PRECLUDES COVERAGE. .............................................................................................. 15

   **B.**   SVB CANNOT PROVE RELIANCE UPON THE LIMITED PARTNERSHIP AGREEMENT AND THE SUBSCRIPTION AGREEMENTS. ......................... 20

   **C.**   NEITHER THE LIMITED PARTNERSHIP AGREEMENT NOR THE SUBSCRIPTION AGREEMENTS ARE QUALIFYING DOCUMENTS.......... 22

       **1.**   THE LIMITED PARTNERSHIP AGREEMENT AND SUBSCRIPTION AGREEMENTS DO NOT QUALIFY AS GUARANTEES. ...................... 23

       **2.**   THE LIMITED PARTNERSHIP AGREEMENT AND SUBSCRIPTION AGREEMENTS DO NOT QUALIFY AS SECURITY AGREEMENTS…24

VII.   CONCLUSION............................................................................................. 26

CERTIFICATION OF COMPLIANCE ..................................................................... 28

CERTIFICATE OF SERVICE .................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

*Advanced Network, Inc. v. Peerless Ins. Co.*, 190 Cal. App. 4th 1054 (2010) ............................ 14

*Banc of Cal. v. Fed. Ins. Co.*, No. 21-56179, 2022 WL 17583056 (9th Cir. Dec. 12, 2022) . 24, 25

*BancInsure v. Marshall Bank*, 453 F.3d 1073, 1075-76 (8th Cir. 2006) ........................ 3, 6, 16, 19

*Bank of Bozeman v. BancInsure, Inc.*, 404 F. App'x 117 (9th Cir. 2010) ............................ passim

*Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254 (1992) .................................................. 13

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854 (1993) ................. 14

*BP W. Coast Prods. v. Crossroad Petroleum, Inc.*, No. 12-CV-665, 2018 WL 264120 (S.D. Cal. Jan. 2, 2018) ............................................................................................................ 23

*EAC Credit v. Wilson*, 187 S.E.2d 752 (N.C. 1972) .................................................... 24

*FDIC v. Ins. Co. of. N. Am.*, 105 F.3d 778 (1st Cir. 1997) ............................................. 1

*First Am. Title Ins. Co. v. XWarehouse Lending Corp.*, 177 Cal. App. 4th 106 (2009)............... 14

*First Nat'l Bank, Colfax v. Hartford Accident & Indem. Co.*, 295 N.W.2d 425 (Iowa 1980)...... 16

*Flagstar Bank, FSB v. Fed. Ins. Co.*, No. 05-70950, 2006 WL 3343765 (E.D. Mich. Nov. 17, 2006), *aff'd*, 260 F. App'x 820 (6th Cir. 2008) ........................................................... 8

*Forcht Bank, N.A. v. BancInsure, Inc.*, 514 F. App'x 586 (6th Cir. 2013).................................... 8

*Fremont Reorganizing v. Fed. Ins. Co.*, No. 09-01208, 2013 WL 12124105 (C.D. Cal. Apr. 3, 2013) ....................................................................................................................... passim

*French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A.*, 925 F.2d 603 (2d Cir. 1991) ................................................................................................................................... 7

*Hamilton Bank v. Ins. Co. of N. Am.*, 557 A.2d 747, 750-51 (Pa. Super. Ct. 1989)............... 18, 21

*Jefferson Bank v. Progressive Cas. Ins. Co.*, No. 90-584, 1990 WL 180585, (E.D. Pa. Nov. 19, 1990), *rev'd on other grounds*, 965 F.2d 1274 (3d Cir. 1992). ............................................... 23

*Laurel v. Allstate Ins. Co.,* No. 09-3990, 2010 WL 1235326 (C.D. Cal. Feb. 3, 2010) ............... 14

*Liberty Nat'l Bank v. Aetna Life & Cas. Co.*, 568 F. Supp. 860 (D.N.J. 1983)............................. 1

*McKee v. State Farm Fire & Cas. Co.*, 145 Cal. App. 3d 772 (1983) ........................................ 14

*Metro Fed. Credit Union v. Fed. Ins. Co.*, 607 F. Supp. 2d 870 (N.D. Ill. 2009) ........................ 24

ii

*Nat'l City Bank v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171 (Minn. 1989)..................... 2

*Oritani Sav. and Loan Ass'n v. Fidelity and Deposit Co. of Maryland*, 989 F.2d 635 (3d Cir. 1993) ..................................................................................................................................... 1

*Reliance Ins. Co. v. Cap. Bancshares, Inc./Cap. Bank*, 912 F.2d 756 (5th Cir. 1990)................. 16

*Republic Nat'l Bank of Miami v. Fid. & Deposit Co. of Md.*, 894 F.2d 1255 (11th Cir. 1990) 2, 21

*Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070 (2003) ....................................................... 14

*Scott v. Cont'l Ins. Co.*, 44 Cal. App. 4th 24 (1996).................................................................... 14

*Scottsdale Ins. Co. v. Fineman*, No. 4:20-cv-00368, 2021 WL 411360 (N.D. Cal. Feb. 5, 2021)14

*Self-Help Ventures Fund v. Custom Finish*, 682 S.E.2d 746 (N.C. Ct. App. 2009) ..................... 24

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715 (1993)..................................... 15

*Valley Cmty. Bank v. Progressive Cas. Ins. Co.*, 854 F. Supp. 2d 697 (N.D. Cal. 2012)............. 16

*Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, (1995) ................................................................ 14

**Other Authorities**

9A J. Appleman & J. Appleman, Insurance Law and Practice § 5701 (1981) ............................... 2

*Original*, BLACK'S LAW DICTIONARY (6th ed. 1990) ................................................................ 6, 17

*Original*, THE AMERICAN HERITAGE DICTIONARY, ................................................................. 6, 17

*Original*, WEBSTER'S NEW COLLEGIATE DICTIONARY (11th ed. 2003).................................... 6, 17

*Possession*, MERRIAM-WEBSTER, ................................................................................................ 21

Robin Weldy, "History of the Bankers Blanket Bond and the Financial Institution Bond with Comments on the Drafting Process," in Financial Institution Bonds 1, 1 (1989) ...................... 1

**Rules**

Cal Civ. Code § 1644......................................................................................................................... 14

Case 5:23-cv-00095-BO-RN    Document 199    Filed 05/04/26    Page 4 of 33

Federal Insurance Company ("Federal") and Berkley Regional Insurance Company ("Berkley") (together, "Defendants") move for summary judgment against SVB Financial Group and Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bank (collectively, "SVB") and in support thereof, state:

## I.       OVERVIEW

This case arises from a fraudulent scheme orchestrated by Elliot Smerling ("Smerling"). Smerling defrauded lenders into extending credit to a non-existent entity (called the JES Fund) by manufacturing a Limited Partnership Agreement purporting to create the JES Fund and Subscription Agreements purporting to document investments in the JES Fund. SVB fell victim to the scheme because its personnel: (1) extended credit to Smerling based only upon PDF copies of the loan documents, as opposed to originals; and (2) completely overlooked documented indicia of fraud. As a result, SVB incurred a multi-million-dollar loan loss. Rather than acknowledge its internal failures, SVB seeks to convert its reckless lending into a claim under a Financial Institution Bond ("Bond")[1] issued by Federal Insurance Company and an excess, follow-form Financial Institution Bond issued by Berkley.[2]

Unlike other forms of insurance, the Bond was "drafted by a joint effort of the American Bankers' Association and the American Surety Association." *Calcasieu–Marine v. Am. Employers' Ins. Co.*, 533 F.2d 290, 296 n.6 (5th Cir. 1976).[3] The Bond is not credit insurance. *Liberty Nat'l Bank v. Aetna Life & Cas. Co.*, 568 F. Supp. 860, 866 (D.N.J. 1983). It does not "protect [an insured] when it simply makes a bad business deal." *Republic Nat'l Bank v. Fid. &*

---

[1] Statement of Material Facts ("SMF"), ¶¶1, 3;  Exhibit 1, Financial Institution Bond; Exhibit 2, FDIC-R's Answers to Interrogatories, No. 4.

[2] SMF ¶¶2, 3; Exhibit 2, FDIC-R's Answers to Interrogatories, No. 4.

[3] *See also FDIC v. Ins. Co. of. N. Am.*, 105 F.3d 778, 786 (1st Cir. 1997); *Oritani Sav. and Loan Ass'n v. Fidelity & Dep. Co.*, 989 F.2d 635, 643 (3d Cir. 1993); Robin Weldy, "History of the Bankers Blanket Bond and the Financial Institution Bond with Comments on the Drafting Process," in Financial Institution Bonds 1, 1 (1989).

*Deposit Co. of Md.*, 894 F.2d 1255, 1263 (11th Cir. 1990). "The failure to follow sound business practices and verify the authenticity is a business risk taken by banks and not an insured risk covered by the Bond." *Nat'l City Bank v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171, 175 (Minn. 1989); 9A J. Appleman & J. Appleman, Insurance Law and Practice § 5701, at 380 (1981) (a bond "does not insure good management nor against the risk of loss inherent in the banking operations").

Defendants will: summarize why SVB cannot prove a covered loss (**Section II**); explain the terms of the Bond and SVB's burden of proof (**Section III**); explain how the fraud occurred and set forth the facts rebutting SVB's claim (**Section IV**); and explain why the admitted facts preclude coverage (**Section V**).

## II.    SUMMARY OF ARGUMENT

SVB seeks coverage under Insuring Clause 5 of the Bond on the theory that Smerling allegedly forged signatures on Subscription Agreements and the Limited Partnership Agreement.[4] Like other forms of insurance, the Bond is a risk-sharing arrangement that required SVB to satisfy specific conditions in order to secure coverage. SVB cannot meet those conditions for at least three reasons.

First, as part of the risk-sharing arrangement between the parties, Insuring Clause 5 contractually obligates an insured to conduct traditional due diligence for each loan, part of which includes obtaining the "original" loan documents before advancing funds to the borrower.[5] Courts enforce Insuring Clause 5 as written and find no coverage is available where the insured failed to possess the original of the document containing an alleged forgery. *See, e.g.*, *Bank of Bozeman v. BancInsure*, 404 F. App'x 117, 118-19 (9th Cir. 2010); *BancInsure v. Marshall Bank*, 453 F.3d

---

[4] SMF ¶3; Exhibit 2, FDIC-R's Answers to Interrogatories, No. 4; Dkt. 1-3, pp. 2, 4, ¶¶1,10.
[5] SMF ¶4; Exhibit 1, Insuring Clause 5, pp. 8-9.

2

1073, 1075-76 (8th Cir. 2006). Failing to comply with this contractual condition to coverage, SVB did not obtain the original of either the Limited Partnership Agreement or Subscription Agreements, but instead, relied upon mere PDF copies. Its relationship manager acknowledged that he only received a scanned copy:

> Q. In earlier response to one of my questions, you made reference to a wet ink signature. I just want to understand, what do you mean by a wet ink signature?
> A. My understanding is it's a pen to paper actual ink signature on a sheet of paper.
> Q. Did you in connection with any of the documents you received from JES see a wet ink signature?
> A. I did not have a physical piece of paper with ink on it in front of me, no, just to be clear.
> Q. All of the information, including, for example, the partnership agreement, were scans of documents sent over email?
> A. I believe so, yeah.[6]

Very simply, because SVB did not obtain the original of the Limited Partnership Agreement or Subscription Agreements—the only documents claimed to be forged—its loss is not covered as a matter of law. *Fremont Reorganizing v. Fed. Ins. Co.*, No. 09-01208, 2013 WL 12124105, at \*13 (C.D. Cal. Apr. 3, 2013) (granting summary judgment under Insuring Clause 5 because insured did not obtain original documents).

Second, Insuring Clause 5 only applies if SVB "relied" upon the allegedly forged documents in extending credit.[7] Because Insuring Clause 5 contemplates coverage for a **Forgery**[8] on a document, Insuring Clause 5 provides that an insured can only demonstrate such required reliance if it had "actual physical possession" of the forged documents.[9] The phrase "physical possession" mandates tangible possession of the loan documents (as opposed to electronic

---

[6] SMF ¶¶21, 22; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 88:12-88:25.
[7] SMF ¶4; Exhibit 1, Insuring Clause 5, pp. 8-9.
[8] The bolded terms are defined in the Bond.
[9] SMF ¶4; Exhibit 1, Insuring Clause 5, pp. 8-9.

3

possession of electronic images). *Fremont Reorganizing*, 2013 WL 12124105, at \*13. Despite that mandatory element of coverage, SVB never obtained physical possession of the Limited Partnership Agreement or Subscription Agreements. On the contrary, its relationship manager testified that he solely received electronic communications[10] and "did not have a physical piece of paper with ink on it in front of me . . . ."[11] Because SVB never had physical possession of the Limited Partnership Agreement or Subscription Agreements, it did not rely upon them and cannot prove a covered loss under Insuring Clause 5. *Id.*

Third, Insuring Clause 5 only applies if the insured extends credit in reliance on specific types of documents. To that end, Insuring Clause 5 requires proof of a **Forgery** on one of the following: (1) a **Certificated Security**; (2) deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property; (3) **Certificate of Origin or Title**; (4) **Document of Title**; (5) **Evidence of Debt**; (6) corporate, partnership or personal **Guarantee**; (7) **Security Agreement**; or (8) **Instruction**.[12] Fatally, as detailed below, neither the Limited Partnership Agreement nor the Subscription Agreements qualify as any of these documents. Therefore, even if SVB had relied upon the Limited Partnership Agreement or Subscription Agreements (which it did not) and had obtained the originals thereof (which it did not), its loss is not covered under Insuring Clause 5.

In short, Insuring Clause 5 does not provide all-risk coverage against every form of loan fraud, which essentially is what SVB seeks. On the contrary, it provides focused coverage against a specific peril (i.e., **Forgery** on specific types of documents), but only if the insured complied with its part of the risk-sharing arrangement by extending credit in reliance upon the original

---

[10] SMF ¶21; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 53:02-53:07, 88:12-88:25.
[11] *Id.*
[12] SMF ¶4; Exhibit 1, Insuring Clause 5, pp. 8-9.

4

document that it had in its physical possession.  SVB cannot satisfy these mandatory elements of coverage because it extended credit based upon documents outside the scope of coverage and failed to follow the contractually mandated banking procedures.  As a result, its claim is not covered, and Defendants are entitled to summary judgment.

## III.    ELEMENTS OF COVERAGE

Before detailing why SVB cannot establish a covered loss, Defendants will first explain the relevant terms of the Bond and the elements of SVB's claim.   Because the Bond does not provide credit insurance, it includes an exclusion barring coverage for loan losses[13] unless the claimed loss meets the requirements of Insuring Clauses 1, 4, or 5.  In this case, SVB seeks coverage only under Insuring Clause 5.  That insuring clause provides coverage for:

> Loss resulting directly from the ASSURED having, in good faith, for its own account or the account of others:
>
> a.  acquired, sold or delivered, or given value, extended credit or assumed liability, in reliance on any original:
>
> (1) **Certificated Security**,
>
> (2) deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,
>
> (3) **Certificate of Origin or Title**,
>
> (4) **Document of Title**,
>
> (5) **Evidence of Debt**,
>
> (6) corporate, partnership or personal **Guarantee**,
>
> (7) **Security Agreement**, or
>
> (8) **Instruction**, which
>
> > i.   bears a **Forgery**, or
> >
> > ii.  is fraudulently altered, or
> >
> > iii. is lost or stolen, . . . .
>
> ***
>
> Actual physical possession, and continued actual physical possession if taken as collateral, of the items listed in a.(1) through a.(8) above by the ASSURED or a

---

[13] SMF ¶8; Exhibit 1, Conditions and Limitations, § 4.a.-b., p. 22.

5

correspondent Federal or State chartered deposit institution or an authorized representative of the ASSURED is a condition precedent to the ASSURED having relied on such items. Release or return of such collateral is an acknowledgment by the ASSURED that it no longer relies on such collateral.

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.[14]

This insuring clause interposes five distinct elements, though for the purpose of this motion, Defendants are moving on the first three elements only. For completeness, Defendants will detail all required elements of Insuring Clause 5.

First, Insuring Clause 5 applies if SVB extended credit "in reliance on any original" of the documents enumerated in Subsections a.(1) through a.(8).[15] Because the Bond does not define the term "original," the term must be defined in accordance with its ordinary meaning in the context of how it is used, which dictionaries can help elucidate. Dictionaries agree that the word "original" encompasses the first rendering of a document (not a copy thereof).[16] Applying this definition, courts have held that the insured must possess the first rendering of the allegedly forged documents (in this case the Limited Partnership Agreement or Subscription Agreements) and it is not entitled to coverage if it obtained only copies thereof. *Bank of Bozeman*, 404 F. App'x at 117-18; *BancInsure*, 453 F.3d at 1075-76; *Fremont Reorganizing*, 2013 WL 12124105, at *13.

Second, Insuring Clause 5 only applies if SVB "relied" upon the allegedly forged documents.[17] To avoid a dispute over what constitutes reliance, Insuring Clause 5 expressly provides that "actual physical possession" of the forged documents is a condition precedent to

---

[14] SMF ¶4; Exhibit 1, Insuring Clause 5, pp. 8-9.

[15] *Id.*

[16] *Original*, WEBSTER'S NEW COLLEGIATE DICTIONARY (11th ed. 2003) (defining original as "that from which a copy, reproduction, or translation is made" or "a work composed firsthand"); *Original*, THE AMERICAN HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=original (last visited May 3, 2026) (defining original as "the source from which a copy, reproduction, or translation is made"); *Original*, BLACK'S LAW DICTIONARY (6th ed. 1990) (defining original as "the first copy or archetype; that from which another instrument is transcribed, copied, or imitated").

[17] SMF ¶ 4; Exhibit 1, Insuring Clause 5, pp. 8-9.

6

proof of reliance.[18]  The phrase "physical possession" connotes tangible possession of a tangible item. *Fremont Reorganizing*, 2013 WL 12124105, at \*13.  Therefore, SVB must establish that it had tangible possession of the Limited Partnership Agreement or Subscription Agreements.  If it did not comply with this contractually mandated due diligence, it cannot prove reliance upon those documents and Insuring Clause 5 does not apply.

Third, because Insuring Clause 5 applies only if the insured extended credit in reliance upon one of the documents enumerated in Subsections a.(1) through a.(8), SVB must prove that the Limited Partnership Agreement or Subscription Agreements qualify as a **Certificated Security**; deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property; **Certificate of Origin or Title**; **Document of Title**; **Evidence of Debt**; corporate, partnership or personal **Guarantee**; **Security Agreement**; or **Instruction**.[19]  Unless the Limited Partnership Agreement or Subscription Agreements constitute one of these enumerated documents, Insuring Clause 5 does not apply, and SVB's claim is not covered.

Fourth, Insuring Clause 5 applies only if one of the above-enumerated documents bears a **Forgery**,  is fraudulently altered, or is lost or stolen.[20]  The Bond defines **Forgery** as "the signing of the name of another natural person with the intent to deceive . . . ."[21]  SVB therefore bears the burden of proving that the Limited Partnership Agreement or Subscription Agreements were signed with the name of another natural person with the intent to deceive, were fraudulently altered, and/or were lost or stolen.  *French Am. Banking v. Flota Mercante Grancolombiana*, 925 F.2d 603, 604 (2d Cir. 1991) (explaining the plaintiff bears the burden of proving coverage

---

[18] *Id.*
[19] SMF ¶ 4; Exhibit 1, Insuring Clause 5, pp. 8-9.
[20] *Id.*
[21] SMF ¶ 6; Exhibit 1, Conditions and Limitations, § 1.n.

pursuant to the terms of the bond, including that the documents in question bear a forgery). Absent such proof, Insuring Clause 5 does not cover the claimed loss.[22]

Finally, SVB must prove that its loss resulted directly from its good-faith reliance on the forged documents.[23] To prove coverage, the insured "must show more than the fact the forgeries caused it to enter into the transactions with [the borrower]; it must also show that these forgeries directly caused its loss." *Flagstar Bank, FSB v. Fed. Ins. Co.*, No. 05-70950, 2006 WL 3343765, at *8 (E.D. Mich. Nov. 17, 2006), *aff'd*, 260 F. App'x 820, 824 (6th Cir. 2008). In essence, the bank must prove that it would not have suffered the claimed loss had the documents not borne a forgery. *Bank of Bozeman*, 404 F. App'x at 119; *see also Forcht Bank v. BancInsure*, 514 F. App'x 586, 591-92 (6th Cir. 2013).[24]

## IV. SUMMARY OF CLAIM

The issues raised in this motion do not implicate any disputed facts because, as explained below, the motion solely addresses: (1) the legal question of whether the Limited Partnership Agreement and Subscription Agreements qualify as one of the documents enumerated in Insuring Clause 5; and (2) whether SVB carried out the contractually mandated due diligence on the loans at issue. Neither implicates a question of fact because (1) the former solely requires a comparison of the Limited Partnership Agreement and Subscription Agreements to the documents enumerated in Insuring Clause 5; and (2) the latter requires application of SVB's undisputed admissions to the plain terms of the Bond and Ninth Circuit precedent interpreting the Bond. However, to provide context to this dispute, Defendants will provide background on the loan to the JES Fund (**Section**

---

[22] As mentioned above, Defendants are not moving on this element but include this discussion for completeness.
[23] SMF ¶ 4; Exhibit 1, Insuring Clause 5, pp. 8-9.
[24] As also mentioned above, Defendants are not moving on this element but include this discussion for completeness.

**IV.A.**) and then document SVB's failure to obtain the original of the Limited Partnership Agreement and the Subscription Agreements (**Section IV.B.**).

### A.   SVB'S LOAN TO JES FUND

On December 1, 2020, Smerling contacted SVB about extending a line of credit to his private equity fund, referred to as JES Fund III ("JES Fund").[25]  Smerling's initial loan submission contained obvious indicia of fraud. As reflected in SVB's internal analysis of Smerling's submission, Smerling identified investors with "strangely generic" names,[26] claimed investment in companies with no discernible presence,[27] and provided facially contradictory financial records.[28]  As a result, SVB's personnel identified the risk that Smerling's alleged business was "entirely made up."[29]

The indicia of fraud extended even further: the Subscription Agreements were obviously all signed by the same person. Even though he had no training in deciphering forgeries, an SVB executive (Tom Davies) reviewed the signature pages (after the loan had been approved) for the Subscription Agreements and easily identified them as forged:

> Q.   Do you recall that based upon your review of the subscription agreements that you concluded that they looked like they were filled out and maybe signed by the same person?
> A.   I do recall that, yes.
> Q.   And so is it fair to say that in your review of the subscription agreements, even without formal training on how to detect a forgery, you were able to see that they appeared to be signed by the same person?
> A.   That was the conclusion I reached, yes.[30]

---

[25] SMF ¶ 9; Dkt. 1, pp. 7-8, ¶ 29-30.
[26] SMF ¶ 10; Exhibit 4, Davies Deposition, pg. 54:12-55:12.
[27] SMF ¶ 11; Exhibit 4, Davies Deposition, pg. 47:20-48:15.
[28] SMF ¶ 12; Exhibit 4, Davies Deposition, pg. 137:7-138:7.
[29] SMF ¶ 13; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 77:17-21; Exhibit 7, Gates-Fraher Deposition, pg. 115:7-20; Exhibit 6, Vlahos Deposition, pg. 85:13-86:11; Exhibit 5, Caulfield Deposition, pg. 73:14-74:9.
[30] SMF¶ 14; Exhibit 4, Davies Deposition, 43:8-19.

SVB's relationship manager (Josh Cashwell) also concluded that the Subscription Agreements appeared to be signed by the same person:

> Q.  Isn't it true, sir, that when you looked at the signature blocks for the subscription agreements, you concluded that they appear to be signed in the same handwriting?
>
> . . . .
>
> A.  Yes.[31]

SVB nonetheless approved the loan because its employees never bothered to review the Subscription Agreements *before* extending the loan.[32]

Despite being presented with an obvious forgery and other indicia of fraud, SVB loaned $150 million to the JES Fund. Upon approval of the loan, Smerling immediately took a $94,957,322.65 advance on that line of credit, which he used to pay down JES Fund's prior line of credit.[33] Thereafter, SVB conducted post-closing due diligence that should have been done pre-closing, and quickly and easily uncovered that Smerling had provided fraudulent financial information.[34] SVB thereafter declared the loan in default and reported Smerling to the criminal authorities. The United States Attorney indicted Smerling for bank fraud and Smerling ultimately pleaded guilty to bank fraud.

## B.  SVB RECEIVED A SCANNED COPY OF THE LIMITED PARTNERSHIP AGREEMENT AND SUBSCRIPTION AGREEMENTS.

Smerling presented two documents to create the illusion that the JES Fund existed: a Limited Partnership Agreement[35] and Subscription Agreements.[36] The Limited Partnership

---

[31] SMF ¶ 15; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 42:19-22, 42:24.
[32] SMF ¶ 29; Exhibit 3, Cashwell 11-8-2024 Deposition, pg., 42:7-13, 42:15-17; Exhibit 5, Caufield Deposition, 16:2-10; Exhibit 6, Vlahos Deposition, 23:17-24; Exhibit 7, Gates Deposition, 18:9-13; 18:22-19:1; Exhibit 8, Enroth Deposition, 18:15-18.
[33] SMF ¶ 16; Dkt. 1, p. 8, ¶¶ 32-33.
[34] SMF ¶ 17; Exhibit 4, Davies Deposition, 43:8-19.
[35] SMF ¶ 18; Dkt. 1-3, p. 8; Exhibit 9.
[36] SMF ¶ 18; Dkt. 1-3, p. 8; Exhibit 10.

Agreement purportedly reflected the general terms governing the partnership,[37] while the Subscription Agreements purportedly identified investors that subscribed to the alleged partnership.[38]

According to SVB, SVB's outside legal counsel (Cadwalader, Wickersham, & Taft L.L.P.) was responsible for gathering and reviewing the Subscription Agreements on behalf of SVB.[39] Cadwalader's Rule 30(b)(6) Representative, Tim Hicks, acknowledged that Cadwalader obtained the Subscription Agreements from Smerling via email and that Cadwalader did not receive an original or wet-ink version of the Subscription Agreements:

> Q.  Were -- you mentioned subscription agreements.  Did the -- did you receive subscription agreements directly from Akerman in connection with this particular loan?
> A.  That's my recollection.
> Q.  How did -- how were they received?
> A.  Email.
> Q.  Were they attached to an email as a PDF?
> A.  I don't recall.
> Q.  Did you at any time receive wet ink copies of the subscription agreements?
> . . .
> A.  What is wet ink?
> Q.  Meaning the version that was signed with a pen.
> A.  Meaning I could spit on it and smear that signature?
> Q.  Yes.
> A.  No.[40]

SVB's employees confirmed that they too did not receive the original version of the Subscription Agreements.  Josh Cashwell, SVB's relationship manager responsible for originating the loan, acknowledged that while the Subscription Agreements bear a hand-written signature, he

---

[37] SMF ¶ 30; Exhibit 9.
[38] SMF ¶ 32; Exhibit 10.
[39] SMF ¶ 19; Exhibit 5, Caufield Deposition, 23:18-24; Exhibit 6, Vlahos Deposition, 26:4-21; Exhibit 7, Gates Deposition, 70:17-71:5; Exhibit 4, Enroth Deposition, 57:6-9, 57:19, 24-25.
[40] SMF ¶¶ 20-21; Exhibit 11, Hicks Deposition, 17:2-12, 17:16-21.

received them via email.[41] Cashwell acknowledged that SVB never obtained the wet-ink version of the Subscription Agreements:

> Q. In earlier response to one of my questions, you made reference to a wet ink signature. I just want to understand, what do you mean by a wet ink signature?
> A. My understanding is it's a pen to paper actual ink signature on a sheet of paper.
> Q. Did you in connection with any of the documents you received from JES see a wet ink signature?
> A. I did not have a physical piece of paper with ink on it in front of me, no, just to be clear.
> Q. All of the information, including, for example, the partnership agreement, were scans of documents sent over email?
> A. I believe so, yeah.[42]

SVB could have requested the wet-ink version of the Subscription Agreements, but SVB chose not to do so.[43]

And it is obvious from the face of the signature pages of the Subscription Agreements that they were copies of documents signed by hand. Even SVB's lending expert confirmed that SVB solely received electronic copies of the Subscription Agreements that were hand-executed using a physical writing utensil (i.e., a pen) and that the bank solely received electronic copies of those documents:

> Q. But as a matter of background and context, you agree with me the only versions of the signature pages the bank received were scanned copies of alleged signature pages that purportedly had been signed with a pen?
> . . . .
> A. Yeah, I would agree that they received PDFs of -- of the subs- -- Subscription Agreements.
> Q. And those Subscription Agreements that they received a PDF copy of appeared to have been hand-signed with a pen as opposed to electronically signed with DocuSign, correct?
> A. They did, yes.[44]

---

[41] SMF ¶¶ 22, 23; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 88:12-88:25.

[42] *Id.*

[43] SMF ¶ 24; Exhibit 12 Josh Cashwell 11-12-24 Deposition, pg. 171:03-171:06; Exhibit 5, Caufield Deposition, pg. 42:09-42:12.

[44] SMF ¶ 26; Exhibit 13, Kelley Deposition, pg. 70:16-71:10 (objections omitted).

***

Q.	Do you understand that in this instance the Subscription Agreements that were provided in a PDF format were attached to an email?
A.	Yes.[45]

Where, as here, documents are executed with a pen, even SVB's expert agrees that the wet-ink version satisfies the dictionary definition of "original":

Q.	Do you see the definition of "original" in the second column to the right?
A.	Okay.
Q.	And it says, and I quote, "the source or cause from which something arises; that from which a copy, reproduction, or translation is made." Do you see that?
A.	I do.

***

Q.	When you -- when you -- when you take a loan agreement and you sign it with a pen --
A.	Sure.
Q.	-- can we agree that the wet-ink version is -- is the first rendering of the document?
A.	 I would think so, yes. [46]

Because SVB did not receive the wet-ink version of the Subscription Agreements and solely received them as an attachment to an email, SVB's expert characterized the versions received by SVB as a "faithful representation."[47]  But, that clever phrase is code for a copy:

Q.	When you use the phrase "faithful representation," do you agree with me that the PDFs in this instance were a copy?
A.	Yes, I -- I would agree that they were a -- a -- a copy or something that reflected the original document when it was transferred into electronic form.[48]

## V.	GOVERNING LEGAL STANDARD

The parties agree that California law governs this dispute.  Under California law, the plain terms of an insurance policy must be applied as written.  *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1264 (1992). A court must interpret a contract to give effect to all of its terms and avoid an

---

[45] SMF ¶ 25; Exhibit 13, Kelley Deposition, pg. 84:17-84:20.
[46] SMF ¶ 33; Exhibit 13, Kelley Deposition, pg. 204:17-204:24, 205:16-205:21.
[47] SMF ¶ 27; Exhibit 13, Kelley Deposition, pg. 83:22-84:05.
[48] SMF ¶ 34; Exhibit 13, Kelley Deposition, pg. 85:03-85:09.

13

interpretation that renders a term mere surplusage. *Advanced Network v. Peerless Ins. Co.*, 190 Cal. App. 4th 1054, 1063 (2010). "If contractual language is clear and explicit, it governs." *Bank of the West*, 2 Cal. 4th at 1264; *First Am. Title Ins. Co. v. XWarehouse Lending*, 177 Cal. App. 4th 106, 115 (2009) ("[W]hen the terms of the policy are plain and explicit the courts will not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed."). And the interpretation of an insurance policy is determined, if possible, solely from the terms of the policy and their clear and explicit meaning understood in their ordinary and popular sense. *Waller v. Truck Ins. Exch.*, 11 Cal. 4th 1, 18 (1995); Cal Civ. Code § 1644. A court may not rewrite the terms of the policy or engage in a forced construction. *Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070, 1078 (2003). Where the terms in a policy are defined within the policy, those definitions control and must be applied. However, the absence from a policy of a definition of a word or phrase does not by itself necessarily create an ambiguity. *Bay Cities Paving v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 866 (1993). A party may not create an ambiguity by referring to or citing extrinsic materials outside the policy. *McKee v. State Farm Fire & Cas. Co.*, 145 Cal. App. 3d 772, 776 (1983). When a policy does not define a term, the court should apply the ordinary and popular definition of that term. *Scottsdale Ins. Co. v. Fineman*, No. 4:20-cv-00368, 2021 WL 411360, at *5 (N.D. Cal. Feb. 5, 2021) (when interpreting "the ordinary sense of [undefined] words [in an insurance policy], courts in insurance cases turn to general dictionaries"); *Laurel v. Allstate Ins. Co.,* No. 09-3990, 2010 WL 1235326, at *8 (C.D. Cal. Feb. 3, 2010) (referencing dictionaries to define undefined term in policy). However, in doing so, it is critical to ensure that the context in which the word is used is considered because dictionaries often include more than one definition. *Scott v. Cont'l Ins. Co.*, 44 Cal. App. 4th 24, 30 n.4 (1996) (noting that "the multiple meanings of a word as found in a dictionary" must be considered in the context of

14

the language as used in the insurance policy); *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 737 (1993) ("A word generally has several meanings, even in the dictionary. You have to consider the sentence in which it stands to decide which of those meanings it bears in the particular case . . . .").

## VI.   ARGUMENT

Federal served SVB with an interrogatory asking SVB to identify any allegedly forged or altered documents.   In response, SVB asserted that the Limited Partnership Agreement and Subscription Agreements bore a **Forgery**.[49]  Without conceding that SVB could prove a **Forgery** (as defined in the Bond), Defendants move for summary judgment because even if SVB proved that a **Forgery** appears on the documents at issue, its claim under Insuring Clause 5 fails because (1) SVB did not obtain the original of either the Limited Partnership Agreement or the Subscription Agreements; (2) SVB did not rely upon the Limited Partnership Agreement or Subscription Agreements in extending the loan; and (3) neither the Limited Partnership Agreement nor the Subscription Agreements  qualify as a document covered under Insuring Clause 5.

### A.   SVB'S ADMITTED FAILURE TO OBTAIN THE "ORIGINAL" PRECLUDES COVERAGE.

Requiring an insured to follow traditional banking standards, as part of the parties' risk-sharing arrangement, Insuring Clause 5 incorporates a contractual obligation to obtain the original documents before extending credit.[50] To that end, Insuring Clause 5 expressly states that it applies only if SVB ". . . extended credit . . . in reliance on any ***original*** . . . ."[51] Enforcing that contractual element of coverage as written, courts agree that an insured is not entitled to coverage where, as here, an insured does not secure the original documents prior to extending credit. *See, e.g.*, *Bank*

---

[49] SMF ¶ 3; Exhibit 2, FDIC-R's Answers to Interrogatories, No. 4, 5; Dkt. 1-3, pp. 2, 4, ¶¶ 1,10.
[50] SMF ¶ 4; Exhibit 1, Insuring Clause 5, pp. 8-9.
[51] SMF ¶ 4; Exhibit 1, Insuring Clause 5, pp. 8-9.

*of Bozeman*, 404 F. App'x at 118-19; *BancInsure*, 453 F.3d at 1076; *Reliance Ins. Co. v. Cap. Bancshares, Inc.*, 912 F.2d 756, 758 (5th Cir. 1990); *Valley Cmty. Bank v. Progressive Cas. Ins. Co.*, 854 F. Supp. 2d 697, 706-07 (N.D. Cal. 2012); *First Nat'l Bank v. Hartford Acc. & Indem. Co.*, 295 N.W.2d 425, 429-30 (Iowa 1980).

The Ninth Circuit, while interpreting and applying California law, upheld the "original" requirement in *Bank of Bozeman*. In that case, the insured purchased an interest in a loan allegedly based upon forged stock certificates. Because the insured never obtained the original stock certificates, the Ninth Circuit held that the insured could not recover under Insuring Agreement (E): "A condition precedent to coverage under BancInsure's Financial Institution Bond (FIB) is '[a]ctual physical possession of [original security documents] by the Insured . . . or [its] authorized representative.'" 404 F. App'x at 118.

The Eighth Circuit enforced the "original" requirement despite possession of an electronic copy in *Marshall Bank*. In that case, the insured submitted a financial institution bond claim, alleging that a thief fraudulently induced it to approve a loan based upon forged loan documents. The insured did not, however, obtain the original loan documents before extending the loan and disbursing the loan proceeds. Instead, it accepted a facsimile copy of the loan documents. The failure to procure the original, the court held, precluded coverage:

> By its own terms, the clause at issue speaks to what type of *signature* is acceptable. It does not, however, except the bank from maintaining actual physical possession of the original guarantee . . . .

453 F.3d at 1076. The insured argued that requiring original documents rendered coverage meaningless, but the court rejected that argument:

> Again, we cannot agree that the coverage against forgery that Marshall Bank purchased was meaningless. The protection afforded by the policy is against forgery, but not forgery committed by use of faxed documents, accepted by the bank without perusal of the originals. Several factual scenarios, all involving forgery, would have clearly resulted in coverage under the policy. Most notably,

16

> Marshall Bank could have simply waited for original documents to arrive before disbursing funds. The fact that an insured's circumstance is outside a policy's realm of coverage does not, without more, render the policy illusory. Marshall Bank paid for protection from forgery and, in most instances, the policy provided that coverage. This is not one of those instances, however, and we will not read such coverage into the policy.

*Id.* at 1076–77 (internal footnote omitted). The court so held because the bond does not "permit[] copied documents to serve as proxies for originals." *Id.* at 1076.

Under *Bank of Bozeman* and *Marshall Bank*, SVB must demonstrate that it possessed the "original" of the Limited Partnership Agreement and Subscription Agreements. A scanned copy of a hand-signed document attached to an email is not, under any sense of the word, an "original." By its very nature, the version of the document executed by the signor (i.e., the wet-ink version) is the original because it is the first rendering of the document. Scanning that document into the computer creates a replica or copy of the document.[52] To that end, the commonly understood meaning of "original" is the first rendering of a document,[53] and courts agree that possession of an electronic copy does not qualify as possession of the "original" for purposes of Insuring Clause 5. *See, e.g.*, *Fremont Reorganizing*, 2013 WL 12124105, at *13 (holding the insured did not have actual physical possession of original loan documents when it released loan funds based upon

---

[52] Federal expects SVB to argue that the Limited Partnership Agreement equated an electronically scanned copy as an original. First, the Limited Partnership Agreement is immaterial to the terms of the Bond and SVB's contractual obligation to obtain the original. But even if it were material, this argument fails because the Limited Partnership Agreement provides the ". . . subscription agreement and any amendments hereto ***to the extent signed and delivered by means of a facsimile machine or other electronic transmission*** (including PDF) shall be treated in all manners and respects and for all purposes as an original agreement." This provision only applies to documents "signed . . . by facsimile machine or other electronic transmission." That did not occur here, as SVB's own expert admitted that the Subscription Agreements were hand-signed and were not signed by means of a facsimile machine or other electronic method. (Exhibit 13, Kelley Deposition, pg. 71:16-71:10; 260:16-206:19).

[53] Dictionaries agree that, in context, the word "original" encompasses the first rendering of a document (not a copy thereof). *Original*, WEBSTER'S NEW COLLEGIATE DICTIONARY (11th ed. 2003) (defining original as "that from which a copy, reproduction, or translation is made" or "a work composed firsthand"); *Original*, THE AMERICAN HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=original (last visited May 3, 2026). (defining original as "the source from which a copy, reproduction, or translation is made"); *Original*, BLACK'S LAW DICTIONARY (6th ed. 1990) (defining original as "the first copy or archetype; that from which another instrument is transcribed, copied, or imitated").

faxed copies); *Alliance Nat'l Bank v. Fed. Ins. Co.*, No. 4:07-CV-0061, 2008 WL 11627908, at *1 (N.D. Ga. June 19, 2008) (holding the insured did not have "actual physical possession" of a manufacturer's statement of origin where it had only a facsimile version of the signed document); *Hamilton Bank v. Ins. Co. of N. Am.*, 557 A.2d 747, 750–51 (Pa. Super. Ct. 1989) (holding photocopies do not qualify as original documents where the bond required physical possession of those documents).

The decision in *Fremont Reorganizing* illustrates the point well. In that case, the insured sought coverage under a financial institution bond, even though it received and relied upon only a faxed copy of the allegedly forged document. As here, the bond conditioned coverage on obtaining the original document. Nevertheless, the insured argued that the court should award coverage because there was no material distinction between a faxed copy of the document and the original document. Refusing to re-write the bond or ignore its terms, the district court rejected that argument and held that the insured was not entitled to coverage because it did not obtain the original documents:

> First, the plain language of Insuring Clause 5 requires Signature to have relied on original documents that are actually in its physical possession. . . . Moreover, a facsimile copy does not constitute an "original" document. . . . The language does not "permit reliance on copies of entire documents that were received through a fax machine."

2013 WL 12124105, at *13.

Here, SVB claims that the Limited Partnership Agreement and Subscription Agreements bear a **Forgery**. As evidenced from the documents themselves and confirmed by SVB's witnesses, the Limited Partnership Agreement and Subscription Agreements were demonstrably executed with a pen.[54] But incredibly, SVB did not require, or even request, the original version of those

---

[54] SMF ¶ 26; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 88:12-88:25; Exhibit 11, Deposition of Timothy Hicks, 17:2-12, 17:16-21; Exhibit 13, Kelley Deposition, pg. 70:16-71:10.

documents (i.e., the wet-ink version) before distributing almost $100 million in loan funds. Instead, it received a scanned copy of the documents as attachments to an e-mail. That fact is undisputed, because both SVB's witnesses and SVB's experts admit that SVB solely received the Limited Partnership Agreement and Subscription Agreements via email:

| SVB Personnel | Role | Testimony |
|---|---|---|
| Josh Cashwell | Relationship Manager | Q. Did you in connection with any of the documents you received from JES see a wet ink signature?<br>A. I did not have a physical piece of paper with ink on it in front of me, no, just to be clear.<br>Q. All of the information, including, for example, the partnership agreement, were scans of documents sent over email?<br>A. I believe so, yeah.[55] |
| Brian Kelley | SVB Expert | Q. But as a matter of background and context, you agree with me the only versions of the signature pages the bank received were scanned copies of alleged signature pages that purportedly had been signed with a pen?<br>***<br>A. Yeah, I would agree that they received PDFs of -- of the subs- -- Subscription Agreements.<br>Q. And those Subscription Agreements that they received a PDF copy of appeared to have been hand-signed with a pen as opposed to electronically signed with DocuSign, correct?<br>A. They did, yes.[56] |

SVB could have requested the original, wet-ink version of the Limited Partnership Agreement and the Subscription Agreements, but it chose not to comply with the contractually mandated closing procedure embedded in the Bond. Because of SVB's choice, Insuring Clause 5 does not apply, and Defendants are entitled to summary judgment. *See Marshall Bank*, 453 F.3d

---

[55] SMF ¶¶ 22, 23; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 88:12-88:25.
[56] SMF ¶¶ 25, 26; Exhibit 13, Kelley Deposition, pg. 70:16-71:10 (objections omitted).

19

at 1076 ("The protection afforded by the policy is against forgery, but not forgery committed by use of faxed documents, accepted by the bank without perusal of the originals.")

### B. SVB CANNOT PROVE RELIANCE UPON THE LIMITED PARTNERSHIP AGREEMENT AND THE SUBSCRIPTION AGREEMENTS.

As explained above, Insuring Clause 5 applies only if SVB "extended credit . . . in reliance on any original" of the enumerated documents. To avoid a dispute about what constitutes reliance, the Bond defines the term. It does so by stating that an insured must have physical possession of the document in order to rely upon that document:

> Actual physical possession, and continued actual physical possession if taken as collateral, of the items listed in a.(1) through a.(8) above by the ASSURED or a correspondent Federal or State chartered deposit institution or an authorized representative of the ASSURED is a condition precedent to the ASSURED having relied on such items. Release or return of such collateral is an acknowledgment by the ASSURED that it no longer relies on such collateral.[57]

As such, it is not enough for SVB to claim that it required Smerling to provide the Limited Partnership Agreement and Subscription Agreements. It must prove that it had "actual physical possession" of the Limited Partnership Agreement and Subscription Agreements.

As explained above, SVB never obtained physical possession of the Limited Partnership Agreement or Subscription Agreements. On the contrary, its relationship manager testified that he solely received electronic communications[58] and "did not have a physical piece of paper with ink on it in front of me . . . ."[59] SVB instead obtained scanned copies of the Limited Partnership Agreement and Subscription Agreements.[60] While SVB will defend the practice of exchanging documents via email, the Bond, which is the contractual agreement between the parties, imposes a specific requirement for coverage—physical possession of the documents. Absent physical

---

[57] SMF ¶ 4; Exhibit 1, Insuring Clause 5, pp. 8-9.
[58] SMF ¶¶ 22-23; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 88:12-88:25.
[59] SMF ¶¶ 22-23; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 88:12-88:25.
[60] SMF ¶¶ 22-23; Exhibit 3, Cashwell 11-8-2024 Deposition, pg. 88:12-88:25; SMF ¶¶ 25, 26; Exhibit 13, Kelley Deposition, pg. 70:16-71:10.

possession of the documents, SVB did not rely upon the documents, and it is not entitled to coverage.

The Bond does not define the terms "physical" or "possession" and therefore the Court must apply the ordinary meaning of those terms. The term "physical" means "something that can be touched" and the term "possession" means "the act or condition of having or taking into control."[61] In combination, the phrase "physical possession" means tangible control over the documents listed in a.(1) through a.(8), all of which must be *originals*, as set forth in the lead-in language of clause (a). In other words, the Bond requires that the bank have true physical possession of the originals of the loan documents. *Fremont Reorganizing*, 2013 WL 12124105, at *13; *Republic Nat'l Bank of Miami v. Fid. & Deposit Co. of Md.*, 894 F.2d 1255, 1262 (11th Cir. 1990) ("Republic, therefore, did not have the forged documents in its physical possession at the time it purportedly acted in reliance upon them"); *Hamilton Bank*, 557 A.2d at 750-51 ("the clear meaning of the blanket bond mandates that Bank must physically possess the original bills of lading at the time of extending credit before it may recover its losses").

*Fremont Reorganizing* addressed this very issue under California law while interpreting the very provision at issue in this case. In that case, the insured claimed that it relied upon allegedly forged documents when extending credit, even though it did not obtain the paper versions of the loan documents prior to extending credit. Rejecting that argument, the district court enforced the plain terms of the bond as written and held that the insured could not demonstrate reliance unless it had physical possession of the documents. The insured claimed that it received electronic copies of the documents, but the court applied the common meaning of the term "physical possession" and held that this term contemplated possession of paper copies (not receipt of electronic copies):

---

[61] *Possession*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/possession (last visited May 3, 2026).

"The undisputed facts show that Signature did not receive actual physical possession of the original loan documents, but authorized the release of loan funds based on receipt of a faxed copy of the loan documents." 2013 WL 12124105, at *13.

As in *Fremont Reorganizing*, SVB's witnesses and experts admit that SVB did not obtain "physical possession" of the Limited Partnership Agreement or Subscription Agreements but instead accepted scanned copies. Regardless of the wisdom of that practice, it does not comply with the plain terms of the Bond and, thus, SVB cannot demonstrate that it relied upon the Limited Partnership Agreement or Subscription Agreements. Accordingly, SVB's claim is not covered under Insuring Clause 5 and Defendants are entitled to summary judgment.

### C. NEITHER THE LIMITED PARTNERSHIP AGREEMENT NOR THE SUBSCRIPTION AGREEMENTS ARE QUALIFYING DOCUMENTS.

Even if SVB had obtained actual, physical possession of the original documents prior to extending credit and could prove reliance, there still can be no coverage for SVB's loss because neither the Limited Partnership Agreement nor the Subscription Agreements qualify as one of the types of documents enumerated in Insuring Clause 5.[62] While Insuring Clause 5 encompasses traditional documents exchanged during loans (such as a note and mortgage), Smerling himself executed the actual loan documents in this case and, thus, those loan documents do not bear a **Forgery** (defined as signing the name of *another*). Plaintiffs are therefore left to argue that the Limited Partnership Agreement and Subscription Agreements constitute something they are not: **Guarantees** or **Security Agreements**. This argument fails on its face.

---

[62] SMF ¶ 4; Exhibit 1, Insuring Clause 5, pp. 8-9.

### 1. *The Limited Partnership Agreement and Subscription Agreements Do Not Qualify as Guarantees.*

SVB wrongly suggests that the Limited Partnership Agreement and Subscription Agreements trigger coverage under Insuring Clause 5 because they constitute a **Guarantee**. The Bond defines the term **Guarantee** as "a written undertaking obligating the signer to pay the debt of another to the ASSURED or its assignee . . . , if the debt is not paid in accordance with its terms."[63] SVB therefore bears the burden of proving that the Limited Partnership Agreement and Subscription Agreements obligated the signor to pay the debt of another to SVB. *BP W. Coast Prods. v. Crossroad Petroleum, Inc.*, No. 12-CV-665, 2018 WL 264120, at *6 (S.D. Cal. Jan. 2, 2018) (explaining "[a] guarantor makes a direct promise to perform the principal's obligation in the event the principal fails to perform"); *Jefferson Bank v. Progressive Cas. Ins. Co.*, No. 90-584, 1990 WL 180585, at *4 (E.D. Pa. Nov. 19, 1990) (explaining that "[a] title insurance policy is not a promise to pay a debt if the debt is not paid, and therefore it is not a guarantee"), *rev'd on other grounds*, 965 F.2d 1274 (3d Cir. 1992).

The Limited Partnership Agreement and Subscription Agreements contain no such provision. They do not obligate anyone to pay the debts of the JES Fund. The Limited Partnership Agreement contains a single provision addressing loans to the partnership. That provision does not, however, obligate the limited partners to pay the debt to SVB. It provides as follows:

> Each Limited Partner agrees that . . . obligations under any Subscription Facility (including obligations of any Parallel Partnership, Alternative Vehicle or Feeder Fund that is a co-borrower or co-guarantor under such Subscription Facility) shall be payable from any Partnership source, including, without limitation, Remaining Commitments, proceeds of Portfolio Investments, and receipts or revenues of any character (in each case regardless of whether any credit extended under any Subscription Facility is related or attributable to a particular Portfolio Investment or transaction).[64]

---

[63] SMF ¶ 5; Exhibit 1, Definition 1.o., p. 17.
[64] SMF ¶ 31; Exhibit 9, Limited Partnership Agreement, p. 16, 4.5(b).

In short, the Limited Partnership Agreement *authorizes* the use of partnership funds to pay SVB, but it does not *obligate* the limited partners to pay the debt to SVB.[65] The Subscription Agreements set forth the mechanism for the "subscribers" to become partners under the terms of the Limited Partnership Agreement. But they, too, do not contain any promise to pay the debt of the partnership. Because they do not do so, they do not qualify as a **Guarantee** under the Bond and any alleged forgery thereof does not trigger coverage under Insuring Clause 5.

### 2. *The Limited Partnership Agreement and Subscription Agreements Do Not Qualify as Security Agreements.*

SVB also argues that the Limited Partnership Agreement and Subscription Agreements qualify as a **Security Agreement**. The Bond defines **Security Agreement** as any "agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation."[66] SVB assert that the Limited Partnership Agreement and Subscription Agreements are **Security Agreements** because they secure payment or performance of the partnership's loan obligation.

Courts addressing this issue hold that a document does not qualify as a **Security Agreement** unless the bank can assert its rights thereunder to pursue collection. *Banc of Cal. v. Fed. Ins. Co.*, No. 21-56179, 2022 WL 17583056, at *2 (9th Cir. Dec. 12, 2022); *FDIC v. RLI Ins. Co.*, 49 F. Supp. 3d 517, 524 (N.D. Ill. 2014), *aff'd*, 784 F.3d 1104 (7th Cir. 2015); *Metro Fed. Credit Union v. Fed. Ins. Co.*, 607 F. Supp. 2d 870, 878 (N.D. Ill. 2009) (determining advance requests "when approved by a 'duly authorized signatory of Arbor Green' became 'a binding legal

---

[65] Even in the absence of a contractual definition, North Carolina courts recognize that a guarantee is ". . . a contract, obligation or liability arising out of contract, whereby the promisor, or guarantor, undertakes to answer for the payment of some debt, or the performance of some duty, in case of the failure of another person who is himself in the first instance liable to such payment or performance." *Self-Help Ventures Fund v. Custom Finish*, 682 S.E.2d 746, 749 (N.C. Ct. App. 2009); *EAC Credit v. Wilson*, 187 S.E.2d 752, 755 (N.C. 1972).
[66] SMF ¶ 7; Exhibit 1, Conditions and Limitations § 1.x., p. 18.

24

obligation to repay the principal sum advanced and all interest accrued as stipulated [in the Agreements]).

*Banc of California* recently addressed the definition of a **Security Agreement**. In that case, the bank extended credit based upon an alleged deposit at another bank. In order to secure its interest in funds held at that bank, the insured received a control agreement. That agreement expressly provided the bank the right to control a specific set of funds held at another bank. The Ninth Circuit held that a "control agreement" constituted a "Security Agreement" under a financial institution bond because it created a possessory interest in the bank account. 2022 WL 17583056, at *2. In short, the Court looked to whether the agreement created an interest in a specific asset and held that the agreement at issue in that case did because the control agreement expressly provided the bank with an interest in the borrower's funds.

The Seventh Circuit reached an analogous result in *RLI*. In that case, the borrower secured a loan by forging equipment leases. The FDIC argued that the leases qualified as a Security Agreement because the provisions therein created an interest in specific property. The District Court held that the leases were "Security Agreements" because they created an interest in the property: the "[l]eases permit the lessor in case of default to repossess the equipment and to require payment of arrears, costs of equipment removal and reasonable attorneys' fees . . . . Plainly, then, the Leases secured payment of an obligation—particularly when as here they were used as collateral for loans." *Id.*, 49 F. Supp. 3d at 524.

Applying *RLI* and *Banc of California*, the Limited Partnership Agreement and Subscription Agreements do not expressly identify or create a right for SVB to pursue specific property (such as the computer equipment in *RLI* or bank account in *Banc of California*). As such, the Limited

Partnership Agreement and Subscription Agreements do not qualify as **Security Agreements**, and any alleged forgery thereof does not trigger coverage under Insuring Clause 5.

## VII.    CONCLUSION

For the reasons set forth herein, Defendants respectfully request that this Honorable Court enter summary judgment in its favor and against the Plaintiffs, and for all other relief the Court deems necessary and appropriate.

Dated: May 4, 2026

Respectfully submitted,

/s/ *Scott L. Schmookler*_____
Scott L. Schmookler
Illinois State Bar. No. 6238034
sschmookler@grsm.com
Angela Sullivan
Illinois State Bar No. 6330028
asullivan@grsm.com
**GORDON REES SCULLY MANSUKHANI**
One North Franklin, Suite 800
Chicago, IL 60606
312-980-6779
Fax 312-565-6511
*Attorneys for Federal Insurance Company*
-and-
Suzanne R. Walker
**GORDON REES SCULLY MANSUKHANI**
421 Fayetteville St., Suite 330
Raleigh, North Carolina 27601
swalker@grsm.com
984-242-1811
Fax 919-741-5840
N.C. State Bar No.: 37774
Local Civil Rule 83.1(d) Attorney for Federal
Insurance Company

/s/ *Michael Keeley*_____
Michael Keeley
Texas State Bar No. 11157800
mkeeley@clarkhill.com

26

Holly Naehritz
Texas State Bar No. 24083700
hnaehritz@clarkhill.com
CLARK HILL PLC
901 Main Street, Suite 6000
Dallas, TX 75202-3794
(214) 651-4300
(214) 651-4330 Fax
*Attorneys for Berkley Regional Insurance Company*

-and-

Heather G. Connor
NC State Bar No. 27563
heather.connor@mgclaw.com
David M. Fothergill
NC State Bar No. 31528
david.fothergill@mgclaw.com
McAngus Goudelock & Courie, PLLC
Post Office Box 30307
Charlotte, NC 28230
(704) 404-4664
(704) 643-2376 Fax
*Local Civil Rule 83.1(d) Counsel for Defendant Berkley Regional Insurance Company*

27

## CERTIFICATION OF COMPLIANCE

I, Scott Schmookler, hereby certify that the foregoing brief complies with L.R. 7.2. I further certify that the above document contains 8,370 words, excluding those portions of the document excluded from the word count pursuant to L.R. 7.2. This certificate was prepared in reliance on the word-count function of the Microsoft Word processing system used to prepare this document.

/s/ Scott L. Schmookler_____
Scott L. Schmookler

28

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing to all counsel of record using the CM/ECF system;

/s/ Scott L. Schmookler_____
Scott L. Schmookler

29