IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-00095-BO-RN

| | | |
|---|---|---|
| SVB Financial Group, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | <u>ORDER</u> |
| | ) | |
| Federal Insurance Company, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the Court on the FDIC's motion for summary judgment as Receiver for Silicon Valley Bank and defendants', Federal Insurance Company and Berkley Regional Insurance Company, joint motion for summary judgment. [DE 200]; [DE 199]. The appropriate responses and replies have been filed. In this posture, the motion is ripe for disposition. For the following reasons, the FDIC's motion [DE 200] is GRANTED and the defendants' motion is DENIED. [DE 199].

## BACKGROUND

I. Facts

This case involves an insurance coverage dispute between the FDIC and two insurers, Federal Insurance Company ("Federal") and Berkley Regional Insurance Company ("Berkley"). The origin of this dispute centers on "a fraudulent scheme perpetrated by Elliot Smerling." [DE 1-3, ¶ 1]; [DE 10, ¶ 1]; [DE 14, ¶ 1]. As part of this scheme, Smerling, under his private equity fund JES Global Capital III, L.P., sought a $150 million line of credit from Silicon Valley Bank ("SVB"). [DE 1-3, ¶ 1]; [DE 10, ¶ 1]; [DE 14, ¶ 1].

SVB eventually approved the $150 million dollar loan when "on February 2, 2021 SVB signed a Loan and Security Agreement" with JES Global Capital III, L.P. and JES Global Capital GP III, LLC. [DE 201, ¶ 42]; [DE 217, ¶ 42]. "[O]n February 3, 2021, SVB funded an approximately $95 million draw on the line of credit" to Smerling's fund. [DE 201, ¶ 49]; [DE 217, ¶ 49]. Although "SVB personnel testified that they had no knowledge of the forgeries while underwriting the loan, did not disregard known risks, and followed all applicable procedures," [DE 201, ¶ 41]; [DE 217, ¶ 41], they would soon discover some irregularities as "part of a randomized review of credits meeting certain criteria." [DE 201, ¶ 75]; [DE 217, ¶ 75]. SVB thereafter discovered that the documents Smerling had used to secure approval for the loan, a Limited Partnership Agreement and Subscription Agreement, were fraudulent. [DE 199, p. 5].

Smerling was subsequently arrested on February 26, 2021, for financial crimes, in part related to the SVB loan, pled guilty, and was sentenced to 97 months in prison. [DE 1-3, ¶ 8]; [DE 10, ¶ 8]; [DE 14, ¶ 8].

However, the focus of this case turns on the two insurance bonds SVB had entered into with defendants. [DE 1-3, ¶ 10]; [DE 10, ¶ 10]; [DE 14, ¶ 10]. The first bond, issued by Federal, contains a single loss limit of $15,000,000 and a $30,000,000 aggregate limit of liability, with an effective date from August 1, 2020, to August 1, 2021. [DE 1-3, ¶ 19]; [DE 10, ¶ 19]; [DE 14, ¶ 19]. The Bond has an insuring clause titled, "Extended Forgery." [DE 1-3, ¶ 21]; [DE 10, ¶ 21]; [DE 14, ¶ 21]. That provision provides coverage for the following:

> "Loss resulting directly from the ASSURED having, in good faith, for its own account or the account of others:
>
> a. acquired, sold or delivered, or given value, extended credit or assumed liability, in reliance on any original

(1) **Certificated Security**,

(2) deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,

(3) **Certificate of Origin or Title**,

(4) **Document of Title**,

(5) **Evidence of Debt**,

(6) corporate, partnership or personal **Guarantee**,

(7) **Security Agreement**, or

(8) **Instruction**,

which

i. bears a **Forgery**, or

ii. is fraudulently materially altered, or

iii. is lost or stolen, or

b. guaranteed in writing or witnessed any signature on any transfer, assignment, bill of sale, power of attorney, **Guarantee**, or endorsement upon or in connection with any item listed in a.(1) through a.(8) above, or

c. acquired, sold or delivered, or given value, extended credit or assumed liability in reliance on any item listed in a.(1) through a.(4) above which is a **Counterfeit Original**.

Actual physical possession, and continued actual physical possession if taken as collateral, of the items listed in a.(1) through a.(8) above by the ASSURED or a correspondent Federal or State chartered deposit institution of the ASSURED is a condition precedent to the ASSURED having relied on such items. Release or

return of such collateral is an acknowledgement by the ASSURED that it no longer relies on such collateral.

For purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature."

[DE 14, ¶ 21]; [DE 199-3, pg. 8–9, 32–33]; [DE 202-9, pg. 9–10, 33–34] (bolding in original). It is under this clause that the FDIC moves for recovery, and the clause under which Federal and Berkley argue that denial of coverage is appropriate. [DE 199, p. 9]; [DE 204, p. 5].

The second Bond, issued by Berkley, is an "Excess Bond," with a "Single Loss Limit of Liability of $15,000,000 in excess of the $15,000,000 Federal Bond limits… and an Aggregate Limit of $30,000,000." [DE 14, ¶ 26]; [DE 1-3, ¶ 26]. The Berkley Bond states, in the relevant part, that Berkley agrees to pay the insured for loss which:

a) would have been paid by the underlying Carrier(s) in the UNDERLYING COVERAGE scheduled below but for the fact that such loss exceeds the Limit of Liability of the underlying Carrier(s), and
b) for which the underlying Carrier(s) has made monetary payment and the Insured has collected the fully monetary amount of the underlying Carrier's expressed Limit of Liability.

[DE 14, ¶ 28]; [DE 1-3, ¶ 28].

It was under these policies that, once SVB discovered the fraudulent activity of Smerling in the post-closing review, SVB sought coverage for its alleged losses. [DE 201, ¶ 75]; [DE 217, ¶ 75]; [DE 199-1, ¶¶ 1–2]; [DE 199-1, ¶ 17]. While the parties dispute the actual extent of loss

suffered by SVB, SVB alleges that it lost more than $70,000,000. [DE 1-3, ¶ 38]; [DE 204, p. 9]; [DE 10, ¶ 38]; [DE 14, ¶ 38]; [DE 217, ¶ 83].

In order to recover under the policies, SVB sent correspondence to the defendant insurers categorized as proof of loss in order to secure coverage under the bonds.[1] [DE 201, ¶ 93]; [DE 217, ¶ 93]. The defendant insurers, in correspondence dated January 3, 2022 (Federal) and January 28, 2022 (Berkley), rejected coverage. [DE 201, ¶¶ 94–95]; [DE 217, ¶¶ 94–95]. Berkley's denial "adopt[ed] and incorporate[d] herein the reasons and defenses asserted by Federal." [DE 201, ¶ 95]; [DE 217, ¶ 95]. In later correspondence, Federal reaffirmed its denial of the claim on "the grounds that the documents submitted by Smerling were not qualifying documents, were not originals, were not possessed by SVB, and did not cause SVB to suffer a direct loss." [DE 201, ¶ 96]; [DE 217, ¶ 96].

II. Procedural Posture

"On March 10, 2023, the California Department of Financial Protection & Innovation took possession of SVB, ordered that SVB be liquidated, and appointed the FDIC as its receiver." [DE 201, ¶ 146]; [DE 217, ¶146]. Thus, the FDIC, in this case, is serving as receiver for SVB. SVB was a subsidiary of SVB Financial Group ("SVBFG"), who has also been a party in this case, in addition to SVB Financial Trust. [DE 1-3, ¶ 13]; [DE 108]. On June 22, 2026, this Court held that the FDIC, and not SVBFG, "is the owner of the insurance claim at issue and is entitled to recover [Silicon Valley Bank]'s loss." [DE 222, p. 6]. Subsequently, SVBFG and SVB Financial Trust informed this Court that, "in light of the June 22, 2026 Order" that the FDIC is the owner of

---

[1] However, the defendant insurers dispute whether this correspondence "satisfies the requirements for a proof of loss under the Bond." [DE 217, ¶ 93].

insurance claim, the SVB plaintiffs "will no longer be active participants" in this litigation.[2] [DE 231, p. 1]. The SVB plaintiffs also informed this Court that they "adopt and incorporate by reference the legal arguments in favor of coverage" raised in the reply brief of the FDIC, [DE 228], and join the "FDIC-R's Response to the Insurers' Statement of Additional Material Facts. [DE 227]." [DE 231, p. 1–2].

In light of this procedural history, the current cause before this Court involves the FDIC's motion for summary judgment, with defendant Insurers' joint motion for summary judgment. [DE 199]; [DE 200].

III. Claims Asserted

In the complaint, SVB and SVBFG brought claims for breach of contract and a declaratory judgment under N.C. Gen. Stat. § 1-253 *et seq*. In the FDIC's motion for summary judgment, the FDIC asks that this Court grant an order that the defendants are "obligated to provide coverage for the loss under the Bonds up to the applicable policy limits." [DE 204, p. 4]. In converse, defendants, Federal and Berkley, seek an order from this Court that the FDIC is not entitled to recover under the policies. [DE 199, p. 9].

STANDARD

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute

---

[2] However, SVB plaintiffs stated that they reserve their right to appeal the Court's order at the conclusion of this action. [DE 231, p. 1].

to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). When deciding cross-motions for summary judgment, a court considers each motion separately and resolves all factual disputes and competing inferences in the light most favorable to the opposing party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The court must ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## DISCUSSION

The parties dispute whether the elements of coverage under the "Extended Forgery" clause are met. *See* [DE 199]; [DE 204]. Federal and Berkley, in their motion for summary judgment, move on three elements that would bar coverage under the contract: 1) that the Subscription and LP Agreements were not "originals"; 2) SVB never had "actual physical possession" of the Subscription and LP Agreements and therefore could not have "relied" on them; and 3) the Subscription and LP Agreements do not qualify as any document listed under a.(1) through a.(8) of the insuring clause. [DE 199, p. 10–11].

FDIC, on the other hand, moves for summary judgment on all elements of coverage: 1) the Subscription and LP Agreements were "originals"; 2) SVB had "actual physical possession," and then "relied" on "forged" documents; 3) the LP and Subscription Agreements constitute "Guarantees" and "Security Agreements"; 4) SVB's loss directly resulted from relying on forged documents in approving the loan; and 5) SVB acted in "good faith." [DE 204, p. 3–4].

I. Principles of Insurance Contract Interpretation

California law will be applied because the parties primarily argue in their briefs through California law and there is no conflict between North Carolina and California law as to the issues addressed in this order.[3]

Interpretation of insurance policies are questions of law for the Court and this inquiry "follows the general rules of contract interpretation." *C.J. Segerstrom & Sons v. Lexington Ins. Co.*, 724 F. Supp. 3d 1052, 1058 (C.D. Cal. 2023). These rules of interpretation require courts to "look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). The goal of construing insurance contracts is "to give effect to the parties' mutual intentions." *Minkler v. Safeco Ins. Co. of Am.*, 49 Cal. 4th 315, 321 (2010). "If contractual language is clear and explicit, it governs." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992).

However, if the language is not "clear and explicit," but rather, ambiguous, a court will "resolve[] the ambiguity by looking to the expectations of a reasonable insured." *Esparza v. Burlington Ins. Co.*, 866 F. Supp. 2d 1185, 1194 (E.D. Cal. 2011) (quotations omitted). "An

---

[3] *See* [DE 204, p. 11 n. 5]; [DE 207, p. 16]; [DE 199, p. 17]; *N. State Deli, LLC v. Cincinnati Ins. Co.*, 386 N.C. 733, 740–41 (2024); *Hunter v. Town of Mocksville*, 897 F.3d 538, 547–48 (4th Cir. 2018); *State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343 F.3d 249, 254 (4th Cir. 2003).

insurance policy provision is ambiguous when it is capable of two or more constructions both of which are reasonable." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal 4th 854, 867 (1993). However, "[a]mbiguity cannot be based on a strained instead of reasonable interpretation of a policy's terms." *Highlands Ins. Co. v. Universal Underwriters Ins. Co.*, 92 Cal. App. 3d 171, 175, 154 Cal.Rptr. 683 (1979).

Lastly, if ambiguity persists, courts will construe the ambiguity against the party who caused it to exist. *In re K F Dairies, Inc. & Affiliates v. Fireman's Fund Ins. Co.*, 224 F.3d 922, 926 (9th Cir. 2000). Generally, "[i]n the insurance context, this is almost always the insurer." *Id.* This means that ambiguities in insurance contracts are resolved "against the insurer and in favor of coverage." *C.J. Segerstrom & Sons v. Lexington Ins. Co.*, 724 F. Supp. 3d at 1058. Thus, ambiguities in coverage are to be interpreted "broadly, protecting the objectively reasonable expectations of the insured." *AIU Ins. Co.* v. *Superior Ct.*, 51 Cal 3d 807, 822 (1990).

II. Were the Subscription and LP Agreements "Originals"?

Both the Insurers and the FDIC move for summary judgment on what "original" means under the contract. As both sides acknowledge, the Extended Forgery clause requires that SVB "…extended credit…in reliance on any *original*." [DE 199-3, p. 8] (emphasis added); [DE 199, p. 19]; [DE 204, p. 18]. However, the insurance Bond does not define "original." [DE 199-3]; [DE 204, p. 18].

The parties debate what "original" means under the clause. The Insurers posit that the term "original" requires the "wet-ink" paper version of the documents, as those "wet-ink" "originals" were the first rendering of the document. [DE 199, p. 21–23]. FDIC, on the other hand, argues that such a construction of the term "original" is unreasonable and inconsistent within the context of the contract. [DE 216, p. 6]. The reason for this debate over what "original" means is because SVB

never received the "wet-ink" paper LP and Subscription Agreements from Smerling and his fund before issuing the line of credit. [DE 199, p. 22–23]; [DE 216, p. 5–6]. Instead, SVB received the LP and Subscription Agreements via email in PDF format. [DE 199, p. 22–23]; [DE 204, p. 8]; [DE 216, p. 5]. Thus, if the term "original" under the contract indeed requires the "wet-ink" paper version of the agreements, then the claim for coverage must fail, as an essential element would not be met.

First, this Court looks to the "language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." *Waller*, 11 Cal. 4th at 18. Again, the purpose of which is "to give effect to the parties' mutual intentions." *Minkler*, 49 Cal. 4th at 321. "If contractual language is clear and explicit, it governs." *Bank of the W.*, 2 Cal. 4th at 1264. Dictionary definitions do not resolve the question of what original means. One definition of "original" is "being the first instance or source from which a copy, reproduction, or translation can be made." *Original*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/original (last visited September 24, 2026). However, another definition of "original" is "not secondary, derivative, or imitative." *Id.* Such definitions, while informative, do not clearly demand a "wet-ink" definition under the contract as suggested by the Insurers, nor do they clearly disallow PDF scans of documents. As the FDIC argues, "what makes a document an original is its role in the transaction, not the medium in which it exists. If a document is a source document for the loan transaction…it is an original." [DE 204, p. 18]. Thus, a PDF scan of a paper document transmitted electronically for the purpose of securing a loan would be an original under the FDIC's view. *Id.* Although a "wet-ink" requirement appears reasonable, so does a definition of original that allows for electronically transmitted source documents, "particularly in today's banking world where most people do most or all of their banking online, and electronic copies are widely considered

originals." *Transp. All. Bank, Inc. v. BancInsure, Inc.*, No. 1:11-CV-148, 2014 WL 684691, at *6 (D. Utah Feb. 21, 2014).

Ambiguity exists when there are "two or more constructions both of which are reasonable." *Bay Cities Paving & Grading, Inc.*, 5 Cal 4th at 867. However, courts will "resolve[] the ambiguity by looking to the expectations of a reasonable insured." *Esparza*, 866 F. Supp. 2d at 1194. Indeed, ambiguities in insurance contracts are resolved "against the insurer and in favor of coverage." *C.J. Segerstrom & Sons v. Lexington Ins. Co.*, 724 F. Supp. 3d at 1058. Although Insurers' definition of "original" may be reasonable, it is far from clear that such a definition is the only reasonable construction. Insurers left the term "original" undefined, opening the door to other plausible constructions, such as permitting PDF scans of documents and other electronically transmitted documents. [DE 228, p. 2]. Because there is ambiguity in what "original" means, it must be resolved in favor of coverage. *C.J. Segerstrom & Sons v. Lexington Ins. Co.*, 724 F. Supp. 3d at 1058. Thus, "electronic and electronically-transmitted documents can constitute originals" when they serve as source documents for loan transactions. [DE 228, p. 5]; [DE 204, p. 18]. The FDIC, therefore, has met the element of "original."

III. <u>Was there "Actual Physical Possession" and "Reliance"?</u>

The parties also dispute whether the elements of "actual physical possession" and "reliance" on the documents that Smerling provided SVB has been met. [DE 199, p. 24]; [DE 204, p. 17, 29]. The insuring clause states "[a]ctual physical possession…is a condition precedent to the ASSURED having relied on" the documents. [DE 14, ¶ 21]; [DE 199-3, pg. 8–9, 32–33]; [DE 202-9, pg. 9–10, 33–34].

The Insurers argue that, although the Bond does not define "actual physical possession," its ordinary meaning requires "tangible control" over the documents. [DE 199, p. 25]. FDIC, on

the other hand, argues that because the LP and Subscription Agreements were stored in SVB's "electronic files on the Bank's servers and computer systems," the element of actual physical possession is met. [DE 204, p. 29]. This dispute, similarly, to the dispute about the meaning of "original," centers on the fact that SVB did not get the "wet-ink" physical documents, but rather electronically transmitted documents. [DE 199, p. 22–23]; [DE 216, p. 5–6]; [DE 204, p. 8].

Again, the Court interprets the words of the contract as to their ordinary meaning. *Waller*, 11 Cal. 4th at 18. In addition, "language in a contract must be interpreted as a whole." *Id.* (citation omitted). Insurers claim that the definition of "physical" means "something that can be touched."[4] [DE 199, p. 25]. However, "physical" can have a more expansive definition such as "existing in a form that you can touch or *see*." *Physical*, *Merriam-Webster*, https://www.merriam-webster.com/simple/physical (last visited Sept. 24, 2026) (emphasis added). There are other issues with the Insurers' definition of "physical possession." As previously stated, the language of a contract is interpreted "as a whole." *Waller*, 11 Cal. 4th at 18. Although Insurers argue that the term "physical possession" means "tangible control," the word "tangible" is absent in the surrounding language. However, tangible is present in other sections of the Bond. [DE 216, p. 20–21]. One example includes the definition of "property," which in part states "*tangible* items of personal property which are not specifically enumerated." [DE 199-3, p. 18] (emphasis added). Another use of tangible is located in Specific Exclusion (h), "loss of any *tangible* item of personal property." *Id.* at 21 (emphasis added). Most importantly, "tangible" is absent from the Extended Forgery clause entirely. Given that the Bond uses "tangible" elsewhere, the Court cannot "read

---

[4] It is this definition of "physical" with the definition of "possession" being "the act or condition of having or taking into control," that Insurers arrive to the conclusion that "physical possession" means tangible control. *Possession*, *Merriam-Webster*, https://www.merriamwebster.com/dictionary/possession (last visited Sept. 24, 2026). [DE 199, p. 25].

into the policy" what the Insurers have failed to include, as courts "are not to insert what has been omitted." *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal 4th 758, 764 (2001). Thus, the FDIC has the sole reasonable interpretation of the term "physical possession," which includes electronic storage. Another federal court has arrived at a similar conclusion, reading the same "physical possession" term to include electronic storage, not solely "tangible control," holding that a bank had "actual physical possession…in the form of electronic data." *Transp. All. Bank, Inc.*, 2014 WL 684691, at *8.[5]

However, even if the meaning of "physical possession" supplied by the Insurers was reasonable, it is not the only reasonable construction. Nothing in the clause appears to suggest that electronic storage is prohibited. Thus, assuming arguendo that "tangible control" is a reasonable definition, there is ambiguity as there are "two or more constructions both of which are reasonable." *Bay Cities Paving & Grading, Inc.*, 5 Cal 4th at 867. And, again, ambiguity is resolved against the insurer and in favor of coverage. *C.J. Segerstrom & Sons v. Lexington Ins. Co.*, 724 F. Supp. 3d at 1058. Therefore, the FDIC is entitled to summary judgment as to the element of "actual physical possession."

Lastly, receipt of the LP and Subscription Agreements, as specified in the final Loan Agreement, were conditions precedent to extending the line of credit to Smerling and his fund. [DE 217 ¶¶ 56–57]; [DE 201 ¶¶ 56–57]; [DE 228, p. 5–6]. SVB had its counsel at Cadwalader, Wickersham & Taft L.L.P. ("Cadwalader") review the agreements. [DE 199-1 ¶¶ 19–20]; [DE 228, p. 6]. Cadwalader, then on February 3, 2021, confirmed that the "documentary conditions precedent were satisfied for the credit." [DE 201 ¶ 47]; [DE 217 ¶ 47]. It is clear then, that SVB

---

[5] It should be noted, however, that the Court in this case was applying Utah law. *Id.* at *3.

"relied" on the LP and Subscription Agreements in extending the line of credit, as required by the Extended Forgery clause.

IV. Do the LP and Subscription Agreements Constitute Qualifying Documents under a.(1) through a.(8)?

Both parties similarly move on the element of whether a qualified document has been met. [DE 199, p. 26]; [DE 204, p. 23]. In order to satisfy this element, the documents must fall under one of the listed documents in a.(1) through a.(8) and it must bear a forgery. [DE 199-3, pg. 8–9, 32–33]; [DE 202-9, pg. 9–10, 33–34]. The parties debate whether the LP and Subscription Agreements meet the definition of "Guarantee" and "Security Agreement" under the insuring clause. [DE 199, p. 8]; [DE 204, p. 2].

a. "Forgery"

Forgery is defined under the Bond agreement as "the signing of the name of another natural person with the intent to deceive but does not mean a signature which consists in whole or in part of one's own name, with or without authority, in any capacity for any purpose." [DE 199-3, p. 17]. Roughly two weeks after the closing of the new line of credit to Smerling's fund, SVB's chief Credit Officer initiated a review of the loan agreement as part of a randomized review of certain credits. [DE 201 ¶ 75]; [DE 217 ¶ 75]. That same SVB officer testified that when he reviewed the agreements provided by Smerling, it looked like "they were all filled out by the same person." [DE 201 ¶ 75]; [DE 217 ¶ 75]. One example regarding the forgery involved a SVB official reaching out to a person at the University of Miami to determine whether they had, like the Smerling documents had listed them as, [DE 201 ¶ 26]; [DE 217 ¶ 26], been a subscriber in the fund. [DE 201 ¶ 76]; [DE 217 ¶ 76]. The University of Miami could not verify that any investment had been made by them into Smerling's fund. [DE 201 ¶ 76]; [DE 217 ¶ 76]. Despite this, the Subscription

Agreement listed the University of Miami Endowment as a Subscriber, with accompanying signatures, and a "Subscriber Amount" of $25,000,000. [DE 202-39, p. 32–33]. Defendant insurers admit themselves that "Smerling defrauded lenders…by manufacturing a Limited Partnership Agreement…and Subscription Agreements." [DE 199, p. 5]. As previously stated, Smerling was subsequently arrested on February 26, 2021, for financial crimes, in part related to the SVB loan, pled guilty, and was sentenced to 97 months in prison. [DE 1-3, ¶ 8]; [DE 10, ¶ 8]; [DE 14, ¶ 8]. Thus, it is clear that the LP and Subscription Agreements bore forgeries.

b. "<u>Security Agreement</u>"

The Bond defines "Security Agreement" as "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." [DE 202-9, p. 19]; [DE 217, ¶ 106]. This definition, as the parties admit, requires two elements: (1) a grant of an interest; and (2) a description of the property. [DE 220, p. 26]; [DE 228, p. 6]. Simply put, "a security agreement requires an express grant of an interest in an identified asset." [DE 220, p. 26]. The requirements of a "Security Agreement" are met in the LP and Subscription Agreements.

The LP Agreement contains the LPs' obligation to make capital contributions through drawdowns. [DE 201, ¶ 74]. The Subscription Agreement establishes the size of the capital commitments by limited partners and binds the limited partners to both the LP and Subscription Agreements. [DE 201, ¶¶ 67–68]; [DE 217, ¶¶ 67–68]. Next, Section 4.5(a) of the LP Agreement permits the "pledging and assigning as collateral" the LPs' rights and obligations to pay commitments, the right to call drawdowns, and the right to receive and apply those payments to satisfy indebtedness. [DE 201, ¶ 72]; [DE 204, p. 26]. Essentially, "[t]hat provision identifies the LPs' capital commitments as collateral and authorizes their assignment to Subscription Lenders."

[DE 204, p. 26–27]. Indeed Section 4.5(b) states that "Limited Partner[s] will honor capital calls by the Subscription Lenders." [DE 201, ¶ 73]; [DE 217, ¶ 73]. Section 4.5(b) further states that "in the event of a default under the Subscription Facility, a call by the Subscription Lenders to pay Drawdowns to satisfy obligations thereunder shall be deemed to be duly made." [DE 201, ¶ 73]; [DE 217, ¶ 73]. Thus, the "LPs' commitments under the LP and Subscription Agreements are present, enforceable undertakings that run directly to lenders like SVB." [DE 228, p. 7]. Therefore, the LP and Subscription Agreements meet the definition of Security Agreement because they gave SVB an enforceable right and interest to specific property of the limited partners (their capital commitments) to secure payment of indebtedness. *See Banc of Cal. Nat'l Ass'n v. Fed. Ins. Co.*, No. 21-56179, 2022 WL 17583056, at *2 (9th Cir. Dec. 12, 2022) (holding that the "interest" required under the definition of "Security Agreement" is ambiguous and resolved it against the insurer by finding that a "possessory interest" created by a Control Agreement satisfied the requirements of "Security Agreement").

c. "*Guarantee*"

The Bond defines "Guarantee" as "a written undertaking obligating the signer to pay the debt of another to the ASSURED or its assignee or to a financial institution from which the ASSURED has purchased participation in the debt, if the debt is not paid in accordance with its terms." [DE 202-9, p. 18]; [DE 217, ¶ 105]. Because the LP and Subscription Agreements mandate that the limited partners pay the debt of the fund to lenders like SVB, they are "Guarantees" under the Bond.

Again, the Subscription Agreement confirms the capital commitments by limited partners and binds the limited partners to both the LP and Subscription Agreements. [DE 201, ¶¶ 67–68]; [DE 217, ¶¶ 67–68]. Section 4.5(a) of the LP Agreements provides the General Partner

authorization "to enter into financing arrangements[s] pursuant to which the Partnership incurs indebtedness or otherwise is provided credit." [DE 201, ¶ 72]; [DE 217, ¶ 72]. Section 4.5(a) further states that "[t]he Partnership may secure such indebtedness or other credit by pledging and assigning as collateral to such lenders or other credit providers rights of the Partnership…and to the obligations of one or more of the Limited Partners to pay Remaining Commitments." [DE 201, ¶ 72]; [DE 217, ¶ 72]. Additionally, and most importantly, Section 4.5(b) makes the payments to lenders obligatory, as "each Limited Partner agrees that its obligation to pay Remaining Commitments for purposes of payment of obligations under any Subscription Facility, is absolute and unconditional." [DE 201, ¶ 73]; [DE 217, ¶ 73]. Section 4.5(b) further obligates the limited partners to "honor capital calls made by the Subscription Lenders." [DE 201, ¶ 73]; [DE 217, ¶ 73]. Those capital calls by lenders create a binding obligation, "a call by the Subscription Lenders to pay Drawdowns to satisfy obligations thereunder *shall be deemed to be duly made*." [DE 201, ¶ 73]; [DE 217, ¶ 73] (emphasis added).

Thus, the LP and Subscription Agreements plainly from their text obligate the limited partners of the fund to pay the debts of the fund to lenders, like SVB. Therefore, the agreements are "Guarantees" under the bond. [DE 202-9, p. 18]; [DE 217, ¶ 105].

V. <u>Did SVB's "Loss Directly Result" from its "Good Faith" Reliance?</u>

Finally, FDIC moves for summary judgment on the remaining two elements of coverage: 1) SVB's loss resulted directly from; 2) its good faith reliance on the forged documents. [DE 204, p. 3].

First, the Bond's language of "loss resulting directly from" has been interpreted to employ an "efficient proximate cause" test under California law. *Banc of Cal. Nat'l Ass'n v. Fed. Ins. Co.*,

686 F. Supp. 3d 928, 937 (C.D. Cal. 2023). The "efficient proximate cause" is the predominant cause of loss. *Id.*

It is undisputed that SVB provided Smerling's fund with a $95 million draw on the line of credit. [DE 201, ¶ 49]; [DE 217, ¶ 49]. However, that loan was not repaid and SVB suffered "substantial harm." [DE 201, ¶ 85]; [DE 217, ¶ 85]. The forgery by Smerling not only was the "predominant cause" of SVB's loss, but it was also the only cause. Thus, there is no genuine dispute of material fact as to whether SVB's loss resulted directly from their reliance on the forged documents.

Next, "good faith" is interpreted to mean honesty and fairness. *See E. W. Bank v. Axis Ins. Co.*, No. CV1110792MWFPLAX, 2012 WL 13012667, at *2 (C.D. Cal. Aug. 31, 2012); *Good Faith, Merriam-Webster*, https://www.merriamwebster.com/dictionary/good%20faith (last visited Sept. 28, 2026). Essentially, good faith focuses on "honesty, *i.e.*, a lack of collusion or subjective doubt or reckless indifference to the risk of a forgery." *E. W. Bank*, 2012 WL 13012667, at *2. Applying this standard to SVB, there is no evidence that SVB and its employees acted dishonestly or with an unlawful purpose, or with reckless indifference. SVB had its counsel at Cadwalader review the agreements. [DE 199-1 ¶¶ 19–20]; [DE 228, p. 6]. "SVB personnel testified that they had no knowledge of the forgeries…did not disregard known risks, and followed all applicable procedures." [DE 201, ¶ 41]; [DE 217, ¶ 41].

As the FDIC succinctly puts it, the good faith "standard reflects the purpose of the coverage…If coverage disappeared whenever a bank could have detected forgery with the benefit of hindsight, the insurance would be meaningless." [DE 204, p. 15].

Therefore, the FDIC is also entitled to summary judgment as to whether they acted in good faith.

## CONCLUSION

For the foregoing reasons, the FDIC's motion for summary judgment as Receiver [DE 200] is GRANTED. Defendant Insurers' motion for summary judgment [DE 199] is DENIED. SVB plaintiffs' motion for summary judgment [DE 206] is DENIED as MOOT. The remaining motions in limine to exclude experts [DE 232]; [DE 237]; [DE 239]; [DE 241]; and [DE 243] are DENIED as moot.

The Clerk is DIRECTED to enter judgment in favor of the FDIC and against defendant Insurers and close this case.

SO ORDERED, this 30 day of September 2026.

Terrence Boyle

TERRENCE W. BOYLE

UNITED STATES DISTRICT JUDGE